IN THE

United States Court of Appeals
for the Third Circuit

UNITED STATES,
*Plaintiff-Appellant*,

v.

UNITED STATES SUGAR CORP., ET AL.,
*Defendants-Appellees.*

On Appeal from the
United States District Court for the District of Delaware
Honorable Maryellen Noreika
NO. 1:21-cv-01644

**BRIEF FOR AMERICAN ECONOMIC LIBERTIES PROJECT
AS *AMICUS CURIAE* IN SUPPORT OF APPELLANT**

KATHERINE VAN DYCK
*Senior Legal Counsel*
LEE A. HEPNER
*Legal Counsel*
AMERICAN ECONOMIC LIBERTIES PROJECT
2001 Pennsylvania Avenue NW
Suite 540
Washington, DC 20006
(202) 904-8101
kvandyck@economicliberties.us

*Counsel for Amicus Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

CORPORATE DISCLOSURE STATEMENT ................................................. vi

INTEREST OF AMICUS ................................................................................. 1

SUMMARY OF ARGUMENT ........................................................................ 1

ARGUMENT ..................................................................................................... 6

    I.     The Clayton Act Protects Against Incipient Harms ........................... 6

          A.     The Imperial Acquisition Fails the Incipiency Standard ....................... 8

          B.     The Incipiency Standard Preserves Competition ................................. 17

    II.    Appellees Are Not Immune From Antitrust Enforcement ........................... 23

    III.   Conclusion ................................................................................................... 25

CERTIFICATE OF COUNSEL ..................................................................... 27

CERTIFICATE OF SERVICE ........................................................................ 28

# TABLE OF AUTHORITIES

**Cases**

*Am. Crystal Sugar Co. v. Cuban-American Sugar Co.*, 259 F.2d 524 (2d Cir. 1958) ................................................................................................................ 16

*Bostock v. Clayton Cty.*, 140 S. Ct. 1731 (2020) ........................................ 7

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007) .................. 6, 15

*Brown Shoe Co. v. United States*, 370 U.S. 294 (1962) ........................ passim

*FTC v. Elders Grain, Inc.*, 868 F.2d 901 (7th Cir. 1989 ............................ 15

*FTC v. H.J. Heinz Co.*, 246 F.3d 708 (D.C. Cir. 2001) ........................ 8, 13

*FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160 (3d Cir. 2022) .......... 7, 8, 10, 13

*FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327 (3d Cir. 2016) ............ passim

*FTC v. Procter & Gamble Co.*, 386 U.S. 568 (1967) ................................ 6

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015) ............................ 15

*FTC v. W. Meat Co.*, 272 U.S. 554 (1926) ........................................ 4

*Georgia v. Pa. R.R.*, 324 U.S. 439 (1945) .................................... 24, 25

*Md. & Va. Milk Producers Ass'n v. U.S.*, 362 U.S. 458 (1960) ................ 25

*ProMedica Health Sys. v. FTC*, 749 F.3d 559 (6th Cir. 2014) .................... 8

*U.S. v. Aluminum Co. of Am.*, 377 U.S. 271 (1964) ............................ 5

*U.S. v. Anthem, Inc.*, 855 F.3d 345 (D.C. Cir. 2017) ............................ 7

*U.S. v. Cont'l Can Co.*, 378 U.S. 441 (1964) .................................... 5, 8

*U.S. v. E.I. du Pont de Nemours & Co.* ("*E.I. du Pont*"), 353 U.S. 586 (1957) ......... 7

*U.S. v. El Paso Natural Gas Co.*, 376 U.S. 651 (1964) .......................... 25

*U.S. v. H&R Block, Inc.*, 833 F. Supp. 2d 36 (D.D.C. 2011) ...................................... 8

*U.S., et al. v. U.S. Airways Group, Inc. and AMR Corp.*, No. 1:13-cv-01236-CKK, Dkt. 169 (D.D.C. Apr. 25, 2014) ................................................................... 20

*United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1963) ........................................ passim

*Verizon Communications v. Law Offices of Curtis V. Trinko*, 540 U.S. 398 (2004) .. 23, 24

## Statutes

15 U.S.C. § 1 ....................................................................................................... 22

15 U.S.C. § 15 ..................................................................................................... 22

15 U.S.C. § 18 ...................................................................................... 3, 4, 23, 24

15 U.S.C. § 18a .................................................................................................... 3

15 U.S.C. § 2 ....................................................................................................... 22

15 U.S.C. § 7 ....................................................................................................... 22

7 U.S.C. §§ 1359bb, *et seq.* ................................................................................. 24

## Government Reports

Bryan Deese, Neale Mahoney, and Tim Wu, *The President's Initiative on Junk Fees and Related Pricing Practices*, The White House (Oct. 26, 2022) ...................... 21

Bureau of Transp. Statistics, *Airline Domestic Market Share* (Aug. 2021 to July 2022) ........................................................................................................... 19

Council of Economic Advisers, *Benefits of Competition and Indicators of Market Power* (Apr. 2016) ........................................................................................... 2

Dep't of Justice & Fed. Trade Comm'n, *Hart-Scott-Rodino Annual Report* (Fiscal Year 2010) ...................................................................................................... 2

Dep't of Justice & Fed. Trade Comm'n, *Hart-Scott-Rodino Annual Report* (Fiscal Year 2020) ...................................................................................................... 3

Fed. Trade Comm'n, *Annual Report for the Fiscal Year Ended June 30, 1948* (1949) ........................................................................................................ 4

Fed. Trade Comm'n, Non-HSR Reported Acquisition by Select Technology Platforms, 2010-2019 (Sept. 15, 2021) .......................................................... 3

Susan Helper and Evan Soltas, *Why the Pandemic Has Disrupted Supply Chains*, The White House (June 17, 2021) ............................................................... 19

U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* (2010) ..................................................................................................... 13

## Legislative Materials

H. R. Rep. No. 1191, 81st Cong., 1st Sess. 8 ............................................. 3

Prepared Statement of John E. Kwoka, Jr., *Hearing on "Does America Have a Monopoly Problem? Examining Concentration and Competition in the US Economy*, U.S. S. Judiciary Subcomm. on Competition Policy, Antitrust. and Consumer Rights (Mar. 5, 2019) ................................................................ 2

S. Rep. No. 1775, 81st Cong., 2d Sess. (1950) .......................................... 7

## Journals

Gustavo Grullon, et al., *Are US industries becoming more concentrated?*, 23 REV. FIN. 697 (2019) .......................................................................................... 2

Jan De Loecker, et al., *The rise of market power and the macroeconomic implications*, 135 Q.J. ECON. 561 (2020) ......................................................................... 2

Peter C. Carstensen & Robert H. Lande, *The Merger Incipiency Doctrine and the Importance of "Redundant" Competitors*, 2018 Wis. L. Rev. 783 (2018) ............. passim

Richard Posner and C. Scott Hemphill, *Philadelphia National Bank at 50: An Interview with Judge Richard Posner*, 80 ANTITRUST L.J. 205 (2015) ............... 9, 15, 22

## Other Sources

Alan Levin, et al., *Wave of Airline Flight Delays This Year Mostly Self-Inflicted*, Bloomberg (July 14, 2022) ........................................................................ 20

American Economic Liberties Project, *The Courage to Learn* (Jan. 2021) .................... 2

Germán Bet, A Retrospective Study of Recent U.S. Airline Mergers: What Can We Learn from Production Data?, Univ. of Fla. (Oct. 27, 2021) ............... 21

Pete Muntean, August airline passenger complaints up 320% compared with pre-pandemic levels, CNN Travel (Oct. 26, 2022) ................................. 21

Press Release, *Decision to Close Its Investigation of the Merger of Delta Air Lines Inc. and Northwest Airlines Corporation* (Oct. 29, 2008) .................................... 20

Press Release, *United Airlines and Continental Airlines Transfer Assets to Southwest Airlines in Response to Department of Justice's Antitrust Concerns* (Aug. 27, 2010) ................................................................................................... 20

Scott Horsley, *How the U.S. got into this baby formula mess*, Nat'l Public Radio (May 19, 2022) ................................................................................................. 19

Suzanne Rowan Kelleher, Why Airfares Have Risen Five Times Faster Than The Inflation Rate, Forbes (Oct. 14, 2022) ............................................. 20

*The Case of the Incredible Shrinking Airline Seat*, FlyersRights (Aug. 17, 2021) ............ 20

Thomas Philippon, *The Great Reversal: How America Gave Up on Free Markets* (1st ed. 2019) ................................................................................................. 2

*US Airline Mergers and Acquisitions*, Airlines for America (Apr. 12, 2022) ................. 20

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Local Appellate Rule 26.1.1, amicus states as follows:

The American Economic Liberties Project is a nonprofit, non-stock corporation. It has no parent corporations, and no publicly traded corporations have an ownership interest in it.

## INTEREST OF AMICUS

American Economic Liberties Project ("AELP") is an independent nonprofit organization that works to promote competition, combat monopolistic corporations, and advance economic liberty for all.[1] AELP organizes and employs a diverse set of leading policy experts in areas impacted by concentrated power that include community development, the airline industry, international trade, and national security. It advocates for policies that address today's crisis of concentration through legislative efforts and public policy debates. AELP submits this *amicus* brief because the antitrust laws cannot protect competition if merger challenges supported by clear evidence of incipient consolidation are rejected based on convoluted and unrealistic market definitions.

All parties consent to the filing of this *amicus* brief. No counsel for a party has authored this brief in whole or in part, and no party, party's counsel, or any other person—other than *amicus curiae* or its counsel—has contributed money that was intended to fund preparing or submitting this brief.

## SUMMARY OF ARGUMENT

Concentration of private economic power has reached extreme proportions in virtually every sector of the economy, from Big Tech to pharmaceuticals to

---

[1] https://www.economicliberties.us/.

telecommunications to agriculture.[2] The dangers of economic concentration are well documented, including increased prices, lower quality products and services, underinvestment, restricted access to business ownership, and harm to workers.[3]

Mergers and acquisitions have played a significant role in this erosion of competition, with the number of public companies falling by half since the 1990s, despite an economy that is one third larger today.[4] In the decade prior to the pandemic, the percentage of reported transactions valued at over $1 billion has steadily increased.[5]

---

[2] *See generally* Thomas Philippon, *The Great Reversal: How America Gave Up on Free Markets* (1st ed. 2019); Jan De Loecker, et al., *The Rise of Market Power and the Macroeconomic Implications*, 135 Q.J. ECON. 561 (2020), https://academic.oup.com/qje/article/135/2/561/5714769; *see also* Gustavo Grullon, et al., *Are US Industries Becoming More Concentrated?*, 23 REV. FIN. 697, 698 (2019) (finding that concentration has risen in over 75% of US industries, with an average increase of 90%), https://academic.oup.com/rof/article/23/4/697/5477414; Council of Economic Advisers, *Benefits of Competition and Indicators of Market Power*, at 4 (Apr. 2016) ("majority of industries have seen increases in the revenue share enjoyed by the 50 largest firms between 1997 and 2012"), https://obamawhitehouse.archives.gov/sites/default/files/page/files/20160414_cea_competition_issue_brief.pdf.

[3] American Economic Liberties Project, *The Courage to Learn*, at 8-9 (Jan. 2021), http://www.economicliberties.us/wp-content/uploads/2021/01/Courage-to-Learn_12.12.pdf.

[4] Prepared Statement of John E. Kwoka, Jr., *Hearing on "Does America Have a Monopoly Problem? Examining Concentration and Competition in the US Economy*, U.S. S. Judiciary Subcomm. on Competition Policy, Antitrust. and Consumer Rights, at 1-2 (Mar. 5, 2019), https://www.judiciary.senate.gov/imo/media/doc/Kwoka%20Testimony.pdf.

[5] Council of Economic Advisers, *supra* note 2, at 7; *Compare* Dep't of Justice & Fed. Trade Comm'n, *Hart-Scott-Rodino Annual Report*, at Ex A (Table I) (Fiscal Year 2010), https://www.ftc.gov/sites/default/files/documents/reports_annual/33st-report-fy-2010/1101hsrreport_0.pdf, *and Hart-Scott-Rodino Annual Report*, at Ex. A (Table I)

*See* 15 U.S.C. § 18a (requiring reporting of acquisitions exceeding, as of 2022, $101 million to the Federal Trade Commission). But dominant firms also use smaller acquisitions that fall below Hart-Scott-Rodino reporting thresholds to expand their reach and power.[6] These transactions have gone largely unchecked as courts and enforcers have strayed further and further from the original intent of Section 7 of the Clayton Act, 15 U.S.C. § 18.

Section 7 was explicitly designed stop the "rising tide of economic concentration." *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 317 (1962). The final House Report on the law recognized that "[a]cquisitions of stock or assets have a cumulative effect, and control of the market…may be achieved not in a single acquisition but as the result of a series of acquisitions." H. R. Rep. No. 1191, 81st Cong., 1st Sess. 8. Thus, Section 7 was designed "to permit intervention…when the effect of an acquisition may be a significant reduction in the vigor of competition." *Id.* The final language adopted by Congress is correspondingly broad:

---

(Fiscal Year 2020), https://www.ftc.gov/system/files/documents/reports/hart-scott-rodino-annual-report-fiscal-year-2020/fy2020_-_hsr_annual_report_-_final.pdf (11% of 2010 transactions and 14.8% of 2020 transactions exceeded $1 billion).

[6] See Fed. Trade Comm'n, Non-HSR Reported Acquisition by Select Technology Platforms, 2010-2019, at 13 (Sept. 15, 2021) (finding that only 94 of 616 acquisitions by Alphabet, Amazon, Apple, Facebook, and Microsoft exceeded reporting thresholds), https://www.ftc.gov/system/files/documents/reports/non-hsr-reported-acquisitions-select-technology-platforms-2010-2019-ftc-study/p201201technologyplatformstudy2021.pdf.

> No person engaged in commerce or in any activity affecting commerce…shall acquire the whole or any part of the assets of another person engaged also in commerce *or in any activity affecting commerce*, where in any line of commerce or in any activity affecting commerce *in any section of the country*, the effect of such acquisition *may be substantially to lessen competition*, or to tend to create a monopoly.

15 U.S.C. § 18 (emphasis added).

Congress crafted Section 7 with care. Prior to its amendment in 1950, the law only barred "the acquisition by one corporation of the stock of another corporation" that might harm competition. *Brown Shoe*, 370 U.S. at 312; *FTC v. W. Meat Co.*, 272 U.S. 554, 563 (1926) (affirming that the original language of Section 7 did not apply when "all property and business of the two competing companies were acquired"). Companies quickly took advantage of this loophole, and in a 1948 report, the Federal Trade Commission urged Congress to close it, finding Section 7 "permit[ted] the continued growth of monopoly and concentration of economic power through mergers and acquisitions….[and] encourage[d] the achievement of monopolistic goals through the more enduring process of corporate consolidation."[7]

Congress responded with passage of the Celler-Kefauver Act in 1950, and thus was born the current language of Section 7. *U.S. v. Phila. Nat'l Bank*, 374 U.S. 321, 340 (1963). Section 7 created "authority for arresting mergers at a time when the trend to a

---

[7] Fed. Trade Comm'n, *Annual Report for the Fiscal Year Ended June 30, 1948*, at 17 (1949), https://www.ftc.gov/sites/default/files/documents/reports_annual/annual-report-1948/ar1948_0.pdf.

lessening of competition in a line of commerce *was still in its incipiency.*" *Brown Shoe*, 370

U.S. at 317 (emphasis added). That incipiency standard was strictly enforced throughout

the 1960s.[8] The Supreme Court understood that "Congress used the words '*may be*

substantially to lessen competition'…to indicate that its concern was with probabilities,

not certainties." *Id.* at 323, *quoted by FTC v. Penn State Hershey Med. Ctr.* ("*Hershey*"), 838

F.3d 327, 337 (3d Cir. 2016). "A requirement of certainty and actuality of injury to

competition is incompatible with any effort to supplement the Sherman Act by reaching

incipient restraints." *Id.* at 323 n.39 (quotations omitted). Yet certainty is exactly what

the district court demanded of Appellant (the "Government") when it approved

Appellee U.S. Sugar Corporation's ("U.S. Sugar") acquisition of Imperial Sugar

Company ("Imperial").

The district court's rejection of the Government's proposed markets ignores the

plain language of Section 7 and conflates the elements of the Government's case with

the more stringent ones found in the Sherman Act. At bottom, Section 7's incipiency

standard was forgotten, and a potential trend toward even further consolidation will be

permitted. The Imperial acquisition will, in the various proposed markets, put between

---

[8] *See, e.g., U.S. v. Cont'l Can Co.*, 378 U.S. 441, 461-62 (1964) ("Where concentration is
already great, the importance of preventing *even slight increases* in concentration…is
correspondingly great.") (emphasis added) (quotations omitted); *U.S. v. Aluminum Co.
of Am.*, 377 U.S. 271, 280 (1964) (finding a 1.3% market share increase "reasonably
likely to produce a substantial lessening of competition within the meaning of § 7");
*Phila. Nat'l Bank*, 374 U.S. at 365 ("neither the terms of § 7 nor the legislative history
suggests that any particular percentage share was deemed critical").

56% and 80% of the refined sugar production markets into the hands of two entities, allowing the merged company to soften competition, further collude with its closest competitor, and take one more dangerous step toward a monopoly. This is the embodiment of incipiency, where consolidation should be stopped before it reaches the potential for such harms. The district court's blindness to that incipiency is only compounded by its decision to grant Appellees immunity from our antitrust laws, creating a rule that would gut enforcement and destroy competition in the sugar industry and beyond. The district court erred as a matter of law, and its ruling in Appellees' favor should be reversed.

## ARGUMENT

## I.   THE CLAYTON ACT PROTECTS AGAINST INCIPIENT HARMS

"Section 7's definition of antitrust liability [is] 'relatively expansive.'" *Hershey*, 838 F.3d at 337 (quoting *Cal. v. Am. Stores Co.*, 495 U.S. 271, 284 (1990)). It does not require evidence of actual anticompetitive harm, proof of current monopoly power, or even a dangerous probability of monopoly power like Section 2 of the Sherman Act. *See Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 306-07, 317 (3d Cir. 2007) (discussing elements of Section 2 claims). "If the enforcement of § 7 turned on the existence of actual anticompetitive practices, the congressional policy of thwarting such practices in their incipiency would be frustrated." *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 577 (1967). It would effectively rewrite the law.

"No doubt, Congress could have taken a more parsimonious approach." *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1739 (2020). Section 7 could have used the phrase "will [or shall] lessen competition or create monopolies." But Congress specifically aimed "to make it clear that the bill [wa]s not intended to revert to the Sherman Act test." S. Rep. No. 1775, 81st Cong., 2d Sess. (1950). Section 7 was meant "to cope with monopolistic tendencies in their incipiency and well before they have attained such effects as would justify a Sherman Act proceeding." *Id.* Thus, it "is violated whether or not actual restraints or monopolies, or the substantial lessening of competition, have occurred or are intended." *U.S. v. E.I. du Pont de Nemours & Co.* ("*E.I. du Pont*"), 353 U.S. 586, 589 (1957).

Courts honor Congress's intent by refusing to impose formulaic market definitions on plaintiffs and finding Section 7 violations even when market share increases are small. *FTC v. Hackensack Meridian Health, Inc.* ("*Hackensack*"), 30 F.4th 160, 173 (3d Cir. 2022); *see also Phila. Nat'l Bank*, 374 U.S. at 363 ("This intense congressional concern with the trend toward concentration warrants dispensing, in certain cases, with elaborate proof of market structure, market behavior, or probable anticompetitive effects."); *Brown Shoe*, 370 U.S. at 321-322 ("Congress indicated plainly that a merger had to be functionally viewed, in the context of its particular industry."); *U.S. v. Anthem, Inc.*, 855 F.3d 345, 368 (D.C. Cir. 2017) (harm in a single market is "a sufficient basis for enjoining the merger").

> [A] merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market, is so inherently likely to lessen competition substantially *that it must be enjoined* in the absence of evidence clearly showing that the merger is not likely to have such anticompetitive effects.

*Phila. Nat'l Bank*, 374 U.S. at 363 (emphasis added). "Such a showing establishes a 'presumption' that the merger will substantially lessen competition." *FTC v. H.J. Heinz Co.* ("*Heinz*"), 246 F.3d 708, 715 (D.C. Cir. 2001).

## A.    The Imperial Acquisition Fails the Incipiency Standard

Section 7 recognizes "that where there has been a 'history of tendency toward concentration in the industry' tendencies toward further concentration 'are to be curbed in their incipiency.'" *Cont'l Can*, 378 U.S. at 461 (citation omitted). Because the incipiency risks are so great where, for example, one small merger can trigger a wave of acquisitions that end in oligopoly, courts frequently enjoin mergers resulting in market concentration equal to or less than that created by the Imperial acquisition.[9] Otherwise,

---

[9] "Market concentration is measured by the Herfindahl-Hirschman Index ('HHI'). The HHI is calculated by summing the squares of the individual firms' market shares." *Hershey*, 838 F.3d at 346. *See, e.g., Hackensack*, 30 F.4th at 172-73, 177 (merger that increased HHI by 841 points to 2,835 and resulted in a post-merger market share of 47% deemed presumptively anticompetitive); *Hershey*, 838 F.3d at 347 (post-merger HHI of 5,984 presumptively anticompetitive); *Heinz*, 246 F.3d at 716 (merger that increased HHI by 510 points to 5,285 created presumptively anticompetitive by a "wide margin"); *ProMedica Health Sys. v. FTC*, 749 F.3d 559, 567-68 (6th Cir. 2014) (merger that increased HHI by 1,078 points to 4,391 and created market share of 50% to 80% presumptively anticompetitive); *U.S. v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 72 (D.D.C. 2011) (merger that increased HHI by approximately 400 points to 4,691 and a post-merger market share of 28.4 percent presumptively anticompetitive).

"[t]he oligopoly Congress sought to avoid would then be furthered and it would be difficult to dissolve the combinations previously approved." *Brown Shoe*, 370 U.S. at 344. This was a principal concern of Section 7, and as Judge Posner (who authored the *Philadelphia Bank* opinion as Justice Brennan's clerk) stated, "The innovation of [that] opinion was to have a simple standard, one of presumptive illegality plus a short list of possible rebuttal points that the defendant would be allowed to make." Richard Posner and C. Scott Hemphill, *Philadelphia National Bank at 50: An Interview with Judge Richard Posner*, 80 ANTITRUST L.J. 205, 206 (2015).

*Brown Shoe* involved several product lines and national and local geographic markets. 370 U.S. at 303, 326, 328, 336-37. The Supreme Court found that the merger violated Section 7 because it increased Brown Shoe's market share to as little as 5% in one metropolitan area and as high as 57% in another. *Id.* at 342-43. The Court stressed that, "just as a product submarket may have § 7 significance as the proper 'line of commerce,' so may a geographic submarket be considered the appropriate 'section of the country.'" *Id.* at 336 (citations omitted). "The fact that two merging firms have competed directly on the horizontal level in but a fraction of the geographic markets in which either has operated, does not, in itself, place their merger outside the scope of § 7." *Id.* at 337.

In *Philadelphia National Bank*, the Supreme Court blocked a merger that created one bank in a four-county area controlling "36% of the area banks' total assets, 36% of deposits, and 34% of net loans." 374 U.S. at 331. The Court explained that "[t]he proper

question to be asked in this case is not where the parties to the merger do business or even where they compete, but where, within the area of competitive overlap, *the effect of the merger on competition will be direct and immediate.*" *Id.* at 357 (emphasis added).

The basic premise of these Supreme Court decisions holds true today. A plaintiff "is not required to show extraordinary numbers to make out a prima facie case that the merger would have anticompetitive effects. Anticompetitive effects can occur at even lower thresholds, as evidenced by the Guidelines." *Hackensack*, 30 F.4th at 173 (quotations omitted). Yet the Imperial acquisition before this Court today, which undoubtedly exceeds presumptively unlawful market shares and HHI levels in other cases, is escaping the scrutiny of the incipiency standard, the *Philadelphia National Bank* presumption, and the "hypothetical monopolist" test.[10]

Post acquisition, just two sellers— American Sugar Refining (also known as Domino) and Appellee United Sugars Corporation ("United")[11]—control nearly 80%

---

[10] "[I]f a hypothetical monopolist could impose a small but significant non-transitory increase in price ('SSNIP') in the proposed market, the market is properly defined." *Hershey*, 838 F.3d at 338 (internal citations omitted).

[11] United is an agricultural cooperative that markets and sells refined sugar for U.S. Sugar and three other producers. Joint Appendix ("JA") 2845-2846 (PSAF ¶¶ 12, 15, 19). U.S. Sugar's acquisition of Imperial from Appellee Louis Dreyfus Company, LLC brings Imperial into that cooperative.

of the two regional geographic markets for refined sugar proposed by the Government, with United controlling the lion's share of both:[12]





---

[12] The narrower "Georgia+" market encompasses Georgia and its bordering states. JA38 (Op. 33). The broader "Southeast" market includes six additional states. *Id.* In these customer-based geographic markets, all suppliers making sales within the geographic market were included as market participants, regardless of those suppliers' locations. JA56 (Op. 51).

JA575-576 (Tr. 611:10-18, 611:19-612:1). United and Domino will also control more than 50% of the broader Competitive Overlap and National geographic markets proposed by Appellees, with United again having the largest share of both:





JA930-931, 931-932 (Tr. 992:21-993:9, 993:13-994:1).[13] And because 90% of United and Imperial's sales are to industrial customers, segmenting industrial and retail

---

[13] Appellees agreed that competition in the refined sugar market is regional. JA567, 568 (Tr. 603:13-15; 604:17-24). They proposed a "Competitive Overlap" market that includes all areas where United and Imperial competed pre-acquisition and an

customers would cause United's share of the market to increase even further.[14] JA264-265 (Tr. 166:25-167:3).

The HHI for these markets is even more compelling. Under the 2010 Horizontal Merger Guidelines, post-transaction markets with an HHI above 2,500, and a change in HHI of 200 or more, are defined as "highly concentrated" and are presumptively unlawful.[15] In the Georgia+ market, the acquisition would result in a post-transaction HHI of 3,658, with an increase in HHI of 1,398. JA577 (Tr. 613:3-4). In the Southeast market, the HHI would be 3,035, with an increase in HHI of 1,011. *Id.* (Tr. 613:4-6). In the so-called "USDA South," consisting of the Government's proposed broader market plus Texas, Arkansas, and Louisiana, the post-transaction HHI would again exceed 2,500 with an increase of more than 200. JA578 (Tr. 614:2-7). The Government also established that its proposed markets passed the hypothetical monopolist test, meaning

---

alternative "National" market. JA618, 849 (Tr. 659:15-21, 909:17-24). National Sugar Marketing ("NSM") is the only other company with more than 10% of the National market. JA931 (Tr. 993:7-9.)

[14] Appellees argued (and the district court agreed) that distributors should be included in sellers in the product market, but the record is devoid of any evidence showing how that change in the product market would affect market share calculations. JA36 (Op. 31). Regardless, the Government excluded distributors from the product market because they are customers of refined sugar producers and could not prevent price increases if competition was eliminated among those producers. JA557 (Tr. 593:10-13).

[15] *Hackensack*, 30 F.4th at 172-73; *Heinz*, 246 F.3d at 715-16; U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines*, at 19 (2010), www.ftc.gov/sites/default/files/attachments/merger-review/100819hmg.pdf.

the elimination of competition within those markets would result in a SSNIP and the markets are properly defined. JA555-556, 558, 611 (Tr. 591:22-592:7; 594:5-8; 652:8-9).

The Imperial acquisition is, by every measure, proscribed by Section 7. But the district court refused to engage in a complete analysis of the various markets, (JA39) (Op. 39 n.19), and it certainly did not apply the incipiency standard, or a complete hypothetical monopolist test, to the facts before it. Instead, it effectively demanded evidence from the Government that the acquisition would *actually* create a monopoly and created a new rule granting antitrust immunity to industries subject to regulation.

The district court stated that "large volumes of sugar com[e] in from states outside the proposed geographic markets." JA56 (Op. 51). It wrote at length about sales from producers outside the Georgia+ and Southeast markets, (JA39-40, 56) (Op. 34-35, 51), and discussed how sugar flows between different regions, (JA18-21) (Op. 13-16). However, the district court never explored the actual percentage of sales from those outside producers (or distributors) into the Georgia+, Southeast, or Competitive Overlap markets. It was simply enough for the court that other producers "had the ability to deliver additional sugar to customers in the 'Southeast'," (JA42) (Op. 37), and that an unidentified percentage of "customers already look beyond the Government's

proposed markets for alternatives," (JA57) (Op. 52).[16] But the mere possibility of competition does not negate Section 7 liability. *See Brown Shoe*, 370 U.S. at 333 ("remaining vigor cannot immunize a merger if the trend in that industry is toward oligopoly"). That is closer to what is required a of a Sherman Act claim. By finding the presence of any competitors inconsistent with a Section 7 claim, the district court effectively demanded proof of monopoly power, "the ability to control prices and exclude competition". *Broadcom*, 501 F.3d at 307.

Under Section 7, "'[a] certainty, even a high probability, need not be shown,' and any 'doubts are to be resolved *against the transaction*.'" *Hershey*, 838 F.3d at 337 (quoting *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989)) (emphasis added) (alteration in original). Nor must plaintiffs "present market shares and HHI estimates with the precision of a NASA scientist. The 'closest available approximation' often will do.'" *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 54 (D.D.C. 2015). "[A]n acquisition which reduces the number of significant sellers in a market already highly concentrated and prone to collusion by reason of its history and circumstances is unlawful in the absence of special circumstances." *Elders Grain*, 868 F.2d at 906; *see also* Posner, *supra*, at 207 ("I continue to think a high degree of concentration important, because it facilitates collusion. The

---

[16] The district court reasoned that "the economic reality is that sugar flows easily across the country from areas of surplus to deficit in response to prices and demand." JA57 (Op. 52). But as the district court also stated, that surplus is largely in the southern part of the country, in the proposed markets most effected by the acquisition, with sugar flowing into the northeast. JA19 (Op. 14).

fewer large firms there are in a market, the easier it is for them to collude, either explicitly or tacitly."). The Government presented evidence of high market shares and a market prone to collusion. *See* JA575-576 (Tr. 611:10-18, 611:19-612:1) (describing United and Imperial's substantial market shares); JA578 (Tr. 614:19-22) (the proposed acquisition "would eliminate head-to-head competition between United and Imperial. And…[and] would further soften competition by increasing the extent of coordinated interaction between United and [Domino]"); Appellant's Br., at 39-40 (discussing evidence of past collusion between United and Domino).

There is also ample evidence that the presence of competitors outside the regional markets would *not* cure the harm to competition that the Imperial acquisition is likely to cause. Domestic suppliers based outside the regional markets account for less than 15% of the market, importers account for only 7%, and both were included in the calculations made by the Government's expert. JA575-576 (Tr. 611:10-612:1). Thus, their existence does not defeat the Government's Section 7 claim. *See Phila. Nat'l Bank*, 374 U.S. at 360 n.37 (rejecting similar arguments because "such fuzziness would seem inherent in any attempt to delineate the relevant geographical market"); *Am. Crystal Sugar Co. v. Cuban-American Sugar Co.*, 259 F.2d 524, 529 (2d Cir. 1958) ("The relevance of the ten-state market is not destroyed, we think, by the fact that one-third of its supply is scattered among others than the seven firms mentioned above in which two-thirds of the supply is concentrated.").

The district court's opinion that these producers will suddenly shift strategies, reallocate their resources, and increase their share of the Southeast or Georgia+ markets—when United controls 54% and 46% of those markets post-acquisition—is nonsensical and contrary to the evidence. *See, e.g.*, JA589-590 (Tr. 630:184-631:4) (Imperial's market held steady over the past four years, between 19% and 20% in the narrower market from 2018 to 2021 and 14% to 17% in the broader market over same period); JA658 (Tr. 703:9-10) ("We [Michigan] are a regional sugar supplier. We're not coast to coast. We're not national. So within a certain geography."); JA665 (Tr. 714:23-24) (Michigan "will try to keep as much of [its increased production] as we can in our geographical area"). Instead, United's growth from the Imperial acquisition is the very incipiency that Section 7 is meant to address. *See Phila. Nat'l Bank*, 374 U.S. at 364 (instructing that a 30% market share "presents that threat [of incipiency]").

## B.    The Incipiency Standard Preserves Competition

Embedded in the incipiency standard is an acknowledgment that predicting the precise impact any acquisition might have on competition is extraordinarily difficult, if not impossible. Peter C. Carstensen & Robert H. Lande, *The Merger Incipiency Doctrine and the Importance of "Redundant" Competitors*, 2018 Wis. L. Rev. 783, 805-06, 824 (2018). In fact, a robust body of scholarship has shown that "what agencies and courts assumed to be a sufficient [number of competitors] to preserve workable competition has frequently failed to achieve that goal." *Id.* at 806. This is, at least in part, because

enforcers and courts have not sufficiently taken resiliency, or "resilient redundancy", into account. *Id.* at 785-86.

Increased concentration leaves markets unprepared to handle "virtually limitless" unpredictable uncertainties. *Id.* at 824. "Any number of 'normal' and 'unusual' factors…can cause the amount or nature of competition in a market to change, sometimes quickly and dramatically." *Id.* at 833. Thus, "there is a need for protective 'redundancy' in our economic systems" to help ensure that markets remain competitive and resilient well into the future. *Id.* at 844.

Lack of "redundancy" in the supply chain has the potential to imperil entire industries. Markets with only the minimum number of firms necessary for effective competition are vulnerable to natural disasters, contaminated products, and criminal and political scandals. *Id.* at 833. There are numerous examples of unexpected harms,

such as supply chain disruptions during the pandemic;[17] the recent infant formula crisis;[18] and in the case of the sugar industry, a major beet freeze.[19]

One or more of the firms in a market also frequently wither or implode due to normal competition, often surprisingly quickly. This frequently leaves an insufficient level of competition. *Id.* at 826-35. In addition, when enforcers challenge a merger that would have resulted in the minimum number of competitors necessary for competition, the agreed upon remedy often fails, again leaving the market with too few competitors by the enforcers' own estimates. *Id.* at 836-42. Taken together these scenarios often leave markets with too few serious competitors and too little competition.

As one example, domestic air travel is now dominated by four major airlines (American, Delta, Southwest, and United) that control 67% of the domestic market.[20] This consolidation resulted from mergers and acquisitions over the last 15 years, most

---

[17] *See* Susan Helper and Evan Soltas, *Why the Pandemic Has Disrupted Supply Chains*, The White House (June 17, 2021) (attributing supply chain vulnerabilities in part to "excessive concentration of production of key inputs in a few firms and locations"), https://www.whitehouse.gov/cea/written-materials/2021/06/17/why-the-pandemic-has-disrupted-supply-chains/.

[18] Scott Horsley, *How the U.S. got into this baby formula mess*, Nat'l Public Radio (May 19, 2022) ("four companies control about 90% of the market"), https://www.npr.org/2022/05/19/1099748064/baby-infant-formula-shortages.

[19] *See* JA329 (Tr. 256:2-9) (Imperial executive testifying that customers want multiple suppliers to protect against snowstorms and freezes); JA634 (Tr. 675:8-12) (Imperial's market share went up 14-17% following a beet freeze).

[20] Bureau of Transp. Statistics, *Airline Domestic Market Share* (Aug. 2021 to July 2022), https://www.transtats.bts.gov/.

notably US Airway-America West in 2005, Delta-Northwest in 2008, United-Continental and Southwest-AirTran in 2010, and American-US Airways in 2013.[21] They were all approved by U.S. antitrust enforcers.[22] But time has shown that the mergers led to higher prices,[23] increased flight delays,[24] tighter seating,[25] a plethora of new and

---

[21] *US Airline Mergers and Acquisitions*, Airlines for America (Apr. 12, 2022), https://www.airlines.org/dataset/u-s-airline-mergers-and-acquisitions/.

[22] *See U.S., et al. v. U.S. Airways Group, Inc. and AMR Corp.*, No. 1:13-cv-01236-CKK, Dkt. No. 169, at 15 (D.D.C. Apr. 25, 2014) (approving American-U.S. Airways merger because airport slot divestment "will significantly strengthen the purchasing carriers … and provide legitimate competition to the remaining legacy carriers nationwide"); Press Release, *United Airlines and Continental Airlines Transfer Assets to Southwest Airlines in Response to Department of Justice's Antitrust Concerns* (Aug. 27, 2010) (approving United-Continental merger because slot divestment "will likely significantly benefit consumers on overlap routes as well as on many other routes"), https://www.justice.gov/opa/pr/united-airlines-and-continental-airlines-transfer-assets-southwest-airlines-response; Press Release, *Decision to Close Its Investigation of the Merger of Delta Air Lines Inc. and Northwest Airlines Corporation* (Oct. 29, 2008) ("the proposed merger between Delta and Northwest is likely to produce substantial and credible efficiencies that will benefit U.S. consumers and is not likely to substantially lessen competition"), https://www.justice.gov/archive/opa/pr/2008/October/08-at-963.html.

[23] Suzanne Rowan Kelleher, Why Airfares Have Risen Five Times Faster Than The Inflation Rate, Forbes (Oct. 14, 2022), https://www.forbes.com/sites/suzannerowankelleher/2022/10/14/airfare-inflation-five-times-higher-than-overall-inflation/; *see also* Carstensen & Lande, *supra*, at 802-803 & n.107 (collecting sources).

[24] Alan Levin, et al., *Wave of Airline Flight Delays This Year Mostly Self-Inflicted*, Bloomberg (July 14, 2022) (Bureau of Transportation statistics show flight delays caused by carriers rose from 35% in 2003 to 58% in 2022), https://www.bloomberg.com/news/articles/2022-07-15/flight-delays-in-us-linked-to-airlines-more-than-government.

[25] *The Case of the Incredible Shrinking Airline Seat*, FlyersRights (Aug. 17, 2021), https://flyersrights.org/f/the-case-of-the-incredible-shrinking-airline-seat.

higher fees,[26] and record consumer complaints.[27] In sum, predictions that mergers would lead to efficiencies benefiting consumers were wrong, and divestments proved inadequate.[28]

The domestic air travel market does not stand alone. Ignoring the incipiency doctrine has allowed many mergers that resulted in higher prices and lower levels of innovation. This has been shown by recent empirical work evaluating the consequences of major mergers: "[42] mergers subject to merger specific studies showed that in approximately [80%] of the cases the increased concentration resulted in higher prices and often other adverse effects on the quality of competition." Carstensen & Lande, *supra*, at 800. Another collection of "more than 121 studies that examined in various ways the difference in prices based on levels of concentration" found the "'evidence that concentration is correlated with price is overwhelming.'" *Id.* at 808. A third review

---

[26] See Bryan Deese, Neale Mahoney, and Tim Wu, *The President's Initiative on Junk Fees and Related Pricing Practices*, The White House (Oct. 26, 2022) (airlines collected over $5 billion in baggage and change fees in 2021), https://www.whitehouse.gov/briefing-room/blog/2022/10/26/the-presidents-initiative-on-junk-fees-and-related-pricing-practices/.

[27] Pete Muntean, August airline passenger complaints up 320% compared with pre-pandemic levels, CNN Travel (Oct. 26, 2022), https://www.cnn.com/travel/article/airline-passenger-complaints-dot-august/index.html.

[28] See Germán Bet, A Retrospective Study of Recent U.S. Airline Mergers: What Can We Learn from Production Data?, Univ. of Fla., at 30 (Oct. 27, 2021) ("mergers did not significantly improve merging parties' productivity, marginal costs, or technology"), https://ssrn.com/abstract=3952060; *id.* at 31 (slot divestment "did not address the risk of coordinated effects and unilateral effects on several markets").

of economic literature found that "'concentrated industries tended to perform poorly in serving consumers, as they displayed higher prices, higher price/cost margins, and higher profits than less concentrated industries.'" *Id.* at 809. Other empirical work shows that large mergers do not produce significant efficiency gains overall, and often result in losses in innovation. *Id.* at 812-26. Even Judge Posner has quipped, "I wish someone would give me some examples of mergers that have improved efficiency. There must be some." Posner, *supra*, at 216.

If the incipiency doctrine is implicitly designed to err on the side of over-enforcement, concerns about over-enforcement should be assuaged by the comparatively low risks associated with it. Unlike with Sherman Act violations, which can carry criminal penalties and treble damages, merger actions by the federal government involve only injunctive relief. 15 U.S.C. §§ 1, 2, 7, 15(a). Even in the event of an erroneously enjoined merger, market forces tend to correct errors by, for example, achieving efficiencies through internal expansion. Carstensen & Lande, *supra*, at 794.

Congress's decision to include the incipiency doctrine in Section 7 was an exceptionally wise one due to concerns associated with market concentration. The incipiency doctrine not only preserves competition, but it also creates a bulwark against market disruptions. Markets should contain enough firms—at least one more than courts and enforcers believe necessary—to remain competitive even if future events reduce the number of competitors in the market. *Id.* at 841-42. Thus, Section 7's principal goal of arresting mergers in their incipiency dictates that courts should allow

for redundancy when considering whether an acquisition "may be substantially to lessen competition." 15 U.S.C. § 18.

The district court's decision will allow U.S. Sugar to dramatically increase its production capacity, and a major competitor will be eliminated. United will have more sugar to sell and more opportunities to collude and increase its market share even further. The district court's ruling that this is not likely to substantially harm competition, which failed to consider the actual market shares at issue and ignored the many dangers the incipiency standard is meant to prevent, is reversible error.

## II. APPELLEES ARE NOT IMMUNE FROM ANTITRUST ENFORCEMENT

The district court's implicit use of a Sherman Act standard is further demonstrated by its reliance on *Verizon Communications v. Law Offices of Curtis V. Trinko* ("*Trinko*"), 540 U.S. 398 (2004), to grant Appellees immunity from antitrust enforcement. JA59-60 (Op. 54-55). *Trinko* was a refusal-to-deal case brought under Section 2 of the Sherman Act, where the Supreme Court explicitly refused to grant antitrust immunity to the defendant based on the existence of a regulatory framework governing its telecommunications business. 540 U.S. at 406-07. It instead rejected the claim because it did not find the challenged conduct anticompetitive. *Id.* at 409. The regulatory framework was relevant only because (1) it was designed to diminish any anticompetitive harm that might arise from control of a telecommunications infrastructure and (2) the FCC actually found that Verizon breached its sharing duties

and fined the company. *Id.* at 412-13. "In short, the regime was an effective steward of the antitrust function." *Id.* at 413.

*Trinko* has no application here. *First*, this is not a Sherman Act case. The Government is not required to prove anticompetitive harms. It only has to show that the effect of the Imperial acquisition "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. That burden, guided by the incipiency standard and Third Circuit precedent, has been met. *See supra* Section I.A.

*Second*, the Federal Sugar Program ("FSP") does not exist to prevent antitrust harm to consumers. It was created to protect farmers by setting a price floor. 7 U.S.C. §§ 1359bb, *et seq*. The FSP does not create antitrust remedies, and refined sugar producers are free to set their own rates. Thus, the guardrails that the Court considered in *Trinko* are absent here, and immunity is even less warranted. *See Georgia v. Pa. R.R.*, 324 U.S. 439, 456-67, 460-61 (1945) (finding Section 1 violations where the regulator merely set a "zone of reasonableness" around railroad freight rates); *compare Trinko*, 540 U.S. at 412 (the regulatory scheme at issue was relevant only because it was "designed to deter and remedy anticompetitive harm").

*Finally*, the Government is not trying, as the plaintiff in *Trinko* did, to create a new type of antitrust injury. The Section 7 claim before this Court is an ordinary one seeking ordinary antitrust relief. The district court's refusal to grant that relief—despite ample evidence that the Imperial acquisition is likely to lessen competition and based on the "personal capacity" testimony of a USDA employee and self-interested

executives—subverts the very purpose of Section 7 and is the only unordinary thing before this Court. It creates a new antitrust immunity for nearly every company in the agricultural industry. But it simply cannot be that competitors in any regulated industry will escape scrutiny for blackletter antitrust violations, and the district court's attempt to create such a rule, blind to a body of case law to the contrary, should be reversed.[29]

## III. CONCLUSION

The evidence in this matter clearly demonstrates, under the probabilistic framework created by Section 7, that the Imperial acquisition will lead to presumptively unlawful market concentrations whose effects "may be substantially to lessen competition," 15 U.S.C. § 18, including elimination of head-to-head competition between United and Imperial and the softening of competition and increased coordination between United and Domino. The district court's opinion ignored this evidence. Its rejection of both parties' proposed markets based on the mere presence of competitors runs afoul of the heart of Section 7, "to reach incipient monopolies and trade restraints outside the scope of the Sherman Act." *Brown Shoe*, 370 U.S. at 318 n.32.

---

[29] *See U.S. v. El Paso Natural Gas Co.*, 376 U.S. 651, 659 (1964) (heavily regulated natural gas industry requiring government approval of sales contracts did not preclude enforcement of Section 7 against anticompetitive effects); *Phila. Nat'l Bank*, 374 U.S. at 368 ("reject[ing] the position that commercial banking, because it is subject to a high degree of governmental regulation,…is somehow immune from the anticompetitive effects of undue concentration"); *Georgia*, 324 U.S. at 456-57 (refusing to grant antitrust immunity to railroad freight carriers based on federal regulation of rates); *Md. & Va. Milk Producers Ass'n v. U.S.*, 362 U.S. 458, 472 (1960) (federal regulation of agricultural cooperatives did not create antitrust immunity).

And its finding that the Federal Sugar Program puts Appellees beyond the reach of our antitrust laws has no support in federal jurisprudence. We respectfully ask this Court to enforce the plain language of Section 7 and reverse the judgment of the district court below.

Dated: November 7, 2022                 Respectfully submitted,

                                              *s/ Katherine Van Dyck*
                                                Katherine Van Dyck
                                                Lee A. Hepner
                                                AMERICAN ECONOMIC LIBERTIES PROJECT
                                                2001 Pennsylvania Avenue NW
                                                Suite 540
                                                Washington, DC 20006
                                                (202) 904-8101
                                                kvandyck@economicliberties.us

                                                *Counsel for Amicus Curiae*

# CERTIFICATE OF COUNSEL

I, Katherine Van Dyck, hereby certify that:

    1.      I am a member of the bar of this Court.

    2.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,071 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

    3.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5)(A) and the type styles requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point Garamond font.

4.      Pursuant to Third Circuit Local Appellate Rule 31.1(c), the PDF file and the text of the paper version of the brief are identical. The electronic version of the brief has been scanned for viruses by Microsoft Defender (current version), and no viruses were found.

Dated: November 7, 2022            *s/ Katherine Van Dyck*
                                    Katherine Van Dyck

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of November, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated: November 7, 2022                    *s/ Katherine Van Dyck*
                                           Katherine Van Dyck