# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

v.

UNITED STATES SUGAR CORPORATION, et al.,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Delaware, No. 1:21-cv-1644

## BRIEF OF DEFENDANTS-APPELLEES

Lawrence E. Buterman
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020

Christopher S. Yates
LATHAM & WATKINS LLP
505 Montgomery Street
Suite 2000
San Francisco, CA 94111

Jack B. Blumenfeld
Brian P. Egan
MORRIS, NICHOLS, ARSHT &
  TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899

Melissa Arbus Sherry
  *Counsel of Record*
Amanda P. Reeves
Lindsey S. Champlin
David L. Johnson
Charles S. Dameron
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
(202) 637-2200
melissa.sherry@lw.com

*Counsel for United States Sugar Corporation*
*[Additional counsel listed on signature page]*

# CORPORATE DISCLOSURE STATEMENTS

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendant-Appellee United States Sugar Corporation states that it has no parent corporation, and no publicly held corporation owns ten percent or more of United States Sugar Corporation's stock.

Defendant-Appellee Imperial Sugar Company states that it is wholly owned by Louis Dreyfus Company Sugar Holdings LLC, and no publicly held corporation owns ten percent or more of Imperial Sugar Company's stock.

Defendant-Appellee Louis Dreyfus Company LLC states that it is wholly owned by Louis Dreyfus Company Holding Inc., and no publicly held corporation holds ten percent or more of Louis Dreyfus Company LLC's stock.

Defendant-Appellee United Sugars Corporation states that it has no parent corporation, and no publicly held corporation holds ten percent or more of United Sugars Corporation's stock.

Defendants-Appellees are unaware of any publicly held corporation which is not a party to the proceeding before this Court which has a financial interest in the outcome of this proceeding.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENTS ......................................................i

TABLE OF AUTHORITIES ..................................................................iv

INTRODUCTION ...........................................................................1

STATEMENT OF THE CASE ..................................................................3

    A.    The Transaction Between U.S. Sugar And Imperial ............................3

    B.    The Government's Clayton Act Claim .................................6

    C.    The Trial .........................................................8

    D.    The District Court's Decision .........................................14

    E.    Motions For Injunctive Relief Pending Appeal .................................19

SUMMARY OF ARGUMENT ...................................................................19

STANDARD OF REVIEW ....................................................................22

ARGUMENT ..............................................................................23

I.    The Government Did Not Establish A Relevant Market ................................23

    A.    The District Court Identified The Correct Legal Standards Governing Market Definition ............................24

    B.    The District Court Properly Applied Settled Law And Found As A Matter Of Fact That The Government's Proposed Markets Failed .......................................................27

        1.    The District Court Correctly Rejected The Government's Product Market .........................................27

        2.    The District Court Correctly Rejected The Government's Geographic Markets .................................31

II. The Government's Attacks On The District Court's Market-Definition Analysis Lack Merit ......................................................................34

    A. The Government Mischaracterizes The District Court's Product-Market Analysis And Ignores Relevant Findings Of Fact..................36

        1. Courts Need Not Always Treat Distributors As Customers Only....................................................................................36

        2. Courts Need Not Accept Markets Encompassing "Widely Divergent Customers"............................................................45

    B. The Government's Arguments On Geographic Markets Fail To Grapple With Its Position At Trial And The District Court's Findings ..............................................................................47

III. The Government's Remaining Arguments Do Not Identify Any Error In The District Court's Judgment ...............................................51

    A. The Government's Evidence On Anticompetitive Effects Is Irrelevant And Misleading ..............................................51

    B. The District Court's Observations Regarding USDA Formed No Part Of The Judgment ...........................................55

CONCLUSION .........................................................................58

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Allen-Myland, Inc. v. IBM Corp.,
33 F.3d 194 (3d Cir. 1994) ........................................................ 21, 37-38, 39, 40

American Crystal Sugar Co. v. Cuban-American Sugar Co.,
259 F.2d 524 (2d Cir. 1958) ........................................................ 56

Aya Healthcare Services, Inc. v. AMN Healthcare, Inc.,
No. 17-cv-205, 2020 WL 3414662 (S.D. Cal. June 22, 2020), aff'd,
9 F.4th 1102 (9th Cir. 2021) ............................................................ 10

Black v. Cutter Laboratories,
351 U.S. 292 (1956) ........................................................ 55

Brown Shoe Co. v. United States,
370 U.S. 294 (1962) ........................................................ passim

City of New York v. Group Health Inc.,
649 F.3d 151 (2d Cir. 2011) ........................................................ 26

EEOC v. Pennsylvania,
768 F.2d 514 (3d Cir. 1985) ........................................................ 55

Food Lion, LLC v. Dean Foods Co. (In re Southeastern Milk Antitrust
Litigation),
739 F.3d 262 (6th Cir. 2014) ........................................................ 23

FTC v. AbbVie Inc.,
329 F. Supp. 3d 98 (E.D. Pa. 2018) ........................................................ 53

FTC v. AbbVie Inc.,
976 F.3d 327 (3d Cir. 2020) ........................................................ 53

FTC v. Advocate Health Care Network,
841 F.3d 460 (7th Cir. 2016) ........................................................ 24, 44

FTC v. Hackensack Meridian Health, Inc.,
30 F.4th 160 (3d Cir. 2022) ........................................................ passim

iv

*FTC v. Lundbeck, Inc.*,
  650 F.3d 1236 (8th Cir. 2011) ....................................................26, 35

*FTC v. Penn State Hershey Medical Center*,
  838 F.3d 327 (3d Cir. 2016) ..................................................*passim*

*FTC v. RAG-Stiftung*,
  436 F. Supp. 3d 278 (D.D.C. 2020) ...............................................10

*FTC v. Thomas Jefferson University*,
  505 F. Supp. 3d 522 (E.D. Pa. 2020) .......................................41, 42

*FTC v. Wilh. Wilhelmsen Holding ASA*,
  341 F. Supp. 3d 27 (D.D.C. 2018) .................................................10

*Geneva Pharmaceuticals Technology Corp. v. Barr Laboratories Inc.*,
  386 F.3d 485 (2d Cir. 2004) ...........................................................25

*Gordon v. Lewiston Hospital*,
  423 F.3d 184 (3d Cir. 2005) ...........................................................23

*Leegin Creative Leather Products, Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007) ...................................................................40, 41

*Maris Distributing Co. v. Anheuser-Busch, Inc.*,
  302 F.3d 1207 (11th Cir. 2002) .....................................................40

*McCullough v. Zimmer, Inc.*,
  382 F. App'x 225 (3d Cir. 2010) ....................................................39

*N.W. Controls, Inc. v. Outboard Marine Corp.*,
  333 F. Supp. 493 (D. Del. 1971) ....................................................39

*Ohio v. American Express Co.*,
  138 S. Ct. 2274 (2018) ............................................................15, 52

*Prometheus Radio Project v. FCC*,
  824 F.3d 33 (3d Cir. 2016) .............................................................36

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
  124 F.3d 430 (3d Cir. 1997) ......................................15, 25, 26, 53

*Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*,
    637 F.2d 1001 (5th Cir. Unit A Feb. 1981) ......................................40

*Shah v. VHS San Antonio Partners, L.L.C.*,
    985 F.3d 450 (5th Cir. 2021) ...........................................................26

*SmithKline Corp. v. Eli Lilly & Co.*,
    575 F.2d 1056 (3d Cir. 1978) ..........................................19, 25, 30

*Tokash v. Foxco Insurance Management Services, Inc.*,
    548 F. App'x 797 (3d Cir. 2013) .....................................................54

*Toledo Mack Sales & Service, Inc. v. Mack Trucks, Inc.*,
    530 F.3d 204 (3d Cir. 2008) ............................................................40

*Tunis Brothers Co. v. Ford Motor Co.*,
    952 F.2d 715 (3d Cir. 1991) ............................................................42

*United States v. Continental Can Co.*,
    378 U.S. 441 (1964).........................................................................53

*United States v. Dentsply International, Inc.*,
    399 F.3d 181 (3d Cir. 2005) ............................................................40

*United States v. Energy Solutions, Inc.*,
    265 F. Supp. 3d 415 (D. Del. 2017).............................................52, 53

*United States v. Engelhard Corp.*,
    126 F.3d 1302 (11th Cir. 1997) ...................................................35, 45

*United States v. Marine Bancorporation, Inc.*,
    418 U.S. 602 (1974).....................................................................26, 52

*United States v. McKesson & Robbins, Inc.*,
    351 U.S. 305 (1956).........................................................................38

*United States v. Oracle Corp.*,
    331 F. Supp. 2d 1098 (N.D. Cal. 2004).........................................39

*United States v. Pabst Brewing Co.*,
    384 U.S. 546 (1966).........................................................................52

*United States v. Philadelphia National Bank*,
374 U.S. 321 (1963)..............................................................................25

*United States v. Sabre Corp.*,
452 F. Supp. 3d 97 (D. Del.), *vacated on other grounds*,
No. 20-1767, 2020 WL 4915824 (3d Cir. July 20, 2020) ...............25, 38, 42, 44

*United States v. Sungard Data Systems, Inc.*,
172 F. Supp. 2d 172 (D.D.C. 2001)........................................................21, 42, 45

*United States v. Topco Associates, Inc.*,
405 U.S. 596 (1972).............................................................................40

**STATUTES**

15 U.S.C. § 18 .....................................................................................6

**OTHER AUTHORITIES**

Horizontal Merger Guidelines (2010)........................................................21, 43, 49

Initial Decision, *In re Altria Group, Inc. & JUUL Labs, Inc.*,
No. 9393 (F.T.C. Feb. 23, 2022),
https://www.ftc.gov/system/files/ftc_gov/pdf/
d09393altriainitialdecisionpublic.pdf .................................................10

## INTRODUCTION

This appeal is about a failure of proof. At trial, the government presented overly narrow and inconsistent product and geographic markets in an attempt to distort the competitive impact of United States Sugar Corporation's ("U.S. Sugar") acquisition of Imperial Sugar Company ("Imperial"). The government purported to limit the market to sales by companies that both produce and sell refined sugar, and analyzed the transaction's competitive effects in two regional markets. The government defended those markets based on factual assumptions that (i) sugar distributors are not competitive options for wholesale customers; (ii) all wholesale customers face the same competitive dynamics; and (iii) geographic proximity of refiners to customers is critical because sugar is too costly to transport long distances. It claimed the markets comported with real-world industry realities, as required by Supreme Court precedent. And the government argued that the "hypothetical monopolist test" ("HMT") performed by its expert confirmed the appropriateness of those markets. The district court disagreed.

After a four-day trial with over 30 witnesses, the district court found that the factual assumptions underpinning the government's proposed markets were incorrect and that the government's expert was neither credible nor persuasive. The court found that (i) sugar distributors are often independent competitive sellers; (ii) no evidence suggested divergent customers have the same competitive options;

and (iii) sugar flows easily and cost-effectively across the country. The court also found that arbitrage (*i.e.*, buying at locations or from customers in other regions) would defeat a hypothetical price increase in the claimed regional markets. All this meant that the government's theory that sugar does not travel long distances and that narrow markets are appropriate collapsed under the weight of the evidence.

The government glides past all of that. After resting its case below on claimed "commercial realities," its appeal brief makes no mention of that doctrine. The government largely ignores its own expert—referencing him in one incomplete footnote while simultaneously emphasizing the HMT he conducted. And the word "arbitrage" is nowhere to be found. The government cannot walk away from the case it presented at trial and the critical assumptions it failed to prove.

The government instead recasts the district court's factual determinations as "legal errors" and (mis)characterizes the court as making categorical determinations "as a matter of law." Repetition does not make it so. As to product market, the court did not hold that distributors *always* count as suppliers any more than the case law holds that distributors *never* count as suppliers. The court determined, based on the characteristics of the industry, that sugar distributors are often independent competitive sellers. Likewise, also as to product market, the court did not hold that the government must disaggregate distinct groups of customers. It held the government failed to justify its assumption that all customers should be lumped

together on this record.  And on geographic market, the court did not misunderstand the concept of customer-based markets.  It simply found, based on the evidence, the government's regional markets did not reflect commercial realities.

Affirmance on any of these three grounds of market definition is enough to resolve this appeal.  The government nonetheless spends half of its argument on anticompetitive effects—an inquiry that has no meaning without a relevant market and an issue the district court did not, and did not need to, decide.  There is no reason for the Court to engage with those facts.  But to the extent it matters, the repeated suggestion that the evidence on this issue is "undisputed" is dead wrong.  As for the district court's "assertions" regarding the United States Department of Agriculture ("USDA"), the government attacks a strawman.  The court's discussion of the regulatory backdrop did not result in any holding or finding integral to the judgment.

In the end, the government built its case on proposed markets that conflict with commercial realities and a discredited expert using disproven assumptions.  The district court undertook careful fact-finding that exposed the government's gerrymandered markets for what they were.  This Court should affirm.

## STATEMENT OF THE CASE

### A.    The Transaction Between U.S. Sugar And Imperial

The transaction brings together two companies—U.S. Sugar and Imperial— that operate in distinct ways and are on divergent paths.  For nearly a century, U.S.

Sugar has grown sugarcane in and around Clewiston, Florida, where it also operates a sugar mill and refinery. JA7 (Op.). The Clewiston refinery accounts for less than 7% of all nationwide sugar refining capacity. *Id.* U.S. Sugar grows more sugarcane than it can process in Clewiston, and sells excess sugarcane to third-party mills. *Id.*

U.S. Sugar does not sell its own refined sugar. JA7 (Op.) It is a member of an agricultural cooperative (United Sugars Corporation or "United") that markets its refined sugar along with the sugar produced by several independent producers in Minnesota, Montana, North Dakota, and Wyoming. JA8. United has no control over the amount of sugar its members produce, and is obligated to sell all sugar produced regardless of the amount. *Id.*; *see also, e.g.*, JA267, 274 (169:12-22, 176:5-15). United sells its members' sugar to customers in 45 states. JA41 (Op.).

Imperial operates a cane sugar refinery in Port Wentworth, Georgia. JA8 (Op.). Imperial does not grow its own sugarcane, and imports over 90% of the raw sugar it refines. *Id.*; JA325 (252:5-9). Imperial struggled financially for years: it declared bankruptcy in 2001, suffered a "terrible" industrial accident in 2008, and in 2012 was sold to the Louis Dreyfus Company ("Louis Dreyfus"), which soon began looking for another buyer. JA26 (Op.). The Port Wentworth refinery generally relies on "very old equipment." *Id.*; JA738 (794:18-21). No capital expenditures to improve the refinery, beyond "maintenance" work to ensure it is "safe to operate," have been made. JA26 (Op.). The Port Wentworth refinery would account for

around 7% of the nation's sugar refining capacity if running at full capacity, but it generally runs at less than 75% (and sometimes as low as 60%) of capacity. JA25-27. Imperial describes itself as "structurally uncompetitive"; it is principally a residual or back-up supplier; and its customer base has shrunk steadily in recent years. JA26-27.

On March 24, 2021, U.S. Sugar and Louis Dreyfus entered into an agreement whereby U.S. Sugar would acquire Imperial's assets—principally, its Port Wentworth refinery—for $315 million. JA9 (Op.). With the acquisition, U.S. Sugar will use Port Wentworth to refine more of the sugarcane it grows, and will "use targeted capital expenditures to increase the capacity utilization of Port Wentworth." JA27-28 (Op.). The acquisition will lead to "a more competitive, cost-effective, and efficient refinery." JA27.

Sugar suppliers all over the country and the world compete with the Port Wentworth and Clewiston refineries. Louisiana Sugar Refining ("LSR") refines cane sugar in Louisiana, which Cargill Inc. sells "to customers on both coasts and nearly all states in-between." JA11 (Op.). Domino Sugar ("Domino") operates cane sugar refineries in Florida, Louisiana, Maryland, California, and New York, and sells sugar in all 50 states. JA12-13. National Sugar Marketing Cooperative ("NSM") has members that produce sugar in California, Idaho, and Minnesota, which NSM sells "everywhere in the U.S." JA13. Michigan Sugar processes sugar for sale

"across approximately 25 states in the midwest, northeast, and south." JA14. Foreign producers ship "massive amounts" of refined sugar into the United States. JA50 (Op.). And independent distributors, leveraging their transportation, storage, and processing networks, make up approximately 25% of refined sugar sales. JA34. Distributors often "further process" white sugar "into liquid, invert, brown, or powdered sugar before reselling." JA16.

### B. The Government's Clayton Act Claim

On November 23, 2021, the government filed suit against U.S. Sugar, Imperial, Louis Dreyfus, and United under Section 7 of the Clayton Act, seeking to enjoin the proposed acquisition. *See* 15 U.S.C. § 18. The government alleged the transaction would harm competition for the "production and sale" of refined sugar to "wholesale customers" in two regions (the region comprising Georgia and its neighboring states and the "Southeast[]"). JA138 (Compl. ¶26). That claim rested on certain factual assumptions about the sugar industry.

*Alleged Product Market*. The government proposed a product market that went beyond the product itself (refined sugar). On the supply side, the government limited refined sugar to that which was produced *and* sold by the same entity. JA139 (Compl. ¶27). On the customer side, the government included refined sugar sold to all "wholesale customers," "including retailers, food and beverage manufacturers, and distributors." JA136 (¶20).

U.S. Sugar, however, does not sell refined sugar. And United does not produce refined sugar. So the government treated United and U.S. Sugar as interchangeable entities. JA132-33, 143 (Compl. ¶¶8-9, 36). This allowed the government to contend U.S. Sugar "produced *and* sold" refined sugar and to aggregate U.S. Sugar's sales with sales from United's other members in market share and concentration estimates. JA143-44 (¶¶36-39).

Unlike U.S. Sugar, distributors do sell refined sugar. The government justified excluding them from the market by asserting that distributors are not "entities that can meaningfully compete" with sugar refiners. JA30 (Op.). The government alleged that "[l]arger customers do not generally purchase from distributors," since "buying directly from the sugar producers is typically the most cost-competitive option," JA137 (Compl. ¶23), and that distributors "lack the ability to constrain the prices charged by refined sugar producers," JA149 (¶53).

***Alleged Geographic Markets.*** The government pleaded two regional geographic markets: (i) "Georgia Plus" ("customers in Georgia and its bordering states"), JA141 (Compl. ¶33), and (ii) the "Southeast" (Alabama, Delaware, Florida, Georgia, Kentucky, Maryland, Mississippi, North Carolina, South Carolina, Tennessee, Virginia, West Virginia, and the District of Columbia), JA140 (¶31).

The factual predicate for these regional markets was the assumption that "transportation costs" to ship sugar were so high that the "distance between a sugar

producer and the customer is a significant determining factor in the price a customer pays for refined sugar." JA138 (Compl. ¶24). The government alleged that customers usually "buy refined sugar from producers in close proximity," and that "most customers cannot practically buy refined sugar from a different customer located outside of the relevant geographic market (*i.e.*, by engaging in arbitrage)." JA138, 140 (¶¶24, 30). The government also alleged "significant regional variations in the prices charged to customers due to differences in competitive conditions in each area." JA150 (¶57). Given these assumptions, the government asserted that a "hypothetical monopolist producer of refined sugar" selling to customers in these geographic markets could raise sugar prices without risk of customers avoiding the price increase through geographic "arbitrage." JA141-42 (¶¶32, 35).

Having engineered the relevant markets to treat U.S. Sugar and United as one, exclude distributors, include all "wholesale customers," and isolate narrow portions of the country, the government asserted the acquisition would lead to excessive concentration, with two firms "control[ling] about 75 percent of refined sugar sales to customers in each relevant geographic market." JA143 (Compl. ¶36).

### C.    The Trial

In April 2022, the district court held a four-day bench trial. Over 30 witnesses testified about the particular dynamics of the refined sugar industry. These witnesses included executives from major industrial sugar buyers (*see, e.g.*, JA185-86 (71:3-

72:12), JA680-81 (729:22-730:1), JA954-55 (1021:24-1022:4, JA991-92 (1074:5-1075:5), JA1007 (1092:9-17)); executives from U.S. Sugar, Imperial, and United (*see, e.g.*, JA221 (123:11-22), JA287 (214:9-11), JA293 (220:20-25), JA341 (268:4-1), JA365 (297:1-3), JA709-10 (763:14-764:3), JA736-37 (792:25-793:6)); and executives from other major sugar suppliers (*see, e.g.*, JA405-06 (340:22-341:2), JA439 (418:7-16), JA657 (702:9-20), JA962 (1035:15-17), JA977-78 (1060:22-1061:3), JA1016-17 (1103:14-1104:4), JA1039 (1128:1-10)). Industry witnesses testified that "[s]ugar flows extremely easily in this country," JA530 (553:1), and that sugar distributors have "quite a lot" of competitive advantages in their "toolbox," including their "low cost supply," their "storage" capacity, and "domestic transportation fleets" that allow them to "control cost," JA750 (806:4-807:3). The district court also heard testimony from Dr. Barbara Fecso, the chief economic analyst for the USDA's Federal Sugar Program, who testified, pursuant to subpoena, that in her experience, "market forces work to redistribute sugar" across the country to "where it's needed." JA797 (857:10-21).

Two experts then testified at length about the structure of the sugar industry, their view of the relevant markets, and the likely competitive effects.

**Dr. Dov Rothman (Government's Expert).** Dr. Rothman, an economic consultant with no advanced degree in economics, was the government's sole expert. *See* JA546-47 (591:25-583:6). Many courts have previously found his economic

analyses to be "seriously flawed," "unsupported," "unreliable," and "deficient," *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, No. 17-cv-205, 2020 WL 3414662, at *4 (S.D. Cal. June 22, 2020), *aff'd*, 9 F.4th 1102, 1112 (9th Cir. 2021); "of little use" due to flawed assumptions and "unreliable" economic models, *FTC v. RAG-Stiftung*, 436 F. Supp. 3d 278, 319 & n.33 (D.D.C. 2020); and based on "assumptions" that are "unclear" and "cannot be verified with any degree of rigor," *FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 73 (D.D.C. 2018). *See also* Initial Decision 91, *In re Altria Grp., Inc. & JUUL Labs, Inc.*, No. 9393 (F.T.C. Feb. 23, 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/d09393altriainitialdecisionpublic.pdf (analysis "not economically sound").

At trial, Dr. Rothman admitted that his charge was to "evaluate[] the markets the United States alleged"; that he did not have any role in "identif[ying]" those markets, JA607 (648:11-24); and that he did not attempt to identify "any other potentially relevant geographic market," JA39 (Op.). Dr. Rothman then relied on facts alleged in the complaint to defend the government's market-definition choices.

On the supply side of product market (*i.e.*, how much sugar the merging parties control), Dr. Rothman included all United sales and excluded all independent distributor sales. Dr. Rothman acknowledged United does not produce sugar, JA636 (677:19-21), and has no control over the amount of sugar its members produce, JA636-37 (677:22-678:18). But Dr. Rothman included United's sales of sugar

produced by all four of its independent members—even those located over 1,000 miles from the claimed markets—and never analyzed U.S. Sugar's own share. JA635 (676:10-18); JA623-24 (664:25-665:21). Dr. Rothman also assumed "distributors are merely partners" for sugar producers, *see* JA30 (Op.), and not independent competitors. His reasons: distributors are supposedly a "high cost option" for sugar buyers, JA564 (600:14-20); distributors and refiners "tend [not] to focus on the same customers," JA573-74 (609:22-610:8); distributors appeal to customers "looking to purchase relatively smaller volumes of refined sugar," JA574 (610:9-13); and customers cannot engage in "arbitrage" from distributors because "the distributor will attach its own markup to the refined sugar" and "shipping refined sugar long distances . . . is relatively costly," JA574-75 (610:14-611:2).

On the customer side of the product market (*i.e.*, who the merging parties sell to), Dr. Rothman again followed the government's lead by grouping together all sugar purchasers, including "food-service companies," "food and beverage manufacturers, retailers like grocery stores, [and] distributors." JA37 (Op.); JA552 (588:16-21). When asked whether "competitive conditions for sale to industrial customers are the same as the competitive conditions for sale of refined sugar to retail customers," Dr. Rothman acknowledged he never considered that question. JA627 (668:16-24).

Dr. Rothman similarly defended the government's proposed geographic markets by making a series of assumptions. Specifically, he asserted that "competition in the refined sugar industry is regional" because "refined sugar is costly to transport long distances." JA557-58, 560 (593:16-594:8, 596:4-8). He described the HMT as "one aspect, one part of evaluating the relevant market." JA610 (651:14-24); JA31 (Op.); *see* US Post-Trial Br. 6, Dkt. 218 (government arguing HMT "confirm[ed]" commercial realities of sugar industry).[1] His analysis evaluated whether "a complete elimination of competition between producers of refined sugar to sell refined sugar to customers in the government's geographic area markets would likely result in higher prices." JA563 (599:9-17). He recognized that a critical part of that analysis is whether customers within those regions could avoid a price increase imposed by a hypothetical monopolist by "purchas[ing] refined sugar outside of the geographic market through what's called arbitrage," *i.e.*, "purchasing from other customers like distributors that are located outside of the geographic market." JA564 (600:1-13). He opined that geographic markets oriented "around the locations of buyers" are appropriate only if "arbitrage is limited." JA564-65 (600:21-601:6). And he defended the government's proposed market because, he believed, the likelihood of arbitrage was limited. *Id.*

---

[1] "Dkt." refers to the district court docket.

***Dr. Nicholas Hill (Defendants' Expert)***.  Defendants' expert, Dr. Hill, has a doctorate in economics, formerly worked as an economist for the Department of Justice's Antitrust Division and the Federal Trade Commission, has testified on behalf of both the government and defendants in merger litigation, and his economic analyses have never been found incredible or unreliable.  JA840-42 (900:19-902:5).

At trial, Dr. Hill testified that that Dr. Rothman's analysis was flawed in several respects.  JA846 (906:19-21).  For one thing, Dr. Rothman erred by "wrongly treat[ing] United as the relevant entity."  JA854-57 (914:4-917:22).  Dr. Hill explained that United's members do not have the same incentives because "individual members make their own decisions" about how much sugar to produce. JA855-56 (915:11-916:4).  And by including all of United's sales, Dr. Rothman overstated market shares and concentrations.  JA857 (917:5-10).

Dr. Rothman also should have treated distributors as competitors, Dr. Hill explained.  According to Dr. Hill, "customers are not overly concerned whether the sugar they're purchasing has been produced by the entity itself," and distributors are "competing with other suppliers to win customers."  JA847, 858 (907:9-14, 918:4-8).  Dr. Hill rejected Dr. Rothman's conclusion that distributors are competitively "dependent on refiners" because the evidence showed "distributors buy from a variety of sources," including "imports," and this fact "gives them independence and the ability to compete with other suppliers."  JA858-59 (918:12-919:1).

Dr. Hill further testified that the government's regional markets were "overly . . . narrow," and Dr. Rothman's application of the HMT "flawed." JA849 (909:3-15). In Dr. Hill's view, the "key problem" with Dr. Rothman's analysis is he "didn't adequately consider" the fact that sugar purchasers can and do engage in "arbitrage" by sourcing sugar from different regions. JA874 (934:19-24); *see, e.g.*, JA205-06 (107:1-108:5) (General Mills witness admitting it redirects supply from outside the claimed markets to plants inside); JA34-35, 1980-81 (Op.) (distributors sold sugar from outside regions to customers inside). As Dr. Hill explained, "[t]here is extensive evidence that sugar is able to travel long distances," JA867 (927:3-6), and no evidence of a "past history of prices being significantly different across regions or areas," JA868-69 (928:7-929:13). Dr. Hill analyzed historical prices for sugar within and outside the government's regional markets, and found "no meaningful differences in prices between the states in Dr. Rothman's regions and the states . . . outside of Dr. Rothman's regions." JA869 (929:6-12). Dr. Hill concluded that Dr. Rothman's HMT analysis did not "adequately consider arbitrage" by customers who could "purchase [sugar] . . . outside of the proposed markets and . . . then just arrange transportation to move it into the proposed markets." JA874-75 (934:19-935:18).

## D.     The District Court's Decision

On September 23, 2022, the district court held that the government failed to prove a relevant market and entered judgment in favor of Defendants. As the court

explained, "Section 7 merger challenges are reviewed under a burden-shifting framework." JA45. The Court first "determines whether the government has established a *prima facie* case that the proposed merger is anticompetitive by (1) identifying the proper relevant market and (2) showing that the effects of the merger are likely to be anticompetitive." *Id.* The "relevant market" must "correspond to the commercial realities of the industry," *id.* (quoting *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018)), and consists of "two components: a 'product market' and a 'geographic market,'" *id.* (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962)). "[F]ailure to properly define either a product or geographic market is fatal to a plaintiff's case." *Id.* (citing *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436-42 (3d Cir. 1997)).

The district court made well over 100 findings of fact and numerous credibility determinations. The court found Dr. Rothman's opinions to be "flawed and largely unpersuasive" and "simply not credible." JA29, JA56. By contrast, the court found Dr. Hill "particularly credible." JA29-30. Drawing on extensive evidence regarding the characteristics of the sugar industry, the court concluded the government had not met its burden to define both a relevant product and a relevant geographic market. For three independent reasons, the government "failed to identify the proper relevant market because its product market and geographic

markets ignore the commercial realities of sugar supply in the U.S.," and therefore "failed to establish a *prima facie* case." JA46.

*First*, on product market, the district court found that the government's defined market was "internally inconsistent" because it included some entities who produce but do not sell (U.S. Sugar) and some who sell but do not produce (United and other cooperatives), while excluding others who sell and even sometimes produce (distributors). JA30, 34.

As for distributors, the district court found the record "replete with evidence of distributors competing with refiner producers." JA49. That record evidence, the court found, indicated distributors "account for approximately 25% of sales of refined sugar in the U.S."; "leverage their large network of transportation and storage to maintain and ship an adequate supply of refined sugar to exert competitive pressure when and where necessary"; have the "ability to purchase large quantities of refined sugar from many different sources, including foreign importers," which "allows distributors to price resales competitively"; and would "remain a competitive constraint on price to end customers" "if producers and cooperatives were to increase their price for refined sugar." JA33-36, 49-53. Dr. Hill persuasively "[tied] all of this evidence together" and "explained how distributors are independent actors within the market" that "compete effectively with other suppliers." JA51. Because the government's exclusion of distributors was

"inconsistent with the commercial realities of the industry" and because the government "admit[ted] that it does not have evidence to prove its case if distributors are included," that finding was dispositive. JA52.

*Second*, also on product market, the district court noted the government's proposed market "assume[d] that all wholesale customers are the same without regard to economic realities," but found "no evidence in the record to support such a conclusion." JA53. The court explained that "various wholesale customer types have different sugar needs and purchasing practices," JA37, such that "industrial customers are . . . treated differently by suppliers in the competitive landscape," JA53. Yet Dr. Rothman "admitted that he did not even consider whether retail customers have the same competitive alternatives as industrial customers." JA53. That failure of proof was "yet another reason that the Government's proposed product market fails." *Id.*

*Third*, on geographic market, the district court concluded that "even assuming the [government's] relevant product market" was valid, the government "failed to identify a relevant geographic market as well." JA54. The court evaluated the commercial realities of the industry and the HMT. *Id.* (citing *FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 167 (3d Cir. 2022)).

The district court found the government's proposed "Georgia Plus" and "Southeast" markets "too narrow to be the relevant geographic market" because, in

the event of price increases, customers in those limited regions "easily could (and likely would) turn to outside the area for additional sugar supply." JA43; *see* JA42 ("Customers [could] . . . pick up refined sugar at locations outside of those markets and move it in.").  As the court also noted, the proposed geographic markets were inconsistent with the views of all industry participants.  JA39 ("[N]o document from any party or the USDA . . . groups the states together in the way the Government has in its proposed 'Southeast' market.").  For those reasons, the government's proposed geographic markets were "simply not credible," and "ignore[d] the commercial realities of the sugar industry in this country."  JA56-57.

Because each of these findings was independently sufficient to defeat the first prong of the government's *prima facie* case, the district court declined to "reach the second prong of the *prima facie* case—*i.e.*, whether the government has shown that the effects of the acquisition are likely to be anticompetitive."  JA59.

In closing, the district court deemed it "more than curious that the Government is purportedly concerned about . . . increased prices in an industry where the Government itself keeps the prices high and, in many ways, controls the competition."  JA63.  As the court explained, the "amount of sugar that is available for sale in the U.S. each year is largely controlled by the USDA," JA62, and "USDA's power to manipulate sugar supply" cuts against arguments that the proposed acquisition would harm competition.  JA60.  The court, however, made

clear that its judgment did not rest on those observations; it found the government had not met its burden because it did not "identify the relevant market for analyzing any proposed competitive injury resulting from" the acquisition.  JA59.

### E.    Motions For Injunctive Relief Pending Appeal

The government appealed and moved for an injunction pending appeal.  JA1; Dkt. 246.  The district court denied that motion, noting the government had "failed in its burden" of proof at trial because it "failed to identify a relevant product market," unsuccessfully sought to defend "unduly narrow" geographic markets, and relied on an expert the district court found "unpersuasive (as have other courts)." Order 2 & n.2, Dkt. 253.  The government moved for an injunction pending appeal in this Court.  The Court denied that motion "in its entirety."  Order 1, ECF 27.

### SUMMARY OF ARGUMENT

I.    The district court correctly applied settled law to the facts and concluded the government failed to prove a relevant market consistent with the commercial realities of the sugar industry.  That determination rested on three key findings, each of which independently suffices to sustain the judgment.

*First*, the government's proposed product market excluded distributors based on factual assumptions proven false at trial.  A product market should include sellers with "the ability actual or potential to take significant amounts of business away from each other."  *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1063 (3d Cir.

1978). The district court made extensive factual findings establishing that independent distributors had precisely that ability. That some distributors also produce different kinds of sugar, and that the government included other entities (like United) that sell but do not produce any sugar, only further highlighted the internal inconsistency of the government's proposed product market.

*Second*, the government's proposed product market assumed that all wholesale customers were similarly situated. No record evidence supported that assumption, and contrary evidence suggested that industrial customers, for example, faced different competitive conditions than retail customers. The government's failure to test, let alone prove, that its product-market definition was consistent with commercial realities was yet another market-definition defect.

*Third*, and critically, the government's proposed geographic markets were too narrow in light of the proven (and now-undisputed) commercial reality that sugar flows freely across the country at low cost. Thus, customers in the government's proposed markets could easily engage in arbitrage to defeat a hypothetical price increase. *FTC v. Penn State Hershey Med. Ctr.* ("*Hershey*"), 838 F.3d 327, 338 (3d Cir. 2016). That fact fatally undermined the government expert's "flawed and largely unpersuasive" analysis. JA29. The government's proposed markets fell short both as a matter of commercial realities and the HMT—a test the government had (correctly) framed below as serving only a confirmatory purpose.

II.    The government's arguments on appeal fail in light of the record evidence, its own arguments at trial, and the district court's actual decision.

A.    The district court never treated distributors as suppliers *as a matter of law*; it found *as a matter of fact*, based on the record in this case, that independent distributors in this industry already are and will remain competitors. That determination is entirely consistent with the case law, including a decision by this Court recognizing that non-producers may be treated as sellers if the commercial realities establish them as competitors in a relevant product market. *See Allen-Myland, Inc. v. IBM Corp.*, 33 F.3d 194, 203 (3d Cir. 1994). The government's contrary arguments disregard the *regional* markets it proposed, its own 2010 Horizontal Merger Guidelines ("Guidelines"), and the record in this case. Nor did the district court disregard the HMT; it specifically found that distributors in this industry are capable of undercutting any hypothetical price increase and thereby rejected Dr. Rothman's application of the test.

B.    The district court did not hold that widely divergent customers "must" be treated separately. The district court merely declined to accept the government's product-market definition in the absence of any evidence justifying its decision to lump together diverse customers. *See United States v. Sungard Data Sys., Inc.*, 172 F. Supp. 2d 172, 192 & n.24 (D.D.C. 2001). No case required it to do so.

C.    The government fails to mention the crucial finding that defeated its proposed geographic markets:  sugar buyers' ability to defeat a hypothetical monopolist through geographic arbitrage.  The government also disregards its failure to prove the assumptions, such as high transportation costs, that supposedly justified its regional markets.  The government cannot obscure those problems by asserting the court misunderstood the theory of customer-based geographic markets.  It did not.  This Court's precedent and the government's own Guidelines confirm that it is the *government* that misapplied economic theory.  The government's failure to prove its geographic markets provides yet another independent reason to affirm.

III.    The government asks this Court to look beyond the judgment below and to find fault with the district court on matters the court did not decide.  But the law is clear:  proving a relevant market is a precondition to considering competitive effects.  So the government's cherry-picked and disputed evidence relating to anticompetitive effects has no bearing on this appeal.  The government's objections to the district court's "assertions" about the USDA regulatory regime are also far afield.  The government lost because it failed to prove any relevant market.  *That* is the district court's judgment, and it is the beginning and end of this appeal.

## STANDARD OF REVIEW

This Court reviews conclusions of law *de novo* and findings of fact for clear error.  *See Hershey*, 838 F.3d at 335.  As this Court and others have consistently

recognized, market definition turns on "factual question[s] dependent on the special characteristics of the industry involved," and a district court's determination of those questions is reviewed "for clear error." *Hackensack*, 30 F.4th at 167 (citation omitted); *see, e.g.*, *Hershey*, 838 F.3d at 335; *Gordon v. Lewiston Hosp.*, 423 F.3d 184, 212 (3d Cir. 2005); *see also, e.g.*, *Food Lion, LLC v. Dean Foods Co. (In re Southeastern Milk Antitrust Litig.)*, 739 F.3d 262, 282 & n.9 (6th Cir. 2014) (collecting cases from "[m]ultiple courts of appeals").

## ARGUMENT

## I.  THE GOVERNMENT DID NOT ESTABLISH A RELEVANT MARKET

The district court identified and applied settled legal principles and determined as a matter of fact that the government failed to carry its burden to establish a relevant market—the first prong of the government's *prima facie* case. That determination rested on extensive findings of fact, backed by voluminous evidence and credibility determinations, that the government's product and geographic markets diverged from commercial realities in the sugar industry in three critical respects. The court's findings with respect to each failure are amply supported and independently sufficient to affirm.

**A.** **The District Court Identified The Correct Legal Standards Governing Market Definition**

It is indisputable—and undisputed, *see* Opening Br. ("OB") 17—that the district court correctly identified well-settled law in examining the government's proposed markets. As the court explained (JA45), a claim arising under Section 7 of the Clayton Act is evaluated under a three-part, burden-shifting framework. *See FTC v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 166 (3d Cir. 2022). The burden is initially on the government to "establish a *prima facie* case that the merger is anticompetitive." *Id.* To do so, the government must "(1) propose the proper relevant market and (2) show that the effect of the merger in that market is likely to be anticompetitive." *Id.* (citation omitted). This appeal concerns only the first prong of the *prima facie* case: identification of a proper relevant market.

"The relevant market includes both a product market and a geographic market." *Id.* The goal of the market-definition inquiry is to identify the "'area of effective competition'" among firms "'by reference to a product market (the 'line of commerce') and a geographic market (the 'section of the country').'" *FTC v. Advocate Health Care Network*, 841 F.3d 460, 467 (7th Cir. 2016) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 324 (1962)).

In defining a relevant product market, the "outer boundaries" of that market must be determined by the "reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." JA46 (Op.)

24

(quoting *Brown Shoe*, 370 U.S. at 325); *see Queen City Pizza*, *Inc. v. Domino's Pizza, Inc.*124 F.3d 430, 436 (3d Cir. 1997) (same). The product-market inquiry is designed to help identify those groups of competitors who "have the ability actual or potential to take significant amounts of business away from each other," JA47 (Op.) (quoting *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056, 1063 (3d Cir. 1978)), or who can "restrain an individual firm's ability to raise prices or restrict output," *id.* (quoting *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004)). This analysis requires close attention to "trade realities" regarding "consumer preference[s]" and competitive conditions, *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 356-57 (1963) (citation omitted), and other "practical indicia" like "distinct customer[]" bases, *Brown Shoe*, 370 U.S. at 325; *see United States v. Sabre Corp.*, 452 F. Supp. 3d 97, 142 (D. Del.), *vacated on other grounds*, No. 20-1767, 2020 WL 4915824 (3d Cir. July 20, 2020).

As to geographic market, a "relevant geographic market is that area in which a potential buyer may rationally look for the goods or services he seeks." JA54 (Op.) (quoting *Hershey*, 838 F.3d at 338); *see Hackensack*, 30 F.4th at 166 (same). The district court noted that one "often-used tool" for defining a relevant geographic market is the "hypothetical monopolist test." JA54 (citation omitted). Under that test, a geographic market is properly defined if "'a hypothetical monopolist who owns all the firms in the proposed market could profitably impose a small but

significant non-transitory increase in price ('SSNIP') on buyers in that market.'" *Id.* (quoting *Hackensack*, 30 F.4th at 167). If consumers could avoid "a SSNIP by purchasing the product from outside the proposed market," then the proposed market "is too narrow." *Id.* (quoting *Hershey*, 838 F.3d at 338). And the district court recognized that any geographic market definition must reflect "the economic realities of the industry." JA57; *Hackensack*, 30 F.4th at 166-67; *see Brown Shoe*, 370 U.S. at 336 (geographic market definition requires "pragmatic, factual approach" rather than "formal, legalistic one").

"Determination of the relevant product and geographic markets is a necessary predicate to deciding whether a merger contravenes the Clayton Act." *Hackensack*, 30 F.4th at 166 (quoting *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 618 (1974)). And it is the government that "bears the burden of establishing" those markets. *Id.* at 167. Failure to properly define a relevant market is fatal to the government's case. *See Queen City Pizza*, 124 F.3d at 436-37; *see also, e.g.*, *Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 455 (5th Cir. 2021) (affirming summary judgment for defendant because plaintiff's "relevant market definition is insufficient"); *City of New York v. Grp. Health Inc.*, 649 F.3d 151, 155-56 (2d Cir. 2011) (same); *FTC v. Lundbeck, Inc.*, 650 F.3d 1236, 1239-43 (8th Cir. 2011) (affirming trial judgment for defendant where FTC did not prove relevant market).

**B.** **The District Court Properly Applied Settled Law And Found As A Matter Of Fact That The Government's Proposed Markets Failed**

Having set out the correct legal standards, the district court explained why its findings of fact demonstrated the government had not carried its burden. In so doing, the court faithfully applied the principle that courts "must always consider the commercial realities of the industry involved." *Hackensack*, 30 F.4th at 168. Because the government's proposed markets "ignore[d] the commercial realities of sugar supply in the U.S." (JA46 (Op.)), the court correctly rejected them.

### 1. The District Court Correctly Rejected The Government's Product Market

The district court correctly concluded the government failed to establish a product market for the "production and sale of refined sugar to wholesale customers" because that market (i) was "internally inconsistent" and excluded distributors who compete with producers, and (ii) grouped together all "wholesale" customers without considering customer needs and supply options in the market.

*First*, the government's proposed market definition was "internally inconsistent." JA30 (¶72). The government excluded distributors because they do not produce sugar—even though they do produce some refined sugar types, JA34 (¶79)—while including marketing cooperatives like United and NSM that also do not produce sugar. The government's decision to exclude distributors from the product market was entirely "inconsistent with the commercial realities of the

industry." JA30 (¶72); JA49-52. The court described this conclusion as "not difficult," JA52; the trial record was "replete with evidence" showing why distributors should be treated as independent sellers in the relevant market. JA49.

For example, the district court found that:

- Distributors account for approximately 25% of refined sugar sales in the United States. JA34 (¶80).

- Distributors are not just resellers; they process white sugar into other types of refined sugar (*e.g.*, liquid sugar) and repackage sugar into different sized bags or shipment methods. JA16 (¶34 & n.6).

- Distributors "leverage" nationwide storage facilities and transportation resources to buy sugar opportunistically, store it, and sell when prices rise, or reposition sugar into other "areas that command higher prices." JA16-17 (¶34); JA50.

- Distributors purchase "massive amounts of foreign imports." JA50.

- There was "no evidence . . . that purchasers care whether their sugar supplier is a refiner producer, marketing entity, a cooperative or a distributor." JA36 (¶85).

- Sugar sellers and customers of all sizes consider distributors to be competitors for the sale of sugar. JA16-17 (¶34); JA33 (¶78); JA36 (¶84); JA51.

- Distributors compete directly against the same suppliers from whom they purchase refined sugar—even undercutting them on price. JA35-36, 1980-81 (¶¶83-84).

- "[D]istributors' ability to purchase sugar from a diverse array of sources (and locations) and to store and transport large amounts of sugar in response to shifting market conditions," JA52 n.24, makes them "independent actors within the market and . . . allows them to compete effectively with other suppliers," JA51.

- "[A]mple evidence" supports the "finding that wholesale customers could and would turn to distributors if the price of refined sugar . . . were to increase." JA49 n.22.

- Distributors would "remain a competitive constraint on price to end customers" "if producers and cooperatives were to increase their price for refined sugar." JA52 & n.24.

These findings fatally undermined the factual assumptions underlying the government's proposed product market. The government alleged in its complaint, and its expert assumed, that distributors were "merely partners" for producers, JA30 (Op.); that "[l]arger customers do not generally purchase from distributors," JA137 (Compl. ¶23); and that distributors "lack the ability to constrain . . . prices," JA149 (¶53). And Dr. Rothman testified that distributors were not competitors because

they are a "high cost option," JA564 (600:14-20), and do not "focus on the same customers" as other suppliers, JA574 (610:1-2). The evidence at trial proved otherwise. Because a well-defined product market should include firms that "have the ability actual or potential to take significant amounts of business away from each other," *SmithKline Corp.*, 575 F.2d at 1063, and because the evidence proved independent distributors have that ability, the district court found that "distributors of refined sugar must be included in the relevant product market." JA36 (¶86).

*Second*, the government grouped together all "wholesale" customers in the same product market without explanation or justification. JA53 (Op.). "[T]he government offered no testimony or documentary evidence" to show, for example, that retail customers "are similarly situated to industrial customers such that" they "should be grouped together." JA38 (¶90). And the government "introduced no evidence to support a finding that industrial customers have the same competitive options and purchasing behavior as any other wholesale customer." JA53.

That was a problem because the record indicated an important commercial reality the government overlooked: industrial customers and non-industrial customers have different needs and preferences that bear on how they interact with sellers in the marketplace. *Id*. The record showed that the government's product market included different customer bases, JA2045-46 (430:25-431:3), that contract for different quantities of sugar, JA2356 (PTX469), JA2774-75 (JTX27), pay

different prices, JA2047 (432:2-4), JA264 (166:7-24), JA986 (1069:2-7), and are served by different sales teams, JA37 (¶88). Yet the government's expert, Dr. Rothman, frankly "admitted that he did not even consider whether retail customers have the same competitive alternatives as industrial customers," JA53 (Op.), and "did not differentiate between refined sugar sales to industrial customers and refined sugar sales to retail customers," JA37, 1982 (¶87) (citing JA627 (668:16-24)).

The government did not even *consider* how those distinctions might bear on its product-market definition in order to ensure that it reflects "practical indicia" like "distinct customer[]" bases. *Brown Shoe*, 370 U.S. at 325. That failure of analysis— part of Dr. Rothman's overall failure to "perform any meaningful analysis . . . [of] the propriety of the defined markets provided by the Government," JA31 (¶74)— meant the government did not carry its burden of establishing a product market reflecting "economic realities," JA53 (Op.).

2.  *The District Court Correctly Rejected The Government's Geographic Markets*

The district court was likewise correct when it concluded the government's customer-based geographic markets "ignore the commercial realities of the sugar industry in this country—namely, that sugar flows freely and over long distances in response to market forces." JA57. The court had ample reason to find—as a matter of commercial reality and as an application of the HMT—that the government's

31

markets were "too narrow" because the "evidence establishes that customers already look beyond the Government's proposed markets for competitive alternatives." *Id.*

These conclusions, too, were backed by extensive findings that undercut the theory and factual assumptions on which the government's proposed regional geographic markets rested:

- "Transportation costs" for sugar are "relatively low and usually not determinative of whether a particular sugar supplier will supply a location." JA20 (¶42).

- "Shipping shorter distances is also not always cheaper than shipping longer distances. . . . ." JA20 (¶42 n.7).

- "A nationwide network of railroads, interstate highways, and transfer stations enables customers to buy refined sugar from suppliers located throughout the country." JA18 (¶39).

- "Sugar flows throughout the U.S. from areas of surplus to areas of deficit to meet customer demand." *Id.*

- "If a shortage of sugar exists in an area, the price of sugar will increase and attract sugar from other sources to compensate." JA19 (¶39).

- "Many" suppliers "have additional refined sugar to sell into these proposed markets," including "sugar that is already traveling through the region." JA56.

- "Customers also have the ability to pick up refined sugar at locations outside of those [proposed] markets and move it in." JA42 (¶101).

- "Customers with multiple locations could . . . purchase sugar outside of the proposed markets and transport it to their locations inside the alleged markets to avoid a price increase." *Id.*

- "More than 75% of sugar purchased in [the government's proposed] geographic markets is bought by customers with locations outside of those markets, enabling customers to shift supply among their plants located inside and outside of the Government's geographic markets to defeat any price increase." *Id.*

The government (and Dr. Rothman) rested on the assumption that "transportation costs" and "distance" are "significant determining factor[s]" in the price of sugar, JA138 (Compl. ¶24), and that "competition in the refined sugar industry is regional," JA557 (593:24-25); *see supra* at 7-8, 12. The district court found those factual assumptions unfounded.

The same findings also made clear that the assumptions guiding Dr. Rothman's hypothetical-monopolist analysis were "not credible." JA56. There has never been any dispute that, when conducting the HMT, a proposed market is "too narrow" if consumers could avoid a hypothetical monopolist's regional price increase "by purchasing the product from outside the proposed market." JA54 (Op.)

(quoting *Hershey*, 838 F.3d at 338).  Dr. Rothman said as much, but assumed the opportunity for arbitrage would be "limited" because "shipping refined sugar long distance" is "costly."  JA564-65 (600:14-601:6).  The district court found otherwise as a matter of fact.  JA42 (¶101).  Distributors already buy sugar in other states and from abroad and ship it to customers in the government's proposed regions.  JA34-35, 1980-81 (¶82).  Because low shipping costs would easily permit customers in the proposed markets to evade a hypothetical price increase, the proposed markets were "too narrow."  JA54 (citation omitted); *see* JA57.

Put simply, the government's proposed geographic markets did not accurately describe the "area[s] in which a potential buyer may rationally look for the goods or services he seeks."  *Hershey*, 838 F.3d at 338 (citation omitted).  The "evidence establishes that customers already look beyond the Government's proposed markets for competitive alternatives" because "sugar flows freely and over long distances in response to market forces."  JA57.  The district court thus concluded, correctly, that the government failed "to carry [its] burden" to establish a geographic market.  JA58.

## II.    THE GOVERNMENT'S ATTACKS ON THE DISTRICT COURT'S MARKET-DEFINITION ANALYSIS LACK MERIT

The government largely leaves unaddressed the district court's extensive factual findings, the flaws in Dr. Rothman's analysis that made his testimony incredible and unpersuasive, the government's own theory at trial, and the commercial realities of the sugar industry.

The government casts its appeal as a *legal* challenge to the district court's market-definition analysis. The government, however, concedes the district court "correctly articulated the basic legal principles that govern market definition in Section 7 cases." OB17. The supposed "legal errors" rest on the asserted "misappli[cation]" of those legal principles—*i.e.*, that the court "ignor[ed]" certain factors related to the product-market analysis and "failed to focus on" other factors related to the geographic-market analysis. OB17-18. In that vein, the government likens its appeal to that in *Hershey*, which challenged the district court's application of "an erroneous economic theory to [the] facts." OB15 (citing *Hershey*, 838 F.3d at 336). But there is no "erroneous economic theory" at play here. *See infra* at 42-44. The government's challenge to the "district court's weighing" of the evidence is "review[ed] for clear error," even when "cloaked as a legal argument." *Lundbeck*, 650 F.3d at 1239. "Despite the Government's protestations to the contrary, this case does not touch upon broad antitrust principles, but instead turns on a simple question asked in every civil case—whether the plaintiff carried its burden of proof." *United States v. Engelhard Corp.*, 126 F.3d 1302, 1305 (11th Cir. 1997). The government cannot circumvent the clear-error standard.

Yet the government has forfeited any clear-error challenge. Although it says the district court's findings are "also clearly erroneous" (OB15), the only support comes in the form of two cursory footnotes (OB23 n.18, 32 n.22). That is

insufficient to press a clearly erroneous challenge on appeal. *See Prometheus Radio Project v. FCC*, 824 F.3d 33, 53 (3d Cir. 2016) (arguments relegated to footnotes are forfeited). Under any standard of review, the government's arguments are foreclosed by the district court's findings of fact.

## A. The Government Mischaracterizes The District Court's Product-Market Analysis And Ignores Relevant Findings Of Fact

In seeking reversal of the district court's product-market analysis, the government mischaracterizes the district court's reasoning, misstates the legal standard governing market definitions, and disregards the mountain of evidence that led the district court to reject the government's proposed product market.

### 1. *Courts Need Not Always Treat Distributors As Customers Only*

The commercial realities in this industry convinced the district court that distributor-sold sugar should be included in the relevant product market. The government assails that determination on four grounds: (a) the court was required as a matter of law to treat distributors as customers, not suppliers; (b) the court wrongly elevated commercial realities over the HMT; (c) the court misapplied the HMT; and (d) the district court's analysis requires "double counting" of sugar sales. Each argument fails. And that alone is reason to affirm.[2]

---

[2] The government recognizes it cannot prevail if the district court's finding on distributors is affirmed. OB29 ("*[i]f* the distributor error is corrected" (emphasis added)). But contrary to the government's assertion (OB12), the converse is not

a.    The government first suggests (OB12) the district court held "as a matter of law" that "distributors must be treated as suppliers in the product market," and points to cases (OB24-26) supposedly requiring distributors to be treated as *customers* rather than *suppliers*.  This argument is doubly wrong.

*First*, the district court did not hold that distributors must always be included as suppliers in a product market.  The court's reasoning turned on a *factual*—not legal—determination that there is a "high cross-elasticity between 'refiner . . . sold' refined sugar and 'distributor sold' refined sugar."  JA52.  In other words, if producers increased their prices to the targeted customers, "wholesale customers could and would turn to distributors."  JA49 n.22, 52; *see supra at* 16.

*Second*, *none* of the cases cited by the government (OB24-26) hold that distributors can never be suppliers in a relevant product market.  They instead stand for the modest proposition that, depending on the commercial realities of the industry, non-producing sellers may be treated as either suppliers or customers.  And most critically, none address the commercial realities in *this* industry, on *this* record.

In *Allen-Myland, Inc. v. IBM Corp.*, 33 F.3d 194 (3d Cir. 1994)—which the government describes as the "correct approach to distributors" (OB25-26)—this Court addressed the position of computer "leasing companies" in the market for

---

true.  The district court found three independent flaws in the government's market definition, any one of which is sufficient to affirm.

"large-scale mainframe computer[s]." 33 F.3d at 201-02. These companies "purchase[d] computer equipment from manufacturers and lease[d] it to users." *Id.* at 202 (citation omitted). The question was whether *computer leases* competed with *computer manufacturers' sales* to end users. This Court looked to competitive realities in determining that some leased computers *did* compete with manufacturers' sales (and therefore needed to be included in the relevant market) and some did not. In particular, "[w]ith respect to leases of used computers, there [wa]s a significant difference whether those machines were made by IBM or some other manufacturer." *Id.* That was because "IBM was in a position to . . . carefully control[ ] the number of mainframes that would later appear on the used leasing market," whereas there was "no allegation" other manufacturers "possess[ed] the market power to control prices." *Id.* at 203. When those other manufacturers' computers were "placed in service by leasing companies, they provide[d] an alternative that limit[ed] IBM's power in the market." *Id.* For that reason, those machines "belong[ed] in the relevant market for large-scale mainframe computers." *Id.*

Other courts have similarly recognized that non-producers can compete with producers in a relevant product market. *See, e.g.*, *United States v. McKesson & Robbins, Inc.*, 351 U.S. 305, 308 (1956) (different "independent wholesalers [are] in direct competition with the McKesson wholesale division from which [they] buy[]"); *Sabre Corp.*, 452 F. Supp. 3d at 141 (product market for airline tickets sold only

through online travel agents "improperly excludes sales made by airlines in the direct channel"); *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1159 (N.D. Cal. 2004) ("outsourcing firms [that] . . . use Oracle, SAP or PeopleSoft" software are "independent competitors" of the same firms in the market for human relations and financial management systems); *N.W. Controls, Inc. v. Outboard Marine Corp.*, 333 F. Supp. 493, 520-21 (D. Del. 1971) (including market shares of control-wire reseller with control-wire manufacturers).

The analysis depends on the commercial realities of the industry. Sometimes when distributors buy their goods from a single dominant manufacturer, the facts may show they are unable to compete with the manufacturer with respect to the manufacturers' products, even if the manufacturer markets those products directly. *Cf. Allen-Myland*, 33 F.3d at 202-03. And if a distributor merely sells to a producer's customers for a commission, rather than buying the product and competing for its own customers, the same may be true. *Cf. McCullough v. Zimmer, Inc.*, 382 F. App'x 225, 229 (3d Cir. 2010). Neither set of facts is present here. It is a different factual analysis where, as here, distributors purchase refined sugar from a variety of interchangeable sources, compete head-to-head with manufacturers for the same customers, and can sell sugar "cheaper than" those manufacturers due to a host of competitive advantages. JA35-36 (¶¶83-84); *see supra* at 16-17 (listing advantages).

That commercial reality—which the government neither disputes nor engages—distinguishes this case from others where distributors lacked the same competitive independence and served as mere passive conduits to end users. *See Brown Shoe*, 370 U.S. at 341 n.69 (distributor sales included in manufacturer's market share because "most of [Brown Shoe's own retail stores'] purchases from Brown's distributors were eventually resold" by Brown Shoe itself); *Allen-Myland*, 33 F.3d at 202 (distributor sales not included when distributors "provide nothing more than an alternate way of *financing*"); *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 185 (3d Cir. 2005) (denture manufacturer prevented dealers from "adding competitors' teeth to their lines of products").[3]

---

[3] The government invokes (OB24-25 & n.19) vertical-restraint cases making passing reference to "vertical" relationships between manufacturers and distributors. These cases are inapposite. They do not address product market. They concern manufacturer-distributor relationships where the manufacturer had market power to impose conditions on distributors that find no analog here. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 890 (2007) (manufacturers' use of "vertical price restraints" to eliminate "intrabrand price competition" among "retailers selling the same brand"); *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972) (similar); *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 210, 215 (3d Cir. 2008) (Mack truck dealerships in competition with each other, but in a "vertical" relationship with Mack); *Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1214 (11th Cir. 2002) ("cases involving vertical restraints imposed by a manufacturer on distributors"); *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001, 1004-05 (5th Cir. Unit A Feb. 1981) (agreements between manufacturer and distributors to "abide by territorial and customer restrictions"). And the legal principle from those cases—that courts must analyze arrangements between manufacturers and distributors by "weigh[ing] all the

b.    Next, the government argues (OB22) that the HMT alone, in contrast to "current competitive conditions," "governs market definition." That is not what the government argued below, and is not the law.

The government's myopic focus on the HMT—and its disregard of every other consideration—conflicts with its own case at trial. Dr. Rothman testified that his application of the HMT, standing alone, could not define the relevant market. JA31 (Op.); *see also* JA610, 616 (651:14-16, 657:11-17). The government acknowledged in its post-trial brief that a relevant "market must correspond to the commercial realities of the industry," and "the hypothetical monopolist test" merely "confirms" whether the markets are "valid." Dkt. 218 at 6; *see* OB4, 5 (recognizing that HMT "verified" markets); *cf. FTC v. Thomas Jefferson Univ.*, 505 F. Supp. 3d 522, 542-43 (E.D. Pa. 2020) ("The Government acknowledges . . . the geographic market which passes the HMT must correspond with commercial realities.").

That is unsurprising because binding precedent says the same. While the HMT can play an important role in market definition, this Court has held that market definition "must be tied to the commercial realities of the specific industry at issue," and that the HMT is not "the only test that the district courts may use" in evaluating

---

circumstances of a case," *Leegin*, 551 U.S. at 885, rather than by imposing "*per se*" rules—accords with the fact-intensive analysis undertaken below.

a proposed relevant market. *Hershey*, 838 F.3d at 344-45.[4] (In fact, none of this Court's cases applied the HMT to a relevant *product* market at all.) This Court has further explained that the standard for evaluating a proposed product market— "reasonable interchangeability of use or the cross-elasticity of demand," *Brown Shoe*, 370 U.S. at 325—is a "highly factual issue" that frequently turns on "[s]pecial characteristics of the . . . industry," *Tunis Bros. Co. v. Ford Motor Co.*, 952 F.2d 715, 723 (3d Cir. 1991). The government was right below and wrong now: courts *must* analyze "current competitive conditions" in defining a product market.

     c.    The government also insists (OB10, 20) the district court "did not address" or misapplied the HMT. The court's findings directly refute that assertion.

     The district court explained that, "[b]ased on the evidence presented at trial," it could not "accept the proposition that distributors . . . are incapable of being effective price constraints on refiners," JA49, and found that distributors would "remain competitive with producers" in the event of a price increase, JA50-52. Numerous factors supported that conclusion, including distributors' "ability to

---

[4]   *See also Sabre Corp.*, 452 F. Supp. at 142 (rejecting HMT in favor of "economic 'practical indicia' to assess whether products are 'reasonably interchangeable'"); *Thomas Jefferson Univ.*, 505 F. Supp. 3d at 541 ("Market definition can rest on a mathematical equation only if the variables used in the equation reflect the market's commercial realities."); *United States v. Sungard Data Sys., Inc.*, 172 F. Supp. 2d 172, 182 (D.D.C. 2001) ("'[D]etermination of the relevant market in the end is "a matter of business reality—[] how the market is perceived by those who strive for profit in it."'" (omission in original) (citation omitted)).

purchase large quantities of refined sugar from many different sources, including foreign importers," JA33 (¶79), and distributors' ability to "leverag[e] nationwide storage facilities to buy domestic and imported sugar opportunistically when prices are low and selling later when prices are higher or in areas that command higher prices," JA16-17 (¶34). So if confronted by a "hypothetical monopolist" in the government's narrow geographic markets, many distributors—including distributors located outside those markets—would be able to retain price "independence," and could continue to "compete." JA858-59 (918:17-919:1); *see also* JA51 (Op.).

The government admits "[t]hat may be true" (OB22), but says the court should have blinded itself to the government's proposed geographic markets when considering the product market. As support, the government cites nothing. The government never posited a *global* market for refined sugar, so a hypothetical *worldwide* price increase would be nonsense. At trial, Dr. Rothman presented a hypothetical monopolist analysis bounded by the government's proposed regional markets (*i.e.*, the Southeast and "Georgia Plus"). *See* JA555-56 (591:20-592:3) (Dr. Rothman's testimony positing a hypothetical monopolist "in the geographic markets that the United States has defined"). On appeal, the government admits Dr. Rothman's HMT was limited to a "defined geographic area[]." OB18. And the government's Guidelines clearly state the HMT is applied within the bounds of the candidate geographic market. Guidelines § 4 ("[T]he hypothetical monopolist test

is applied to a group of products *together with a geographic region* to determine a relevant market."); *see Sabre Corp.*, 452 F. Supp. 3d at 125 (same).

That makes sense: the ultimate purpose of a HMT is to help determine the "area of effective competition" among firms. *Advocate Health Care Network*, 841 F.3d at 467 (citation omitted). The government cannot seriously believe the "area of effective competition" in this case is at once global and regional. And it cannot fault the district court for failing to hypothesize a monopolist in a worldwide market the government never proposed.

d.      The government's "double counting" argument (OB26-27) suffers from a similar flaw. When distributors ship sugar to customers in the government's regional markets from outside those areas, *see, e.g.*, JA16-18, 1961-63 (¶¶34-36); JA21 (¶¶43-44); JA34-35, 1979-80 (¶¶81-82), *the government's product-market definition does not count those sales*. JA632 (673:15-21); *see* JA623 (664:6-24). And for sales made to distributors inside the government's markets, the pertinent market shares could be adjusted by simple subtraction. JA940 (1002:4-8). As Dr. Hill explained in testimony credited by the district court, the sleight of hand of excluding *all sales* by distributors has the effect of "overstat[ing]" the market shares of refiners in the government's proposed markets. JA51 (quoting JA859 (919:5-8)).

The government fails to explain why the district court was wrong to credit Dr. Hill's testimony. It instead continues to downplay the significance of its regional

geographic markets.  By omitting sugar sold by distributors into the government's

markets from outside those markets, the government refuses to recognize

"competition where, in fact, competition exists."  *Brown Shoe*, 370 U.S. at 326.  The

district court correctly rejected the government's gerrymandering, and determined

that at least some distributor sales should be accounted for in any proper definition

of the relevant market.

### 2.    Courts Need Not Accept Markets Encompassing "Widely Divergent Customers"

The government separately contends (OB27) the district court committed

"legal error" by "requiring" the government to "subdivide" the market among

wholesale customers.  The court did no such thing:  it simply held the government

failed to establish that divergent customers should be treated as part of the same

market without evidence they are similarly situated.

The government argues (OB28) that courts have sometimes "defined markets

encompassing widely divergent customers."  Sometimes, sure.  But there is no legal

rule *requiring* district courts to approve such markets in the absence of any

supporting evidence.  To the contrary, courts reject proposed product markets for the

same reason as the district court here.  *See, e.g.*, *Engelhard Corp.*, 126 F.3d at 1306

(government's product market failed because it did not establish whether certain

customers were "representative of that market"); *United States v. Sungard Data Sys.,*

*Inc.*, 172 F. Supp. 2d 172, 192 & n.24 (D.D.C. 2001) (government failed to offer

"sufficient evidence to satisfy its burden of proof" when it "lumped all customers together" rather than "fine-tuning its presentation to account for significant differences among [them]"). The district court was not bound to accept the government's broad product market on its expert's *ipse dixit*—especially given its determination that Dr. Rothman was not credible, JA57, and its evidence-backed concern that retail and "industrial customers are, in fact, treated differently by suppliers in the competitive landscape," JA53 (citing JA37-38 (¶¶88-89)). Holding otherwise would prevent courts from undertaking the "pragmatic, factual" inquiry required of any market-definition exercise. *Brown Shoe*, 370 U.S. at 336.

The government also contends (OB29) that, in any event, "disaggregation of industrial and retail customers . . . would only have strengthened the presumption of anticompetitive effects" in a market of only industrial customers. That argument lacks factual support. The government never attempted to prove a product market comprising only industrial customers. Dr. Rothman never analyzed industrial customers separately. JA37 (¶87). And the government never offered an alternative product market at trial. JA52. The government points to no evidence (let alone findings) establishing suppliers' shares of an industrial-customer market in the government's geographic markets. (The figures it does cite (OB29) are "total" nationwide sales figures. JA264-65, 328 (166:10-167:3, 255:10-21).) The government cannot rely on an industrial-customer market it never presented at trial.

**B.   The Government's Arguments On Geographic Markets Fail To Grapple With Its Position At Trial And The District Court's Findings**

The government's arguments regarding geographic market similarly fail to engage with the district court's decision or acknowledge its position at trial.  In rejecting the government's proposed regional markets, the court rested largely on sugar buyers' ability to engage in arbitrage by going outside of those markets to source sugar—giving those buyers the capacity to withstand any hypothetical monopolist.  At trial, the government recognized the importance of arbitrage and asserted that arbitrage opportunities were limited.  Faced with adverse fact-finding on that point, the government does not address arbitrage anywhere in its appellate brief.  The arguments it does make have no merit.

1.   The government (OB32) first insists the district court somehow misunderstood the "economic theory of customer-location-based geographic markets."  As the government tells it (OB31), the court's rejection of the government's geographic markets rested on a failure to grasp that the government's "customer-based markets account for *all* producers that serve customers located in those markets, regardless of the producer's location."  And the government (OB32) likens this purported error to "the one reversed in *Hershey*."  The government misunderstands the district court decision, *Hershey*, and its own economic theory.

The district court fully understood the government's markets were "formulated around customer locations" and so "all relevant sellers to the area were already considered." JA56. But those geographic markets failed in light of "the economic reality . . . that sugar flows easily across the country from areas of surplus to deficit in response to prices and demand." JA57. The "evidence establishes that customers already look beyond the [g]overnment's proposed markets" when they buy sugar; "[f]inding that they would continue to do so in the face of increased sugar prices is not difficult." JA57. Specifically, refined-sugar customers "have the ability to pick up refined sugar at locations outside of those markets and move it in." JA42 (¶101). Customers can alternatively have sugar shipped to their facilities in one part of the country, and then redirect it to their facilities inside the regions. *Id*. And because the government treats distributors as "customers," distributors delivering sugar from outside the regions to wholesale customers inside are (and would remain) "arbitrage" agents too. *See* JA34-35, 1979-80 (¶82); JA17-18, 1962-63 (¶36). Put simply, the proposed customer-based geographic markets failed because of customers' ability to buy sugar from outside the region (*i.e.*, geographic arbitrage).

That factual determination makes the government's reliance on *Hershey* remarkably misplaced. The district court in *Hershey* applied a "discredited economic theory" for hospital mergers instead of the HMT. OB32 & n.23 (citation omitted). The district court here applied the HMT exactly as this Court described it

in *Hershey*: when "consumers would respond" to a hypothetical monopolist's price increase by "purchasing the product from outside the proposed market . . . the proposed market definition is too narrow." *Hershey*, 838 F.3d at 338.

The Guidelines likewise explain why the government's efforts to define customer-based regional markets were doomed. A customer-based regional market is not properly drawn if a hypothetical monopolist's price increase would be "defeated . . . by arbitrage, e.g., customers in the region travelling outside it to purchase the relevant product." Guidelines § 4.2.2.

In short, the government's geographic markets did not reflect "the commercial realities of the industry involved." *Hackensack*, 30 F.4th at 168. Contrary to the government's theory, JA138 (Compl. ¶24), "sugar flows in response to supply and demand and can do so over long distances," JA39 (Op.¶93). That "economic reality" defeated the government's customer-based regional markets. JA57 (Op.).

2. The government next asserts the district court improperly focused on "supply-side factors"—including "the possibility that a competitor would increase sales in the alleged geographic markets 'in response to a price increase'"—that should be considered only in "Defendants' rebuttal case." OB33 (citation omitted). That is a red herring. As noted above, a customer-based regional market is inappropriate if the hypothetical monopolist's price increase would be defeated by arbitrage. The district court found that (i) such conduct already occurs in the

government's markets, and (ii) in the event of a price increase, customers located within the area "easily could (and likely would) turn to outside the area for additional sugar supply." JA43 (¶104); *see* JA39, 42 (¶¶92, 94, 101). These arbitrage findings are uncontested and alone sufficient to sustain the court's judgment.

The government's argument about supply-side factors is also nonsensical. Regardless whether the customer arranges to pick up sugar outside the region (arbitrage), or asks a supplier to deliver the same sugar to a location inside the region, the commercial reality is the same: "sugar flows" cost-effectively over long distances to where it is needed. JA57 (Op.); JA39 (¶93). Whether the customer (*e.g.*, General Mills) arranges for rail shipment or asks the supplier to arrange for rail shipment is immaterial. Either option reflects where "a potential buyer may rationally look for the goods or services he seeks." *Hershey*, 838 F.3d at 338 (citation omitted). And both explain why a hypothetical monopolist would not be able to sustain a price increase within the government's narrow regional markets.

3.     The government finally contends the district court found Dr. Rothman "'simply not credible'" and "reject[ed] the . . . proposed overlapping geographic markets on the basis that they were overlapping." OB30-31 (citation omitted). Not so. The court rejected the government's regional markets because, in light of commercial realities, they were "too narrow." JA57. And it found Dr. Rothman's testimony "simply not credible" (JA56) for many reasons, including the fact that he

did not identify the markets to begin with; did not test any markets other than the ones the government provided; could not say whether one market was more appropriate for assessing this merger than the other; admitted the HMT he applied would be satisfied whether applied to a six-state region or the entire country; and relied on "flawed" assumptions disproven at trial. JA29, 55-56. That credibility determination was not clearly erroneous, and did not reflect "a legal and economic misunderstanding." OB30.

\* \* \*

The district court's findings on product and geographic market are each independently dispositive. For any of these reasons, this Court should affirm.

## III. THE GOVERNMENT'S REMAINING ARGUMENTS DO NOT IDENTIFY ANY ERROR IN THE DISTRICT COURT'S JUDGMENT

### A. The Government's Evidence On Anticompetitive Effects Is Irrelevant And Misleading

The government devotes pages (OB34-41) to setting out evidence on a question that the district court did not address, and that is not properly before this Court: whether the government proved the second prong of its *prima facie* case (anticompetitive effects). The government's detour identifies no error in the district court's judgment. And the government's effort to try its case on anticompetitive effects on appeal is misplaced and misleading.

1.      Market definition is a threshold issue in every Clayton Act case. *See supra* at 26.  That is because, without some understanding of "the boundaries" of the relevant market, a court "lacks the appropriate context in which it must judge any potential anticompetitive harm."  JA47-48 (Op.); *see Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018).  Without a relevant market, neither the district court nor this Court can assess the second prong of the government's *prima facie* case.

The government justifies its decision to press evidence of anticompetitive effects anyway by describing market definition as a "subsidiary" question, invoking older Supreme Court cases.  OB37 (quoting *United States v. Pabst Brewing Co.*, 384 U.S. 546, 549-50 (1966)).  But the Supreme Court and this Court have since been clear that "[d]etermination of the relevant product and geographic markets is 'a necessary predicate' to deciding whether a merger contravenes the Clayton Act," *Marine Bancorporation*, 418 U.S. at 618 (citation omitted), and that the government has the burden to establish such a market, *Hackensack*, 39 F.4th at 167.

The government (OB36-37) cites cases in which courts purportedly analyzed anticompetitive effects even after rejecting the government's proposed markets.  But in those cases the court adopted an alternative market proposed by the *government*.  In *United States v. Energy Solutions, Inc.*, the government asserted four different product markets, two of which were "sub-divi[sions]" of the other two.  265 F. Supp. 3d 415, 436-37 (D. Del. 2017).  The district court rejected the two "sub-

divide[d]" markets, but concluded the government had "produced sufficient evidence establishing" that the first two markets were "relevant product markets." *Id.* at 437. Likewise, in *FTC v. AbbVie Inc.*, 976 F.3d 327, 373 (3d Cir. 2020), the government presented an "alternative" product-market definition the district court accepted after concluding that the "evidence overwhelmingly" supported that product-market definition, *FTC v. AbbVie Inc.*, 329 F. Supp. 3d 98, 131 (E.D. Pa. 2018); *see also id.* at 128 ("The FTC must prove both the relevant product or products that comprise the market as well as the geographical area for the market.").[5]

Here, the district court found that *all* of the relevant market definitions advanced by the government failed. JA46. As the court recognized, it would have been economic nonsense to analyze anticompetitive effects in a market the government did not properly define. JA47-48. The government's insistence that the court was required to have done so anyway flouts precedent establishing that a failure to define the relevant market is "fatal" to the plaintiff's case. *Queen City Pizza*, 124 F.3d at 436-37; *see supra* at 26 (citing cases).

---

[5]    In *United States v. Continental Can Co.*, 378 U.S. 441 (1964) (cited at OB36), the Supreme Court adopted the government's product market. *See* Opp. Mots. to Dismiss or Affirm 8-10, *United States v. Cont'l Can Co.*, No. 367 (U.S. Oct. 1, 1963), 1963 WL 105870 (advocating product market of "glass and metal container companies"); 378 U.S. at 457 (adopting product market of "glass and metal containers").

The fundamental point is this: the district court expressly declined to address "the second prong of the *prima facie* case—*i.e.*, whether the Government has shown that the effects of the acquisition are likely to be anticompetitive." JA59. Without findings on that prong, there is nothing for this Court to review. The Court should not address the government's one-sided presentation of the evidence on appeal. *See Tokash v. Foxco Ins. Mgmt. Servs., Inc.*, 548 F. App'x 797, 802 n.4 (3d Cir. 2013) ("Although the trial judge can weigh the evidence and assess the credibility of witnesses, [a court of appeals] may not." (alteration in original) (citation omitted)).

2. There is no reason for the Court to read further. But to avoid any misimpression, the government is flat wrong when it repeatedly asserts (OB7, 11, 36) that "undisputed" evidence established a "presumption" of anticompetitive harm in markets the government never sought to establish. In arguing otherwise, the government distorts Dr. Hill's testimony beyond recognition.

Dr. Hill testified that he did not find "any concentration concerns" in either of the broader geographic markets he suggested as potential alternatives. JA849-50 (909:3-910:17). On cross, the government pointed to market-share and HHI calculations from a single year (*i.e.*, the market share and HHI calculations presented in the government's brief at 7-8) that "used Dr. Rothman's share methodology." JA932 (994:6-8). Dr. Hill explained that he disagreed with Dr. Rothman's methodology on multiple grounds, including that it (i) wrongly excluded sugar

distributors, JA857-59 (917:23-919:8), and (ii) treated United and all of its producer-members as a single entity, JA857 (917:7-10); *see* JA855-57 (915:22-917:4).[6]  Both methodological flaws led Dr. Rothman to "overstate . . . concentration" and "market share."  JA857-59 (917:5-919:8).  So the only world in which the figures relied on by the government are "undisputed" is a counterfactual one in which Dr. Rothman's discredited "share methodology" is accepted and applied to a market the government did not even attempt to establish.

## B.    The District Court's Observations Regarding USDA Formed No Part Of The Judgment

The government ends (OB41-48) by attacking a strawman:  the district court's observations regarding USDA.  Contrary to the government's intimations, the court never recognized an "immunity" from the antitrust laws, OB42, or an "efficiencies defense," OB47.  And the court's discussion formed no part of its judgment.

At the outset, the government challenges the district court's "assertion[s]," "indicat[ions]," and "statements" related to USDA.  OB15, 41.  But this Court, like all appellate courts, "reviews judgments, not statements in opinions."  *Black v. Cutter Labs.*, 351 U.S. 292, 297 (1956); *see EEOC v. Pennsylvania*, 768 F.2d 514, 516 n.1 (3d Cir. 1985) (dismissing cross-appeal where it addressed only "reasoning

---

[6]    Dr. Hill similarly provided extensive testimony addressing the many flaws in the government's evidence on unilateral and coordinated effects.  *Compare* JA884-910 (944:17-970:6), *with* OB37-40.

of the district court that was not essential to the judgment"). The government cannot bring itself to argue that the district court's observations regarding USDA actually impacted the court's judgment; at most, the government thinks it might be "unclear." OB41. Even a cursory review of the court's opinion reveals otherwise. *See* JA63 (resting judgment on failure to identify relevant market); JA59 (declining to address "whether the Government has shown that the effects of the acquisition are likely to be anticompetitive"). That is enough to reject the government's arguments.

As even the government acknowledges (OB43, 47), Defendants did not press for regulatory immunity or advocate for an efficiencies defense. And the district court did not adopt either. Nor did the court hold that "USDA's regulations rebutted the Government's *prima facie* case." OB44.[7] The court ended its analysis at the first prong of the government's *prima facie* case—long before any such defense or rebuttal would spring into effect. JA59. And while the government briefly suggests the court folded its assessment of USDA's regulations into its consideration of the *prima facie* case, OB44, the opinion concludes that the government "failed to identify the relevant market" and *then* goes on, in a separate section, to discuss USDA's regulatory program. JA59.

---

[7] The government's suggestion (OB45) of inconsistency with *American Crystal Sugar Co. v. Cuban-American Sugar Co.*, 259 F.2d 524 (2d Cir. 1958), is accordingly misplaced. That 64-year-old decision also involved an entirely different market than the ones the government proposed here. *Id.* at 527-28.

The district court discussed USDA's role for a far simpler reason: the court found it "more than curious" that the government would expend its limited antitrust enforcement resources on challenging an acquisition "in an industry where the Government itself keeps the prices high and, in many ways, controls the competition." JA63. That policy observation, while not a component of the court's judgment, was perfectly legitimate.

\* \* \*

The record in this case is long and detailed, involving fact-intensive questions about the commercial realities of the U.S. sugar industry. The district court's decision turned on extensive findings of fact and credibility determinations. The district court had the opportunity to study the record for months, and to observe and question the witnesses at a four-day trial. The government lost that trial on the facts. Because the government cannot—and does not—challenge the district court's findings, the judgment below should be affirmed.

# CONCLUSION

The district court's judgment should be affirmed.

Dated:  November 21, 2022

Respectfully submitted,

*/s/ Melissa Arbus Sherry\**

Lawrence E. Buterman
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY  10020

Christopher S. Yates
LATHAM & WATKINS LLP
505 Montgomery Street
Suite 2000
San Francisco, CA  94111

Jack B. Blumenfeld
Brian P. Egan
Daniel C. Kerrick
MORRIS, NICHOLS, ARSHT &
  TUNNELL LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899

Melissa Arbus Sherry
  *Counsel of Record*
Amanda P. Reeves
Lindsey S. Champlin
David L. Johnson
Charles S. Dameron
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC  20004
(202) 637-2200
melissa.sherry@lw.com

*Counsel for United States Sugar Corporation*

Amanda L. Wait
Norton Rose Fulbright US LLP
799 9th Street, NW
Suite 1000
Washington, DC  20001

Kelly E. Farnan
Richards, Layton & Finger, P.A.
920 N. King Street
Wilmington, DE  19801

/s/ Timothy G. Cameron*
Timothy G. Cameron
Peter T. Barbur
David R. Marriott
Daniel K. Zach
Michael J. Zaken
Lindsay J. Timlin
Hannah L. Dwyer
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY  10019
(212) 474-1000
tcameron@cravath.com

*Counsel for Imperial Sugar Company and Louis Dreyfus Company LLC*

Daniel K. Hogan
Hogan McDaniel
1311 Delaware Avenue
Wilmington, DE  19806

/s/ Peter J. Schwingler*
Peter J. Schwingler
Stinson LLP
50 South Sixth Street
Suite 2600
Minneapolis, MN  55402
(612) 335-1564
peter.schwingler@stinson.com

*Counsel for United Sugars Corporation*

*\*Pursuant to Third Circuit Local Rule 28.3(d), each attorney who has affixed a signature to this brief certifies that she or he is a member of the bar of this Court.*

# COMBINED CERTIFICATIONS

## 1. CERTIFICATE OF BAR MEMBERSHIP

I, Melissa Arbus Sherry, counsel for Appellee United States Sugar Corporation, hereby certify pursuant to Rule 28.3(d) that I am a member in good standing of the bar of the Court of Appeals for the Third Circuit. I further certify that pursuant to Third Circuit Local Rule 28.3(d), each attorney who has affixed a signature to this brief certifies that she or he is a member of the bar of this Court.

## 2. CERTIFICATE OF WORD COUNT

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 32.1, I hereby certify that the foregoing brief contains 12,999 words as counted using the word-count feature in Microsoft Word 365, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 and a 14-point Times New Roman font.

## 3. CERTIFICATE OF IDENTICAL BRIEFS

Pursuant to Local Rule 31.1(c), I certify that the text of the electronic and hard copy forms of this brief are identical.

**4.    CERTIFICATE OF VIRUS CHECK**

Pursuant to Local Rule 31.1(c), I certify that a virus check of the electronic PDF version of this brief was performed using Microsoft Defender Antivirus, which was updated November 21, 2022, and according to that program no virus was detected.

Respectfully submitted,

*s/ Melissa Arbus Sherry*
Melissa Arbus Sherry
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC  20004
(202) 637-2200

*Counsel for United States Sugar Corporation*

Dated:  November 21, 2022

**CERTIFICATE OF SERVICE**

I, Melissa Arbus Sherry, hereby certify that I have this 21st day of November, 2022, electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system, which will send notice to all registered CM/ECF users. Participants in the case are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Melissa Arbus Sherry*
Melissa Arbus Sherry