```
1              UNITED STATES COURT OF APPEALS
                  FOR THE THIRD CIRCUIT
2
3   UNITED STATES OF AMERICA,     )  Case No. 22-2806
                                  )
4           Appellant,            )
                                  )
5   vs.                           )  January 18, 2023
                                  )
6   UNITED STATES SUGAR           )  601 Market Street
    CORPORATION, ET AL,           )  Philadelphia, PA 19106
7                                 )
            Appellee.             )  10:27 a.m.
8
                          ARGUMENT
9
    BEFORE THE HONORABLES:    AMBRO, PORTER and FREEMAN,
10                            CIRCUIT JUDGES
11  APPEARANCES:
12  For Appellants:           PETER M. BOZZO, ESQ.
                              UNITED STATES DEPARTMENT OF
13                             JUSTICE, Antitrust Division
                              950 Pennsylvania Ave., N.W.
14                            Washington, D.C.  20530
15  For Appellee:             MELISSA ARBUS SHERRY, ESQ.
                              LATHAM & WATKINS
16                            555 11th Street, N.W.
                              Suite 1000
17                            Washington, D.C.  20004
18
19
20
21
22
23      Veritext National Court Reporting Company
                  Mid-Atlantic Region
24        1801 Market Street - Suite 1800
                  Philadelphia, PA 19103
25                  1-888-777-6690
```

1                    I N D E X

2  ARGUMENT                                    PAGE

3    By Mr. Bozzo                              3

4    By Ms. Sherry                            25

5    By Mr. Bozzo                             55

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            P R O C E E D I N G S

2        (All Judges are notated as "The Court")

3              THE COURT:  Our second and last case

4    this morning, United States versus United States Sugar

5    Corporation, et al, No. 22-2806, Mr. Bozzo and Ms.

6    Sherry.

7        (Pause)

8              THE COURT:  Take your time setting up.

9        (Pause)

10             THE COURT:  Whenever you're ready.

11       (Pause)

12             MR. BOZZO:  May it please the Court,

13   Peter Bozzo for the United States.

14             I'd like to reserve seven minutes for

15   rebuttal.

16             THE COURT:  That's fine.

17             MR. BOZZO:  The defendants' merger

18   brings together and eliminates all competition between

19   two of the southeast's largest sugar refiners.  These

20   two competitors operate facilities, refineries, that

21   take raw cane sugar and transform it into the refined

22   sugar that gets incorporated into food products that

23   households across the country consume every day.

24             The merger threatens to increase prices

25   for this household staple for customers across 12

                                              Page  4

1    states.

2              THE COURT:  We're pretty familiar with

3    the facts.  As I understand at trial and this was an

4    expedited trial; is that correct?

5              MR. BOZZO:  That's correct.

6              THE COURT:  That both sides presented

7    to the Court the hypothetical monopolist theory; is

8    that correct?

9              MR. BOZZO:  The Government presented a

10   hypothetical --

11             THE COURT:  For the product.

12             MR. BOZZO:  -- monopolist theory.  The

13   defendant --

14             THE COURT:  The Court didn't -- the

15   Court went more of the Brown Shoe factors.

16             MR. BOZZO:  Well, the court indicated

17   the important role that the hypothetical monopolist

18   has played an important role in antitrust cases.  It

19   mentioned that in its geographic market analysis.

20             THE COURT:  It didn't seem to decide

21   the issue on hypothetical monopolist theory.

22             MR. BOZZO:  Well, it didn't reference

23   the test in its product market analysis, but that's

24   exactly where the Court's error, the misapplication of

25   the test lies.  The test analyzes an entire market,

Page 5

1    both its product and its geographic market components.

2                    For the Court to reference the test's

3    importance on the geographic market side is to apply

4    one-half of the test without recognizing that the way

5    it operates is by analyzing an entire market.  Hershey

6    makes --

7                    THE COURT:  If you were to assume for

8    the sake of argument that the Court chose not to apply

9    HMT to the product market, would that standing alone,

10   not thinking about the geographic market at all right

11   now, would that be valid to apply the practical

12   indicia instead?

13                   MR. BOZZO:  The -- yes, the Court could

14   apply an alternative test, but even if putting aside

15   the Court's errors with respect to the hypothetical

16   monopolist test, there's error under this Court's

17   decision in Allen-Myland.  Allen-Myland addressed a

18   market for large scale mainframe computers and it

19   held that leasing companies when they leased new

20   computers that they had just purchased from

21   manufacturers and were functioning as distributors

22   for, that those leases did not belong in the relevant

23   market, because the leasing companies did nothing to

24   increase the supply of new machines.  That's exactly

25   the error here.

Page 6

1          The Court took distributors, which are

2     simply resellers, refiners' customers that do nothing

3     to increase the supply of the relevant product.

4               THE COURT:  But the distributors aren't

5     solely these refiners' customers, right?  They also

6     get their sugar from other refiners in the United

7     States and around the world which they then arbitrage

8     when opportunities arise.  So in that sense, don't

9     they add new product?

10              MR. BOZZO:  They don't, because they

11    are collectively constrained by the supply that

12    they're able to purchase from the refining level.

13              THE COURT:  But the point -- I mean,

14    Judge Porter's point is the refining level doesn't

15    necessarily have to be within this country.  It can be

16    outside.  I mean, I'm looking at this, you know, from

17    more of a -- obviously a layperson's, but a practical

18    level.

19              If producers sell to distributors and

20    distributors get some from producers, some sugar, and

21    some from other producers that are outside the

22    geographic market, it sounds to me like what the

23    producers or distributors are trying to do, let's say,

24    you're a distributor and you're selling to Heinz and

25    you want to keep that customer really happy.  And so

Page 7

1    you probably put sort of a, what my law clerk calls a

2    speculative storage.  I'm going to put some aside just

3    in case there's a high demand that comes up and I've

4    got to be able to supply Heinz.  For God sake, I can't

5    let them go unfulfilled in terms of their requirements.

6              So that distributor then becomes in

7    effect, as Judge Noreika said just like a producer and

8    has to be included in the equation because the --

9    they're both producers and distributors are ultimately

10   selling to the customer, which is Heinz in my example.

11   Am I wrong?

12             MR. BOZZO:  Yes.  The --

13             THE COURT:  Well, practically how am I

14   wrong?

15             MR. BOZZO:  As to foreign supply, which

16   is one of the features that you mentioned that

17   distributors could potentially source sugar from, we

18   accounted for all foreign supply.  So when sugar was

19   sold from a foreign refiner to customers located in

20   the relevant geographic markets that sugar was

21   accounted for and we assigned market shares to it.  We

22   assigned 7 percent market shares to imports to reflect

23   those sales.

24             That indicates that under the

25   hypothetical monopolist test, distributors in the

Page 8

1   relevant geographic markets would be subject to any

2   substantial price increase imposed by the monopolist,

3   so they would not be able to defeat that price

4   increase.

5                    THE COURT:  But again, it really comes

6   back to Judge Porter's question.  If that distributor

7   can get the product elsewhere, the distributor is not

8   really affected in terms of pricing, right?

9                    MR. BOZZO:  These distributors would be

10  affected in terms of pricing under the hypothetical

11  monopolist test.  That's where the district court went

12  wrong --

13                   THE COURT:  Well I guess -- true,

14  because then you say the hypothetical monopolist

15  controls the entire world.

16                   MR. BOZZO:  Exactly.  And this is

17  exactly the error that this Court identified in

18  Hershey where the district court had considered

19  contracts between the merging defendants and third

20  parties that effectively prevented the imposition of a

21  substantial price increase.  But this Court said, you

22  need to hypothesize a monopolist.  That is part of the

23  exercise and that's exactly where the district court

24  here went wrong.  It answered the wrong legal question

25  because it failed to posit a monopolist controlling --

Page 9

1                THE COURT:  I guess what I'm wondering

2     though is if you -- you're assuming that the district

3     court must apply the HMT to the product market

4     analysis.  Where in Hershey we made clear that it does

5     not.  It can use Brown Shoe instead.

6                THE COURT:  It has the option.

7     Actually probably could do one or the other or

8     probably both if it wants to.

9                MR. BOZZO:  So two responses.  First, I

10     do think there's a misapplication of the test in

11     applying it to one-half of the market without

12     recognizing that the test tests the entire market.

13                The district court also failed to

14     reference the test in its product market analysis

15     without providing any legally or economically valid

16     justification for doing so.  The Government put

17     forward its case using the test that this Court has

18     endorsed as sufficient to establish a relevant market.

19                THE COURT:  Wait a minute, wait a

20     minute.  What are you saying that she should not have

21     applied the Brown Shoe factors?

22                MR. BOZZO:  She could have applied the

23     Brown Shoe factors, but given that we put forward a

24     sufficient means of establishing the market, there

25     should have been consideration of that means and a

1    rejection of it on its own terms.

2              Looking at factors that are irrelevant

3    under the test --

4              THE COURT:  You're talking about the

5    product market now, not the geographic market.

6              MR. BOZZO:  Correct.  Looking at

7    factors that are not relevant to the test's application

8    such as distributors' current sales that wouldn't be

9    possible on the same terms under a monopolist is

10   another misapplication under Hershey.

11             THE COURT:  Are there any factual

12   findings that the district court made in support of

13   its product market decision that you believe are

14   erroneous?

15             MR. BOZZO:  We believe that the

16   district court made legal errors, but if the Court

17   views its findings on --

18             THE COURT:  Let's start with the facts.

19   The question was, are there any factual findings that

20   you believe are clearly erroneous?

21             MR. BOZZO:  If the Court views the

22   application of the hypothetical monopolist test here

23   as a factual issue, we do believe that it was legally

24   erroneous and clearly erroneous because the Court

25   failed to posit a monopolist and instead considered

1  relevant -- irrelevant factors such as distributor's -

2  -

3              THE COURT:  But just stick --

4              MR. BOZZO:  -- current sales.

5              THE COURT:  -- just stick with the

6  facts, factual findings.  Are they all okay or are

7  there any of them that are clearly erroneous?

8              MR. BOZZO:  We are -- other than the

9  challenge that I just mentioned --

10             THE COURT:  Yeah.

11             MR. BOZZO:  -- we have not based our

12  appeal on the challenge to legally erroneous findings

13  in the district court's decision and that's because we

14  think there are legal errors.  This goes back to, in

15  addition to the hypothetical monopolist points.

16             I do want to emphasize the error in

17  failing to recognize that distributors' role as

18  resellers under Allen-Myland means that it was

19  permissible for the Government not to treat them as

20  suppliers.

21             THE COURT:  We've said that delineating

22  the geographic market is a factual test.  I don't

23  think we've said one way or the other about the

24  product market, but why should it be -- why should it

25  not be factual as well?  I mean, you've got experts

1   testifying, they can't testify to matters of law,

2   right, they're testifying to matters of fact.

3                MR. BOZZO:  Well, this Court said about

4   the geographic market in Hershey that it involved the

5   application of legal principles to factual findings.

6   And in Hershey there was de novo review --

7                THE COURT:  Right.

8                MR. BOZZO:  -- because the errors were

9   in the application of legal principles.  That's

10  exactly the kind of error that we think happened here.

11  There was error in misapplying Allen-Myland based

12  on that failure to recognize distributors' status as

13  resellers, there was error under the hypothetical

14  monopolist test's in failing to recognize the test

15  application to both sides.

16               THE COURT:  Okay.  Let me just ask it

17  this way, if you were writing the rule for us to

18  determine the product market, is that a factual test

19  or a legal one?

20               MR. BOZZO:  I would -- I believe that

21  the rule from geographic market applies here, which is

22  that while there are factual components to the test,

23  there is also an application of legal principles.  And

24  where there's a misapplication of those principles,

25  that's reviewable de novo and reversable.

Page 13

```
 1                    THE COURT:  Well, let's just hang with
 2    product market right now.  Your product, suggested
 3    product market was the producers or production and
 4    consuming or -- of sale of refined sugar; is that
 5    right?
 6                    MR. BOZZO:  Correct.
 7                    THE COURT:  And the Court suggested
 8    that it should be producers, distributors, and
 9    consumers.
10                    MR. BOZZO:  The Court held that
11    distributors should be treated as suppliers in our
12    relevant markets, yes.
13                    THE COURT:  Correct.  And we talked
14    about that previously.  What's so factually erroneous
15    with respect to that?
16                    MR. BOZZO:  What's factually erroneous
17    is the failure to appreciate the import of
18    distributors' role as resellers, as entities that do
19    nothing to increase the supply --
20                    THE COURT:  But --
21                    MR. BOZZO:  -- of the --
22                    THE COURT:  But the tenor at least of
23    my questions it sounds like the judge did appreciate
24    how important the distributors were in this chain.
25                    MR. BOZZO:  It's true that they're --
```

Page 14

1    the district court did make a factual finding, paragraph

2    34, about the role that distributors play and that

3    they purchase refined sugar and resell it.  But we

4    think there was a legal error in failing to recognize

5    the import of that fact.

6                THE COURT:  Why shouldn't the product

7    just be -- and we're talking about a basic commodity

8    here.  Why isn't the product refined sugar, who cares

9    about producers, distributors?  The consumer, and

10   after all we're talking about consumer welfare, they

11   don't care about all those intermediate middleman and

12   so on, they just want sugar at a good price.

13               THE COURT:  At a good price.

14               MR. BOZZO:  I think that's a fair way

15   to look at it and there's a finding that the district

16   court again made that there are no reasonable

17   substitutes for refined sugar.  So whether

18   distributors are considered as a product market

19   question or whether it's a separate question as to

20   whether they are participants in the product market

21   it's the error in application of Allen-Myland and the

22   hypothetical monopolist test that demonstrates where

23   the district court went astray.

24               THE COURT: So the Court made a factual

25   finding  that distributors are participants in the product

1 | market.  How is that clearly erroneous?

2 |             MR. BOZZO:  It is -- well, our position

3 | is that it's legal error because it fails to reflect

4 | the Allen-Myland principle that where entities are

5 | resellers that do nothing to increase the supply of

6 | the relevant product it's permissible not to treat

7 | them as suppliers.

8 |             THE COURT:  Well again I keep coming

9 | back to Judge Porter's question.  The supply can be

10 | increased by just going outside the United States if

11 | you're a distributor.

12 |             MR. BOZZO:  It cannot because of the

13 | way we accounted for foreign sales.  So again, any

14 | distributors located inside our relevant geographic

15 | markets we accounted for foreign supply that they were

16 | receiving.  We assigned market shares to that supply.

17 |             So if there were a price increase on

18 | that supply, distributors would be subject to it, they

19 | couldn't rely on it as a source to defeat the price

20 | increase.

21 |             We also looked at what's called

22 | arbitrage, sales from customers, including

23 | distributors located outside of the geographic markets,

24 | to customers inside the geographic markets.

25 |             THE COURT:  Basically the concept of

Page 16

1    substitutability?

2                   MR. BOZZO:  Yes.  This is an

3    alternative source that could defeat the geographic

4    markets.  And there again, we concluded that those

5    sales would not be sufficient to undermine our

6    geographic market.

7                   So foreign supply was accounted for

8    in the way we defined our markets, the way we applied

9    the hypothetical monopolist test and it didn't defeat

10   the markets as we defined them.

11                  I would also like to note some of the

12   practical issues that come with holding that

13   distributors should have been assigned market shares.

14   Allen-Myland makes clear that double counting in the

15   assignment of market shares isn't appropriate.  And

16   that's one way that distributor sales could have been

17   accounted for here.

18                  If sales from refiners to distributors

19   were assigned to refiners and their market shares and

20   resales by distributors were assigned to distributors,

21   that's double counting of the sort that Allen-Myland

22   condemns.

23                  The defendants have proposed an

24   alternative in which sugar sales from refiners to

25   distributors would be subtracted from refiners' market

1   shares, but that ignores Brown Shoe's command that

2   market definition has to reflect competition, where in

3   fact, competition exists.  There's competition among

4   refiners for sales to distributors.  We can't ignore

5   that as part of our product market.

6              THE COURT:  Also competition, it may be

7   competition between producers and distributors with

8   respect to sales to customers.  The customer -- I

9   mean, again, I keep going back to questions that Judge

10  Porter asked, he's saying the customer wants it at a good

11  price, doesn't really care where you get it.  It could

12  be a distributor, could be a producer.

13             MR. BOZZO:  And we think that those

14  facts are not going to the relevant legal question,

15  not responding to the fact that distributors are

16  refiners' customers in this market.  There's a long

17  line of Supreme Court and Third Circuit cases that

18  have treated relationships between suppliers and

19  distributors as vertical relationships.  We think it's

20  not reflecting the need to posit a monopolist that

21  would control the terms under which sugar is sold to

22  distributors, the prices they're paying --

23             THE COURT:  But again --

24             MR. BOZZO:   -- potentially the terms of

25  resale.

1          THE COURT:  -- just again focus on the

2    practical.  Judge Noreika said that 20 -- made a

3    finding of fact that 25 percent of the sales to

4    customers in the national market are from

5    distributors.  And you were trying to say I think in

6    your brief, opening brief and your reply brief, that

7    if you look at the national market it's 31 percent, so

8    you're trying to get the presumption that there's

9    anti-competitive effects.

10          But if you have 25 percent of that 31

11   percent coming from distributors and not producers,

12   that takes 25 percent off of 31, which gets you right

13   around a little over 23 I think.

14          So, I mean, I -- looking at this again

15   anew, it seems like if you're the Government, you're

16   trying to say, okay, I've got to get the narrowest

17   geographic market I can even though I'm working maybe

18   backwards.  And that may explain why you at trial I

19   think focused on geographic market first; is that

20   correct?

21          MR. BOZZO:  In our post trial briefing

22   we --

23          THE COURT:  Post trial briefing,

24   correct.

25          MR. BOZZO:  -- briefed geographic

1  market first, correct.

2              THE COURT:  Okay.  And so I get the

3  picture, but when you include distributors in there it

4  becomes a different ballgame, a different analysis.

5              MR. BOZZO:  A couple of points, you

6  referenced the 31 percent market shares in the

7  national market, but the market shares in the other

8  proposed markets were higher, up to 54 percent.

9              THE COURT:  But the Court didn't buy

10  that in connection with the product market.

11              MR. BOZZO:  The Court did not think

12  that those markets were properly defined.  In our

13  briefing and argument we've expressed disagreement

14  with that view, but regardless of the geographic

15  market in which effects were analyzed, there was a

16  prima facie case.

17              Now, this is true even putting aside

18  the market shares because of our evidence of

19  unilateral and coordinated effects.  Unilateral

20  effects goes to the effect of eliminating Imperial as

21  an independent competitor, regardless of how other

22  firms would respond.  And coordinated effects goes to

23  the increased --

24              THE COURT:  Well, you know --

25              MR. BOZZO:  -- incentives for

Page 20

1   coordination.

2                    THE COURT:   -- Imperial was a

3   struggling company and it needed to get some type of

4   bail out, did it not?

5                    MR. BOZZO:   The district court made

6   some findings that Imperial was a struggling company,

7   yes.

8                    THE COURT:   But again coming back to

9   the big picture here, you're Heinz, and the product is

10  this commodity called refined sugar.  Does Heinz

11  really care if it gets refined sugar from the Georgia

12  plus area or the larger area that you talk about the

13  southeast or nationally?  I mean, Heinz probably

14  doesn't care if it gets it from California or even if

15  it gets it from somewhere outside this country.

16                   MR. BOZZO:   That's -- that may be right

17  and that's exactly what we accounted for in our

18  geographic markets.  Our geographic markets are broad

19  markets that included supply from all producers,

20  wherever located that sold to customers located in

21  those markets.

22                   So if Heinz is located in our

23  geographic markets regardless of where it purchased

24  from, we assigned market shares to the entity that was

25  making those sales.  This is exactly what the district

1   court failed to engage with.  It thought that we

2   hadn't accounted for sugar sold by refiners outside of

3   our markets, but customer location based markets of

4   the kind that we defined here, the kind that this Court

5   approved in Hackensack, account for precisely that.

6   That's one of the sources of error in the district

7   court's opinion.

8          THE COURT:  Is it exactly that she

9   didn't account for it or she thought the evidence

10   contradicted your hypothetical?

11          MR. BOZZO:  She -- I would say that she

12   didn't account for it, because the fact is that our

13   geographic markets include supply from any refiner

14   wherever that refiner is located.

15          So a failure to recognize that fact is

16   a misunderstanding of how customer location based

17   markets operate.  It's not a question of consistency

18   with the evidence, it's a question of legal

19   principles, such as those discussed in Hackensack

20   where the Court approved a market where services were

21   provided to residents of a county, including by

22   hospitals outside of it.  That's precisely the market,

23   the type of market that we defined here.

24          THE COURT:  Is there any -- the test

25   applied by the Court was essentially Brown Shoe.  Is

Page 22

```
 1   there any authority that you know of that says that if
 2   you present the HMT theory the Court must deal with
 3   that and not apply Brown Shoe?
 4                 MR. BOZZO:  Not authority directly
 5   making that point, but we do think that Hershey and
 6   Hackensack demonstrate that the test is a sufficient
 7   means of --
 8                 THE COURT:  Well, Hershey and
 9   Hackensack do not apply the HMT.  I mean, they talk
10   about it.
11                 MR. BOZZO:  They do apply the HMT --
12                 THE COURT:  Well, they said the people
13   -- I'm sorry, they said the people agreed that it
14   applies, so they didn't have to make a decision.
15                 MR. BOZZO:  On that issue.  But they
16   then go through and actively approved the relevant
17   markets that the Government approved in that -- that
18   the Government put forward in that case based on the
19   fact that they passed the hypothetical monopolist
20   test.  That's a demonstration that the test is
21   sufficient as a means of proving the markets.  Here,
22   there's no legally valid reason.
23                 THE COURT:  No, clearly it may be
24   sufficient, I agree with that.  But the Court isn't
25   consigned to use that as the only test.  It has the
```

Page 23

1    option of applying Brown Shoe, does it not?

2              MR. BOZZO:  Correct, yes.  But when the

3    Court does apply the hypothetical monopolist test it

4    has to do so correctly.  Failing to recognize that the test

5    analyzes the product and geographic markets together

6    is a form of misapplication and there's the

7    independent misapplication that I've addressed

8    regarding Allen-Myland, the failure to recognize

9    distributors as refiners', customers.

10             THE COURT:  What if the district court

11   opted to apply Brown Shoe and addressed the product

12   market first and stopped there?  Didn't continue to

13   look at the geographic market.  Would that -- would it

14   be okay then to forego applying HMT altogether?

15             MR. BOZZO:  It -- our argument is not

16   that it's necessary to apply the HMT but where the

17   Court acknowledged the test's importance for one-half of

18   the market analysis without recognizing that the way

19   the test operates is by testing the entire market,

20   that's a misapplication.  And there is --

21             THE COURT:  So if you use it, you have

22   to use it for product and geographic markets?

23             MR. BOZZO:  Correct.  There has to be -

24   -

25             THE COURT:  And you have to reach both

1    --

2                    MR. BOZZO:  -- a --

3                    THE COURT:  -- even if one fails?

4                    MR. BOZZO:  You may not have to reach

5    both questions, but when you're applying the test

6    there does have to be a recognition that it operates

7    by testing the product and geographic markets

8    together.

9                    THE COURT:  What is it -- I'm sorry,

10   but is there -- is that in the guidelines or is there

11   case law to that effect?  Where would we go to find

12   the proposition that says you have to apply -- you

13   can't mix and match, you have to do it for both

14   markets?

15                   MR. BOZZO:  That is in the guidelines,

16   Section 4, which both --

17                   THE COURT:  I'm looking at it.  Could

18   you --

19                   MR. BOZZO:  Sure.

20                   THE COURT:  If you don't have it right

21   away, perhaps you can deal with it on rebuttal --

22                   THE COURT:  Yeah, that's fine.

23                   THE COURT:  -- because it's a question

24   that needs to be answered.

25                   MR. BOZZO:  Sure.  Well, it's the

Page 25

1   sentence in the umbrella part of Section 4 that says

2   the hypothetical monopolist test is applied to a group

3   of products together with the geographic region to

4   determine a relevant market.

5              The D.C. District Court in FTC v Rag-

6   Stiftung made this point.

7              THE COURT:  Is that -- are you looking

8   at 411, 412, 413?

9              MR. BOZZO:  It's just the umbrella part

10  of Section 4 before Section 4.1.  It's at the very end

11  of that chapeau.  The hypothetical monopolist test

12  is applied to a group of products together with a

13  geographic region to determine a relevant market.

14             And both Hershey and Hackensack looked

15  to the guidelines in determining how the test

16  operates.  This is a point that defendants recognize

17  as well, page 43 of their response, that the test

18  operates by testing a product market within a defined

19  geographic area, and there was a misapplication of

20  failing to apply it that way here.

21             THE COURT:  Any further questions right

22  now?  We'll get you back on rebuttal.

23             MR. BOZZO:  Thank you.

24             THE COURT:  Ms. Sherry.

25             MS. SHERRY:  Good morning, Your Honors,

Page 26

1  may it please the Court, Melissa Arbus Sherry here on

2  behalf of the defendants.

3                 I want to start where counsel left off.

4  I would point you to the exact same place in the

5  horizontal merger guidelines because it shows the

6  disconnect in their theory on the hypothetical

7  monopolist test.

8                 They argue essentially that you need to

9  imagine when you're talking about product market, you

10 have to imagine a worldwide monopolist.  So there's

11 only one refiner in the entire world and so

12 distributors are stuck buying from that one single

13 refiner.  But as they just quoted to you, that's not

14 how the hypothetical monopolist test works, even in

15 their own guidelines.

16                 You have to look at the product market

17 in the context of the geographic market.  And so what

18 geographic market do we have here, we have the

19 regional ones they defined.  And to get back to all of

20 the questions when you look at the facts in those

21 regional markets, distributors have lots of different

22 options.  They have suppliers outside of the regional

23 markets, they have imports, more than 50 percent of

24 distributors' refined sugar comes from imports.

25                 THE COURT:  Now, your suggestion was

Page 27

1  that the market be national, so.  And then the

2  Government ultimately accepted that, saying if it is

3  national we still win.  Can they go outside the

4  national market easily?

5           MS. SHERRY:  I mean they can.  Again,

6  more than 50 percent of their refined sugar is coming

7  from imports, but I do want to address that argument

8  they made because they, you know, don't seem to do all

9  that much to defend their regional markets on appeal.

10 And so they like to fall back to this 31 percent that

11 you mentioned.

12           And I think it can't go without saying, I

13 mean, they tried their entire case based on regional

14 markets.  All of the discovery leading up to it was

15 focused on --

16           THE COURT:  They're trying to get the

17 biggest percentage and the smallest market --

18           MS. SHERRY:  Exactly --

19           THE COURT:  -- I get it, but -- and one

20 could say, okay, it's their burden so if they keep

21 going with Georgia Plus or the southeastern larger

22 market they're kind of stuck with that.

23           But going back to my days, let's say

24 you and I are against each other in a case and you say

25 it's X and I say it's Y.  And finally, I say okay,

Page 28

1   let's assume, Ms. Sherry, it's X, I still win.  What's

2   wrong with logically saying that in the antitrust

3   area?

4              MS. SHERRY:  So here's the problem with

5   saying it.  They said that in the post trial briefs,

6   so after trial, all of the discovery, all the evidence

7   is in.  In the post trial briefs for the first time

8   they said in like two or three sentences on pages 22

9   and 23 of their brief, look at this.

10             The problem when you do it so late is

11  you don't have evidence in the record to point to.  So

12  let's look at the evidence they point to to support

13  the idea of this 31 percent.  It's three pages, it's

14  in the joint appendix, page 930 to 932.  These are

15  three pages from Dr. Hill's cross-examination.  And

16  literally all they say about it is, look at Figure 23,

17  add up these two figures, does it equal 31 percent,

18  yes.  Is 31 more than 30, yes.

19             So where's Figure 23?  You know, where

20  did these numbers come from?  It's not in the record.

21  There's nowhere in the record that shows where that

22  31 percent comes from, there's no methodology, there's

23  no explanation of it whatsoever.

24             And so the problem with coming up with

25  this late breaking theory to try to save your case is

Page 29

1   you don't have the evidence to support it.  As the

2   district court recognized, there was nothing the Court

3   could do with that, such a conclusory statement, you

4   know, after the fact.  What is the Court supposed to

5   do, really say that there's a presumption based on,

6   you know, five lines of transcript in the testimony?

7            THE COURT:  Well, they did what I guess

8   what they have to do, is they have to try to eliminate

9   distributors.

10           MS. SHERRY:  Well, I mean, so let's

11  focus on the distributors.  I mean, the

12  idea of Heinz, right, the question for purposes of the

13  product market is cross elasticity of demand, right,

14  are they substitutes, are they reasonably

15  interchangeable.  And refined sugar absolutely is the

16  product.  So is there a difference between distributor

17  sold refined sugar and refiner sold refined sugar?

18  It's the exact same product.

19           THE COURT:  You look at it from the

20  basis -- from the viewpoint of the customer, you're

21  right.  But they're, I guess, I'm trying to look at it

22  from the viewpoint of the supplier, are they not?

23           MS. SHERRY:  Well, they do want to talk

24  about supply now, but that's another problem, right.

25  They came in -- they didn't come in with a production

Page 30

```
 1    defined market.  And the reason they didn't focus on

 2    production until now is because if what they really

 3    cared about was production, then all of United sales

 4    from the three other members wouldn't be included.

 5    Because while United is, you know, united for lack of a

 6    better word when it comes to sales, the members are

 7    not united when it comes with respect to production.

 8    They have different incentives when it comes to

 9    production.

10              And so that's why they identified a

11    customer based market.  They focused on sales, when

12    you look at it from the customer's perspective it

13    really doesn't matter.

14              Now, just to correct one thing.  They

15    claim that we've already accounted for imports, right,

16    7 percent of the markets are imports and so even

17    though distributors can easily purchase and do

18    purchase from imports, don't worry about because it's

19    already accounted for.  It's not.

20              All they've accounted for in the 7

21    percent is imports that are going directly into these

22    two regional markets.  So Indiana Sugars, which is

23    outside the regional markets when they get imports and

24    they sell into the southeast, those sales are not

25    being accounted for at all.
```

1           So no double counting problem, no

2   issue, they're just not being accounted for.  And so

3   they absolutely have left distributors out of the

4   market.  And really the only argument that they have

5   is to where the district court could possibly have

6   committed a legal error because they now admit that

7   they're not challenging any of the factual findings,

8   is to come back to this idea that, you know, you have

9   to look at it under the hypothetical monopolist test.

10  And not just --

11          THE COURT:  Although at trial, you

12  focused on the HMT as well, did you not?

13          MS. SHERRY:  We did.  And I -- you

14  know, to go to your questions about doctrine I don't

15  know if I view them as two totally distinct arguments.

16  I mean it has to be -- the markets have to be

17  consistent with commercial realities, that's what the

18  Brown Shoe says.  That's what this Court said in

19  Hackensack and Hershey.

20          And it didn't say that to the exclusion

21  of the hypothetical monopolist test.  I mean, the

22  purpose of the hypothetical monopolist test is one way

23  to test out the hypothesis, right.  Here's the

24  commercial realities, this is what I think the market

25  is.  I'm going to use this test to see if it's right

Page 32

1    or not.

2                    And the problem with their reliance on

3    appeal like so much on the hypothetical monopolist

4    test, number one is, it doesn't exist in the abstract.

5    So what evidence is there about why their markets, you

6    know, pass the hypothetical monopolist test.  All they

7    have is Dr. Rothman, their expert.

8                    The same expert that the district court

9    found to not be credible, not be persuasive.  And you

10   look at how he applied the hypothetical monopolist

11   test and his transcript is in the joint appendix, I

12   think almost the entire transcript except for a few

13   pages.  It starts on JA545.  You can read it cover-to-

14   cover and not really know what methodology he used to

15   apply the test.  You can read it.  You won't see any

16   quantification, you know, what SSNIP could be imposed,

17   how, why.

18                   All he says is, I don't really think

19   arbitrage is going to be a big issue, it's not going

20   to be sufficient enough to defeat a SSNIP here.  Why?

21   Well, for the same assumptions that were proven false

22   at trial, because transportation costs are

23   prohibitively expensive, sugar doesn't flow easily

24   through the country.  We don't think distributors are

25   real competitors.  I mean, that is the hypothetical

1    monopolist test they're riding now.

2                    THE COURT:  When you were preparing for

3    this expedited trial, what was your thought process in

4    dealing with the hypothetical monopolist test

5    primarily?  Because the Government did it and you felt

6    you needed to rebut it or because you thought

7    independently that's where one should start?

8                    MS. SHERRY:  Well, I think -- I

9    wouldn't say that's where we thought one should start.

10   I think one should start always with the commercial

11   realities.

12                   THE COURT:  I'm asking, I'm not --

13                   MS. SHERRY:  And to be clear, our

14   expert, Dr. Hill, didn't do a separate independent

15   hypothetical monopolist test.  Dr. Rothman had done

16   one and we explained why that that test was flawed.

17   One, because it was inconsistent with the commercial

18   realities.  And two, and it's sort of the same point,

19   is that he just didn't properly account for arbitrage.

20                   And, you know, the Government says

21   there's no -- you know, the district court somehow

22   didn't make any arbitrage findings.  I mean that's in

23   their reply brief.  But that is exactly what the

24   district court was focused on.

25                   Paragraph 101 is a very explicit

Page 34

1  finding when it comes to arbitrage.  There are ample

2  opportunities to look outside the market for

3  customers, to look outside the market in order to

4  purchase refined sugar in the event of a price

5  increase within the geographic markets.

6            THE COURT:  How would you answer the

7  question I asked your friend about the product market

8  and delineating the product market?  Is that a factual

9  matter or legal or some combination, how would --

10           MS. SHERRY:  It's a factual matter.  I

11  mean, you know, like anything.  What the Court really

12  was saying in Hershey is market definition is a

13  question of fact.  It's true whether it's product

14  market or geographic market.

15           Of course, if you get the law wrong in

16  doing so then, you know, that's a legal error subject

17  --

18           THE COURT:  Yeah.

19           MS. SHERRY:  -- to plenary review.

20           But, you know, and Hershey it was quite

21  different, right.  In Hershey the district court said

22  I'm applying the hypothetical monopolist test, but in

23  fact, the test that the district court applied was

24  this Elzinga-Hogarty test that had been discredited at

25  least in the merger context.  And then even with

Page 35

1  respect to that test, it only applied one-half of the

2  test and not the other and there were other sort of

3  legal errors to that effect.  There's nothing like

4  that here.

5          I mean, the district court made factual

6  findings.  I think the only legal error they've tried

7  to articulate is the fact that the Court didn't apply

8  the hypothetical monopolist test with respect to the

9  product market --

10          THE COURT:  Are you saying --

11          MS. SHERRY:  -- but neither did their

12  expert.  Their expert applied it looking at the two

13  together.

14          And the district court did talk about

15  about the hypothetical monopolist test when it came to

16  geographic market.  And it just said, it doesn't work

17  because of the arbitrage opportunities because it

18  would be very easy to defeat any SSNIP in this context

19  because customers already do go outside the market to

20  purchase their sugar.  They would continue to do so.

21  There are I think more than 75 percent of the sugar

22  sold into the southeast are to customers that even have

23  locations outside of the regional geographical markets

24  and so they would just go pick up their sugar from

25  there.

1          THE COURT:  So going back to your

2     themes at trial, did you emphasize HMT or did you

3     emphasize Brown Shoe factors?

4          MS. SHERRY:  The Brown Shoe factors.

5     And actually so did the Government.  So, I mean,

6     that's the other strange thing about this appeal is if

7     you look at the complaint in this case, if you look at

8     even Dr. Rothman's testimony, if you look at their

9     closing argument, post trial briefing, it is all about

10    the Brown Shoe factors.

11         They use the hypothetical monopolist

12    test as like a third factor to kind of support what

13    they've already said with respect to commercial

14    reality.  But their focus from the very beginning was

15    on commercial realities.  And, in fact, the premise

16    when they brought this case was all about

17    transportation costs and the expense to look at a

18    regional market because the transportation costs are

19    prohibitive.  It was all about sugar not flowing easily

20    throughout the country.

21         And that's why the district court came

22    out where it did.  It's not that it disagreed with

23    them on the law or on the hypothetical monopolist test

24    or economic theory.  It's because it disagreed with

25    the Court -- the Government, rather on the facts

Page 37

1    because of how the evidence came out at trial.  And as

2    it stands now, those factual findings are not in

3    dispute.

4                    THE COURT:  If the Court had applied

5    the hypothetical monopolist test, that assumes a

6    single hypothetical monopolist owns all the firms

7    globally.  And the Court then focused on distributors,

8    but how could distributors possibly compete with a

9    hypothetical monopolist that controls global sugar

10   production?

11                   MS. SHERRY:  So where I push back is

12   the word global.  That's not how the hypothetical

13   monopolist test would work here.  It would assume that

14   a single refiner was all refining sugar in the

15   proposed regional geographic markets that the

16   Government defined.  You don't zoom out to a

17   worldwide market that no one has ever suggested, and

18   if you did, the test would always be satisfied in the

19   circumstance.

20                   But the question is really is a

21   practical one, right, whether it's in hypothetical

22   monopolist test terms or more generally.  You're just

23   trying to see if the price can be increased or whether

24   there are other market factors at play that would --

25                   THE COURT:  But the district court

1  focused on imports.  So does that talk globally, does

2  it not?

3              MS. SHERRY:  Well, it does, but it

4  also, you know, is into the regional geographic

5  market.  So the focus on imports was the idea that, as

6  you mentioned, distributor at 25 percent of the

7  market, more than 50 percent of their refined sugar

8  comes from imports.  And so it's just one of, you

9  know, many examples that they have other suppliers

10  available to them and that's why they're able to

11  compete within these regional markets.

12              The other thing that the district --

13              THE COURT:  So you're saying that the

14  Government's proposed market would not pass the HMT?

15              MS. SHERRY:  I'm -- I think absolutely

16  not if you account for arbitrage as I think everyone

17  recognized is required to be accounted for.  You know,

18  the Government again response is just to say there's

19  no such findings in arbitrage, there are.

20              THE COURT:  There's kind of a garbage

21  in/garbage out thing, right, when doing the HMT.  If

22  you have factual assumptions for a hypothetical aren't

23  aligned with commercial realities, your HMT is not

24  going to work.  There's nothing magic about doing an

25  HMT, right, if the commercial realities don't line up

Page 39

1   with your assumptions.

2                   MS. SHERRY:  That's exactly right.  I

3   mean, it's an input question.  So if you do an HMT

4   based on the idea that sugar doesn't flow, you're

5   going to come out with the wrong result.  And I think

6   if you look at Dr. Rothman's (indiscernible) he gave

7   an example of how it is supposed to work and he gave

8   an example of milk.

9                   So, you know, you have milk on one

10  block.  If the price of milk goes up on that block

11  what's going to happen, are customers going to go to

12  the next block, if so, you broaden the market

13  and you kind of keep going through that exercise until

14  you define the correct market.

15                  Dr. Rothman didn't do that.  I mean,

16  Dr. Rothman took the Government's markets as he gave

17  them.  He didn't test them.  He took the Government's

18  assumptions with respect to transportation costs and

19  the like.  He didn't, you know, look at or consider

20  the contrary evidence that came in in the record and

21  garbage in/garbage out.  And that was the problem with

22  the test here.

23                  And that's why when I think of commercial

24  realities they're not, you know, two distinct concepts

25  necessarily.  The market has to be consistent with

1  commercial realities, but it's one way to test whether

2  or not that's true.

3          THE COURT:  What do you say to the

4  argument that it's legal error to purport to do an HMT

5  analysis with respect to geography but not product

6  market?

7          MS. SHERRY:  Yeah.  And that's never --

8  I mean, that's not the law.  That's never been their

9  position and the HM -- I mean, the horizontal merger

10  guidelines that they read to you it doesn't talk about

11  doing an HMT, and in fact, the part they read is right

12  before and this is at the end of Section 4, it's right

13  before 4.1.

14          THE COURT:  Yeah.

15          MS. SHERRY:  What it basically says is,

16  okay, we're going to go on and we're going to talk

17  about product market on the one hand and then we're

18  going to talk about geographic market, but to be

19  clear, these are not two completely separate and

20  distinct concepts.  And when you apply the

21  hypothetical monopolist test, it's applied to a group

22  of products together with a geographic region to

23  determine a relevant market.

24          And so it's not like you look at

25  product market in the abstract, apply some test to it

Page 41

1    in a worldwide hypothetical -- you know, hypothetical

2    monopolist situation.  You look at it within the

3    regional geographic markets.

4                    I think the other way to look at it

5    when we're talking about product market and you look

6    at the case and like, what is the test for product

7    market, it's whether there's reasonable

8    interchangeability, as to whether there's cross-

9    elasticity of demand.  The district court made a

10   finding with respect to that.  That's at JA52.

11                   And it's for all the same reasons we've

12   already discussed because distributors in this market,

13   I know they like to say they're just resellers, but

14   the facts proved otherwise.  They are a lot more than

15   just resellers.

16                   It talked about the diversity of

17   supply, but there's also the example you gave with

18   respect to saving up storage, I forgot what you said

19   your law clerk called it, speculative storage.  They

20   have -- distributors buy in large quantities.  They

21   have the ability to store it in and they do store

22   sugar and they're able to move it across the country

23   to areas of demand.  That's something that United, for

24   example, can't do.  United has the obligation to sell

25   all of the sugar from its members each year.

Page 42

1          And so that's another reason they have

2   this ability to compete within the market.  And so

3   unlike all the, you know, cases they like to point to

4   where you have distributors or resellers who don't

5   have that ability to compete, here the factual

6   findings show that they are more than able to compete

7   with refiners in these particular markets.

8          THE COURT:  Your friend keeps referring

9   to Allen-Myland.

10          MS. SHERRY:  Yes.

11          THE COURT:  Can you say a few words

12   about how that case applies or doesn't apply here?

13          MS. SHERRY:  So I think Allen-Myland

14   helps us a lot because what it shows is it's not an

15   on/off switch.  You know, you look and see how

16   distributors fare in the market, whether there are

17   competitor restraint.  And what Allen-Myland did is a

18   very nuanced analysis and said, in certain

19   circumstances they are, in other circumstances they're

20   not.  When they are, we need to actually include them

21   in the market.

22          That's the analysis the district court

23   engaged in here and said in this industry, in this

24   market, they are a competitive restraint and so they

25   should have been included in the market.

1              And I think, you know, one way to -- at

2      least I've been able to conceptualize is to take a

3      step back and think of their argument that

4      distributors -- I mean, it's really categorical,

5      right, distributors are never competitors in the

6      market.

7              That can't possibly be right, I don't

8      even think they would defend it.  I mean, if you

9      imagine a situation where Imperial were to enter into

10     a price fixing agreement with Indiana Sugar as a

11     distributor and they agree to fix prices for

12     customers, I mean, the Government would be the first

13     one coming in here and saying, it's a horizontal

14     restraint it's per se liability.

15             The point is the facts matter.  The

16     district court made fact finding here.  That fact

17     finding's not challenged on appeal.

18             THE COURT:  Looking at this case from

19     afar, since Brown Shoe came out in '67, there's been a

20     lot of academic criticism, there's been some judicial

21     criticism.  Is it your view that Brown Shoe should

22     ultimately be put aside for something like the

23     hypothetical monopolist test or not and why?

24             MS. SHERRY:  I don't think it should be

25     put aside, and you know, I'll start with the governing

Page 44

1  Supreme Court law, you know, as the first point --

2           THE COURT:  I know I get that.

3           MS. SHERRY:  -- but even putting that

4  to the side --

5           THE COURT:  I get that.

6           MS. SHERRY:  -- and I -- you know,

7  putting that to the side, putting this Court's

8  decision to the side, it still is part of the

9  analysis.

10          Now, I recognize that there's some idea

11 that you want some more quantification maybe, right,

12 it's a little too vague --

13          THE COURT:  It's the -- one of the

14 basic criticism is it's too mushy.  You --

15          MS. SHERRY:  Right.

16          THE COURT:  -- have a result and you

17 sort of work your way to getting to that desired

18 result.

19          MS. SHERRY:  And I -- so that's the

20 criticism and, you know, maybe some of the factors are

21 more indicative than others and I think the idea of

22 distinct prices and stuff still has some force in

23 this area, but there's other factors that some have

24 thought are a little bit too mushy in that respect.

25 But it's still, you know, the guiding force behind

Page 45

 1   these cases.

 2                   And in instances where there are -- you

 3   know, ways to quantify it, great --

 4                   THE COURT:  My question --

 5                   MS. SHERRY:  -- the Government should

 6   put on --

 7                   THE COURT:  -- to you is if you were

 8   writing this, you're the boss, and you're setting up

 9   the test, would you follow Brown Shoe into the future

10   or not?

11                   MS. SHERRY:  I would.  I would say it

12   still needs to be consistent with commercial

13   realities.  There are different ways to test that.

14   And to the extent there's -- you know, there's ways to

15   quantify it and test it that that informs the

16   analysis.  But whether or not it, you know, that is

17   done and whether it's done in the correct way is up to

18   whoever the plaintiff is and so the Government in this

19   case.

20                   And the problem here is, you know,

21   number one they went forward on the theory underlying

22   Brown Shoe.  They chose to put forward a hypothetical

23   monopolist test to confirm what they said the

24   commercial realities are, but it's the garbage

25   in/garbage out problem.  All they have is Dr. Rothman.

Page 46

1    I mean, that is the hypothetical monopolist test they

2    have.  It has nothing to do with an independent

3    product market like they say now.  I mean, he doesn't

4    do that analysis either.

5              If you look at the -- in the joint

6    appendix at page 555, that is how he describes what he

7    did for the hypothetical monopolist test.  And he says

8    I looked at it in the two markets that the Government

9    identified, the regional markets.  And so this idea of

10   a worldwide hypothetical monopolist like that isn't in

11   the record anywhere.  Nobody did that analysis and

12   nobody should have done the analysis because that's

13   not how the test is designed to work.

14             THE COURT:  So you're suggesting you

15   would leave in place the possibility of testing

16   something under the Brown Shoe factors or testing

17   something under HMT; is that correct?

18             MS. SHERRY:  I wouldn't separate them

19   out.  I mean, to me it's the input.  I think the

20   commercial realities have to be the inputs into the

21   hypothetical monopolist test.  I think that's one way

22   to test it.

23             THE COURT:  But in terms of the test,

24   there could be two tests depending on the commercial

25   realities.

Page 47

1          MS. SHERRY:  I think there can be and I

2    think, you know, it depends on how the plaintiff

3    chooses to put on the case.  I think the Court, you

4    know, made the point in Hershey I believe it was that

5    the parties there agreed that that was the right test

6    and so that's fine, but it's not the only test.  And I

7    think it's important --

8          THE COURT:  Same thing in Hackensack --

9          MS. SHERRY:  -- to leave that open.

10          THE COURT:  -- as well I think.

11          MS. SHERRY:  Yeah.

12          THE COURT:  But so when do commercial

13    realities point to Brown Shoe and when do commercial

14    realities point to the better test being HMT?

15          MS. SHERRY:  Again, I don't think they

16    point to two different tests.  I just think you have

17    to consider --

18          THE COURT:  Well, I mean, you're

19    preparing for a case.

20          MS. SHERRY:  Right.

21          THE COURT:  And you've got certain

22    facts and your client's telling you here's what it is,

23    here's what the Government is suggesting in its

24    complaint and you've got to figure out how do I go

25    about attempting to rebut that because I'm

1 representing the defendant here.  When is it that you

2 would prefer to use HMT and when is it under

3 commercial -- what commercial realities would cause

4 you to say I prefer to go the Brown Shoe factors way?

5                MS. SHERRY:  I think it probably

6 depends on the type of market.  I'm not going to get

7 more nuanced than that because I'm sure I'll mess up,

8 you know, the economics of it all.  But I think are

9 some markets and how they're defined that maybe are

10 more amenable to a hypothetical monopolist test.  I

11 mean, it's the same way that --

12                THE COURT:  Healthcare systems, like

13 healthcare systems.

14                MS. SHERRY:  Yeah, health -- I mean,

15 that's a good example, right.  The test that was

16 discredited with respect to mergers there was in part

17 because of the unique nature of the healthcare market,

18 how it's a two staged market.  And I think that's

19 probably true in other circumstances where it may lend

20 itself to some markets.  There may be other tests that

21 are more appropriate in other markets.  And so I

22 think, you know, someone that's an expert would have a

23 better sense of what test is best suited to figure out

24 what the commercial realities in fact are and make

25 sure you've defined the market.

1                If you look at Dr. Hill's testimony I

2    think he does a nice job sort of explaining the way

3    you go about it and how it's a holistic inquiry and

4    there's qualitative inputs and there's also

5    quantitative inputs to try to figure out --

6                THE COURT:  So if it's healthcare,

7    let's say that the cardio-thoracic specialty is at the

8    Cleveland Clinic and people come from all over the

9    world to go to the Cleveland Clinic as opposed to just

10   the regular hospital.  And you have that type of

11   situation, which test do you think fits better?

12               MS. SHERRY:  I -- again I think it's a

13   little bit of both.  I don't view it and others may

14   disagree --

15               THE COURT:  I realize I'm asking an

16   academic --

17               MS. SHERRY:  -- I don't view it as an

18   either or.

19               THE COURT:  -- question like at a

20   colloquium.

21               MS. SHERRY:  Right.

22               THE COURT:  But I'm trying to get some

23   background as to how counsel goes about thinking about

24   these things and do the academics make the call here

25   or does counsel make the call or what?

1            MS. SHERRY:  I think it's probably a

2    little bit of both, right, that counsel will look at

3    it --

4            THE COURT:  Or I guess in the end it's

5    probably courts --

6            MS. SHERRY:  -- but I think usually and

7    hopefully --

8            THE COURT:  -- relying on both, but.

9            MS. SHERRY:  Yeah.  And hopefully in

10   consultation with an expert, right, an economics

11   expert who can look at the market and see, you know,

12   both what the commercial realities are, which we can

13   all, you know, look at it and see.  But there's more

14   to it.  I know, you know, there's a criticism that

15   it's too mushy.  But you can look at price

16   differentials throughout the country.  Dr. Hill did

17   that here to see whether there's a difference or

18   whether the price, you know, is equalized.

19            And can look at other things along

20   those lines that aren't, you know, strictly the

21   hypothetical monopolist test, but ways to measure

22   whether it makes sense to focus on a regional market

23   for example instead of a national market.

24            And there are things like, you know,

25   transportation costs, convenience factors that comes

Page 51

1   up in the healthcare market a lot, other reasons why -

2   - you know, it's a perishable item.  Reasons why you

3   would define a regional market and I think those are

4   the kind of things that counsel probably on the

5   Government side and on the defense side will look at

6   it in trying to, first, identify the market and then

7   test it to see if they really have it right.

8                   And so I'm not meaning to avoid the

9   question, I just don't want to pretend that I have the

10  expertise to know in a healthcare case or any other

11  case what the right way to go about it is.

12                  I think in a lot of cases, you know,

13  that have come to this court, the parties' have joined

14  issue on the way they've done it, it's been litigated

15  in one way and there wasn't a fight about the test.

16  And I think that's probably true actually in a fair

17  number of cases where there's a lot of evidence,

18  there's a lot of input into what the market should be

19  and the fights tend to be things along the lines of,

20  you know, should this be included, should this be

21  excluded, you have to zoom out a little bit more, what

22  are the arbitrage opportunities and the like.

23                  THE COURT:  Do you foresee a case

24  coming up in the near future where somebody may

25  attempt to take to the Supreme Court the issue of

1    whether Brown Shoe should any longer be used?

2                    MS. SHERRY:  I think it's possible.  I

3    don't know if I think it's likely.  It does seem to be

4    despite the academic criticism accepted enough as at

5    least one thing --

6                    THE COURT:  And some --

7                    MS. SHERRY:  -- you look at.

8                    THE COURT:  -- judicial criticism, for

9    example, the dissent of Judge Kavanaugh, then Judge

10   Kavanaugh.

11                   MS. SHERRY:  There is, although you

12   know, he also recognized, right, that market

13   definition is a necessary predicate and you have to

14   start with that.  And so you can imagine it going up.

15                   I sort of suspect the question would

16   maybe be more whether it's the be all and end all, as

17   opposed to whether you have to consider commercial

18   realities at all.  But, you know, you can imagine it

19   going up.  I don't feel like it's going up any time

20   terribly soon, but I could be wrong about that.

21                   I mean, I think in the antitrust

22   context, right, people's views and economics change.

23   The economic literature changes and the case law at

24   the Supreme Court level tends to develop in reaction to

25   it.  That's the, you know, per se and rule of reason

Page 53

1    cases have kind of developed in that fashion to take

2    into account new, you know, views on economics.  And

3    for lack of a better phrase, commercial realities as

4    we face them today.

5              THE COURT:  It almost looks like

6    colloquially Brown Shoe is kind of in the bull pen

7    and HMT either doesn't seem to work or you have

8    questions about whether it should work, you bring out

9    Brown Shoe.

10             MS. SHERRY:  That might be true.  I

11   mean, I have to say, you know, I think this is not the

12   case honestly to deal with those deeper doctrinal

13   questions, because I just don't think it's presented

14   here.

15             There was no -- I mean, the Government

16   is the one that pushed the commercial realities theory

17   below.  They did layer on the HMT a little bit on top

18   of it, but not with respect to product market

19   exclusively.  And what was their HMT, it was Dr.

20   Rothman, you know, an expert who was found not

21   credible and not persuasive.

22             And so I think there are -- you know,

23   in antitrust law generally there's a lot of really

24   interesting legal and doctrinal issues and the law has

25   developed some in this area.  I just don't think this

Page 54

1    case is one that presents any of those legal issues.

2    It is -- I think it's the Eleventh Circuit case in

3    Englehart that we quoted in our briefs, this is just

4    like any other civil case.  It's just one where the

5    Government failed to meet its burden of proof.  It

6    really is a failure of proof case, plain and simple.

7                    They came in with a theory, they

8    litigated that theory.  They presented evidence on the

9    theory and the trial court just, you know, disagreed

10    on the facts, not as a matter of law, but on the

11    actual facts.

12                    And so I think there will certainly be

13    other cases that will hit on these legal issues.  I

14    don't think this is the one.

15                    THE COURT:  But insofar as the law is

16    concerned, the Court did use the Brown Shoe test.

17                    MS. SHERRY:  Yeah, but -- yes, but

18    didn't ignore the hypothetical monopolist test.  I

19    mean, they sort of suggest that with respect to

20    product market, but again they never presented a

21    hypothetical monopolist test that just focused on

22    product market.  And the Court absolutely talked about

23    the hypothetical monopolist test when it came to

24    geographic market.

25                    The reason it didn't credit that test

Page 55

1    or at least Dr. Rothman's performance of the test was

2    number one, Dr. Rothman himself was not persuasive or

3    credible.  But also number two, because he based his

4    conclusions on the idea that there were no sufficient

5    arbitrage opportunities.  And in extensive factual

6    findings she had found to the contrary.

7              And so in that sense, I don't think

8    it's fair to say that the district court ignored the

9    hypothetical monopolist test or treated it any

10   differently.  It recognized the commercial realities,

11   but it also found that the only test they presented

12   was from an expert who was not credible and who made

13   an arbitrage finding that was inconsistent with the

14   facts at trial.

15             THE COURT:  Okay.  Any further

16   questions?

17             THE COURT:  No.

18             THE COURT:  Thank you very much.

19             MS. SHERRY:  Thank you.

20             THE COURT:  Mr. Bozzo.

21             MR. BOZZO:  Thank you.  I want to talk

22   about some of the practical issues, the commercial

23   realities questions that Your Honors raised and have

24   discussed.

25             THE COURT:  Well, it's critical that

1  you do that because that's where the district court

2  went.

3                 MR. BOZZO:  Yes.  And the critical

4  commercial reality here is the starting point of this

5  case.  This is a merger among refiners, a horizontal

6  merger among competitors that operate at the same

7  level of the supply chain.

8                 That means that under Brown Shoe and

9  under Philadelphia National Bank market definition has

10 to capture the area where the merger's effect on

11 competition will be direct and immediate.  It has to

12 capture competition where competition exists.

13                Here, the competition is at the

14 refining level.  That was the starting point for our

15 product market analysis.  We tested that market using

16 the hypothetical monopolist test and that is the basic

17 commercial reality along with the fact that

18 distributors function as resellers in this industry,

19 not at the refining level, as customers that

20 demonstrates the appropriateness of our approach to

21 product market.

22                The other critical practical point here

23 is that the effect of the district court's failure to

24 follow Allen-Myland, the effect of its requirement

25 that we treat distributors as suppliers, is that even

Page 57

1    a merger to monopoly among sugar refiners could pass

2    muster under Section 7, so long as independent

3    distributors continued to operate after the merger.

4             It's like saying that in a market in

5    which Apple and Samsung compete, Best Buy also

6    competes, adding in that extra layer of the supply

7    chain that it was appropriate for us to exclude.

8             I want to address counsel's discussion

9    of Allen-Myland a little bit because Allen-Myland drew

10   a distinction that is critical here.  It distinguished

11   between the leases of new computers made by leasing

12   companies and leases of used computers.

13            The critical point about used computers

14   was that they were often reconfigured before they were

15   leased out to the market again.  There was an

16   effective increase of supply based on what the leasing

17   companies in that case were doing, with respect to

18   used computers.

19            The pertinent holding of Allen-Myland

20   is its treatment of new computers, computers that

21   were purchased from manufacturers and sold down the

22   supply chain, just as distributors purchase sugar from

23   refiners and resell it.  We think that's where the

24   Court needs to look in identifying the legal error

25   here.

1          I also want to address the geographic

2     market questions a bit.  And in particular, to point

3     to one of the basic errors that the district court

4     made, which was to find that it was simply not

5     credible.

6               THE COURT:  Do we even have to -- if we

7     disagree with you on the product market, do we even

8     have to get to the geographic market?

9               MR. BOZZO:  Yes.  I think even if the

10    Court disagrees with us on product market, we made out

11    a prima facie case in any plausible geographic market

12    based on our evidence of unilateral and coordinated

13    effects.  That evidence shows the effects of this

14    merger on competition, even in a market in which

15    distributors are treated as suppliers.  So we think

16    that the Court does need to reach that issue and that

17    there's reversible error that we did establish a prima

18    facie case regardless of the product market

19    resolution.

20               On the geographic market issue I do

21    want to address the district court's statement that it

22    was simply not credible for our expert to testify that

23    a market consisting of six states was just as relevant

24    a geographic market as the entire United States.

25               We think that that's plain legal error

1  under the Supreme Court's decision in Pabst, which

2  recognized that multiple geographic markets could

3  qualify as relevant markets.  It defined a single

4  state market, a three state market, and the entire

5  country as relevant markets in that case.

6            THE COURT:  But that wasn't your theory

7  at trial, right, in terms of geographic market?

8            MR. BOZZO:  We did put forward two

9  overlapping geographic markets.

10            THE COURT:  But not national?

11            MR. BOZZO:  I'm sorry?

12            THE COURT:  Not national.

13            MR. BOZZO:  We did not put forward a

14  national market.  Defendants did and we think we've

15  proved our prima facie case there as well.

16            And in any event, there's -- this also

17  reflects another misapplication of the hypothetical

18  monopolist test, in that the Court failed to recognize

19  that the test analyzes whether a market is too narrow.

20            THE COURT:  I mean, prima facie case to

21  prove it is what, you have to prove both on product

22  market and on geographic?  How do you prove a prima

23  facie case?

24            MR. BOZZO:  You prove a prima facie

25  case by showing anti-competitive effects in a --

1          THE COURT:  In --

2          MR. BOZZO:  -- relevant market.

3          THE COURT:  -- a relevant market, both

4   product and geographic.

5          MR. BOZZO:  Correct.

6          THE COURT:  Okay.

7          MR. BOZZO:  And we did that both

8   through market shares and market concentration.

9          THE COURT:  That goes back to my

10  question that if you don't prevail on product then

11  isn't the game over?

12         MR. BOZZO:  Well, if we don't prevail

13  on the point that distributor -- that our treatment of

14  distributors was appropriate, we still can prevail

15  because based on unilateral and coordinated effects,

16  we showed anti-competitive effects in any market, even

17  one -- in any plausible market proposed below,

18  including one that does not treat distributors as

19  suppliers.

20         I also want to address just to clarify

21  quickly the treatment of imports.  I heard counsel say

22  that we did not include distributors in our treatment

23  of imports.  But foreign sales, sales by foreign

24  refiners to customers located in the geographic

25  markets, including distributors, were assigned market

Page 61

1    shares.

2              We assigned a 7 percent market share to

3    the imports category that accounts for sales to all

4    customers in the geographic markets, including

5    distributors.

6              THE COURT:  What about foreign sales to

7    distributors in let's say Wyoming?

8              MR. BOZZO:  Those were addressed through

9    the arbitrage analysis which looked at whether sales

10   from out of market customers including distributors to

11   customers in the geographic markets could defeat a

12   substantial price increase.  So we accounted for them

13   in that way and the conclusion again was that they

14   could not defeat a -- our relevant markets.

15             On this arbitrage issue I want to

16   emphasize that the district court did not make a

17   finding on arbitrage.  If you look through its

18   geographic market findings, they relate to sales by

19   refiners from outside of the geographic markets to

20   customers located in them.

21             In footnote 16 of its opinion it says

22   that it's not in its geographic market analysis

23   addressing sales by distributors.  So there's no

24   arbitrage finding in this opinion that would undermine

25   our geographic markets as we put them forward.

1          Unless there are any further questions

2     --

3          THE COURT:  All right.

4          MR. BOZZO:  -- we request that the

5     Court reverse and remand.

6          THE COURT:  Thank you.  Thank you very

7     much to both counsel.  Very well presented arguments

8     and we'd ask that a transcript be prepared of this

9     oral argument and if you would split the cost if you

10    would, please.

11         Thank you for being here and we'll take

12    the matter under advisement.

13    (Proceedings concluded)

14                    * * * * *

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2

3          I, Sheila G. Orms, certify that the

4    foregoing is a correct transcript from the official

5    electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8    Dated:  January 27, 2023

9

10

11

12    Signature of Approved Transcriber

13

14

15

16

17

18

19

20

21

22

23

24

25

| & |
|---|
| **&**   1:15 |

| 1 |
|---|
| **1-888-777-6...** 1:25 |
| **1000**   1:16 |
| **101**   33:25 |
| **10:27**   1:7 |
| **11th**   1:16 |
| **12**   3:25 |
| **16**   61:21 |
| **18**   1:5 |
| **1800**   1:24 |
| **1801**   1:24 |
| **19103**   1:24 |
| **19106**   1:6 |

| 2 |
|---|
| **20**   18:2 |
| **20004**   1:17 |
| **2023**   1:5 63:8 |
| **20530**   1:14 |
| **22**   28:8 |
| **22-2806**   1:3 3:5 |
| **23**   18:13 28:9 28:16,19 |
| **25**   2:4 18:3,10 18:12 38:6 |
| **27**   63:8 |

| 3 |
|---|
| **3**   2:3 |
| **30**   28:18 |
| **31**   18:7,10,12 19:6 27:10 28:13,17,18,22 |

| 34   14:2 |
|---|

| 4 |
|---|
| **4**   24:16 25:1,10 40:12 |
| **4.1.**   25:10 40:13 |
| **411**   25:8 |
| **412**   25:8 |
| **413**   25:8 |
| **43**   25:17 |

| 5 |
|---|
| **50**   26:23 27:6 38:7 |
| **54**   19:8 |
| **55**   2:5 |
| **555**   1:16 46:6 |

| 6 |
|---|
| **601**   1:6 |
| **67**   43:19 |

| 7 |
|---|
| **7**   7:22 30:16,20 57:2 61:2 |
| **75**   35:21 |

| 9 |
|---|
| **930**   28:14 |
| **932**   28:14 |
| **950**   1:13 |

| a |
|---|
| **a.m.**   1:7 |
| **ability**   41:21 42:2,5 |
| **able**   6:12 7:4 8:3 38:10 |

41:22 42:6 43:2
**above**   63:6
**absolutely** 29:15 31:3 38:15 54:22
**abstract**   32:4 40:25
**academic**   43:20 49:16 52:4
**academics** 49:24
**accepted**   27:2 52:4
**account**   21:5,9 21:12 33:19 38:16 53:2
**accounted**   7:18 7:21 15:13,15 16:7,17 20:17 21:2 30:15,19 30:20,25 31:2 38:17 61:12
**accounts**   61:3
**acknowledged** 23:17
**actively**   22:16
**actual**   54:11
**actually**   9:7 36:5 42:20 51:16
**add**   6:9 28:17
**adding**   57:6
**addition**   11:15

**address**   27:7 57:8 58:1,21 60:20
**addressed**   5:17 23:7,11 61:8
**addressing** 61:23
**admit**   31:6
**advisement** 62:12
**afar**   43:19
**affected**   8:8,10
**agree**   22:24 43:11
**agreed**   22:13 47:5
**agreement** 43:10
**al**   1:6 3:5
**aligned**   38:23
**allen**   5:17,17 11:18 12:11 14:21 15:4 16:14,21 23:8 42:9,13,17 56:24 57:9,9 57:19
**alternative** 5:14 16:3,24
**altogether** 23:14
**ambro**   1:9
**amenable** 48:10

**america** 1:3
**ample** 34:1
**analysis** 4:19
4:23 9:4,14
19:4 23:18
40:5 42:18,22
44:9 45:16
46:4,11,12
56:15 61:9,22
**analyzed** 19:15
**analyzes** 4:25
23:5 59:19
**analyzing** 5:5
**anew** 18:15
**answer** 34:6
**answered** 8:24
24:24
**anti** 18:9 59:25
60:16
**antitrust** 1:13
4:18 28:2
52:21 53:23
**appeal** 11:12
27:9 32:3 36:6
43:17
**appeals** 1:1
**appearances**
1:11
**appellant** 1:4
**appellants** 1:12
**appellee** 1:7,15
**appendix** 28:14
32:11 46:6
**apple** 57:5

**application**
10:7,22 12:5,9
12:15,23 14:21
**applied** 9:21,22
16:8 21:25
25:2,12 32:10
34:23 35:1,12
37:4 40:21
**applies** 12:21
22:14 42:12
**apply** 5:3,8,11
5:14 9:3 22:3,9
22:11 23:3,11
23:16 24:12
25:20 32:15
35:7 40:20,25
42:12
**applying** 9:11
23:1,14 24:5
34:22
**appreciate**
13:17,23
**approach**
56:20
**appropriate**
16:15 48:21
57:7 60:14
**appropriaten...**
56:20
**approved** 21:5
21:20 22:16,17
63:12
**arbitrage** 6:7
15:22 32:19
33:19,22 34:1

35:17 38:16,19
51:22 55:5,13
61:9,15,17,24
**arbus** 1:15 26:1
**area** 20:12,12
25:19 28:3
44:23 53:25
56:10
**areas** 41:23
**argue** 26:8
**argument** 1:8
2:2 5:8 19:13
23:15 27:7
31:4 36:9 40:4
43:3 62:9
**arguments**
31:15 62:7
**articulate** 35:7
**aside** 5:14 7:2
19:17 43:22,25
**asked** 17:10
34:7
**asking** 33:12
49:15
**assigned** 7:21
7:22 15:16
16:13,19,20
20:24 60:25
61:2
**assignment**
16:15
**assume** 5:7
28:1 37:13
**assumes** 37:5

**assuming** 9:2
**assumptions**
32:21 38:22
39:1,18
**astray** 14:23
**atlantic** 1:23
**attempt** 51:25
**attempting**
47:25
**authority** 22:1
22:4
**available** 38:10
**ave** 1:13
**avoid** 51:8

**b**

**back** 8:6 11:14
15:9 17:9 20:8
25:22 26:19
27:10,23 31:8
36:1 37:11
43:3 60:9
**background**
49:23
**backwards**
18:18
**bail** 20:4
**ballgame** 19:4
**bank** 56:9
**based** 11:11
12:11 21:3,16
22:18 27:13
29:5 30:11
39:4 55:3
57:16 58:12
60:15

**basic** 14:7 44:14 56:16 58:3

**basically** 15:25 40:15

**basis** 29:20

**beginning** 36:14

**behalf** 26:2

**believe** 10:13 10:15,20,23 12:20 47:4

**belong** 5:22

**best** 48:23 57:5

**better** 30:6 47:14 48:23 49:11 53:3

**big** 20:9 32:19

**biggest** 27:17

**bit** 44:24 49:13 50:2 51:21 53:17 57:9 58:2

**block** 39:10,10 39:12

**boss** 45:8

**bozzo** 1:12 2:3 2:5 3:5,12,13 3:17 4:5,9,12 4:16,22 5:13 6:10 7:12,15 8:9,16 9:9,22 10:6,15,21 11:4,8,11 12:3 12:8,20 13:6

13:10,16,21,25 14:14 15:2,12 16:2 17:13,24 18:21,25 19:5 19:11,25 20:5 20:16 21:11 22:4,11,15 23:2,15,23 24:2,4,15,19,25 25:9,23 55:20 55:21 56:3 58:9 59:8,11 59:13,24 60:2 60:5,7,12 61:8 62:4

**breaking** 28:25

**brief** 18:6,6,6 28:9 33:23

**briefed** 18:25

**briefing** 18:21 18:23 19:13 36:9

**briefs** 28:5,7 54:3

**bring** 53:8

**brings** 3:18

**broad** 20:18

**broaden** 39:12

**brought** 36:16

**brown** 4:15 9:5 9:21,23 17:1 21:25 22:3 23:1,11 31:18 36:3,4,10 43:19,21 45:9

45:22 46:16 47:13 48:4 52:1 53:6,9 54:16 56:8

**bull** 53:6

**burden** 27:20 54:5

**buy** 19:9 41:20 57:5

**buying** 26:12

**c**

**c** 3:1

**california** 20:14

**call** 49:24,25

**called** 15:21 20:10 41:19

**calls** 7:1

**cane** 3:21

**capture** 56:10 56:12

**cardio** 49:7

**care** 14:11 17:11 20:11,14

**cared** 30:3

**cares** 14:8

**case** 1:3 3:3 7:3 9:17 19:16 22:18 24:11 27:13,24 28:25 36:7,16 41:6 42:12 43:18 45:19 47:3,19 51:10,11,23 52:23 53:12

54:1,2,4,6 56:5 57:17 58:11,18 59:5,15,20,23 59:25

**cases** 4:18 17:17 42:3 45:1 51:12,17 53:1 54:13

**categorical** 43:4

**category** 61:3

**cause** 48:3

**certain** 42:18 47:21

**certainly** 54:12

**certification** 63:1

**certify** 63:3

**chain** 13:24 56:7 57:7,22

**challenge** 11:9 11:12

**challenged** 43:17

**challenging** 31:7

**change** 52:22

**changes** 52:23

**chapeau** 25:11

**chooses** 47:3

**chose** 5:8 45:22

**circuit** 1:1,10 17:17 54:2

**circumstance** 37:19

**circumstances**
  42:19,19 48:19
**civil**  54:4
**claim**  30:15
**clarify**  60:20
**clear**  9:4 16:14
  33:13 40:19
**clearly**  10:20
  10:24 11:7
  15:1 22:23
**clerk**  7:1 41:19
**cleveland**  49:8
  49:9
**client's**  47:22
**clinic**  49:8,9
**closing**  36:9
**collectively**
  6:11
**colloquially**
  53:6
**colloquium**
  49:20
**combination**
  34:9
**come**  16:12
  28:20 29:25
  31:8 39:5 49:8
  51:13
**comes**  7:3 8:5
  26:24 28:22
  30:6,7,8 34:1
  38:8 50:25
**coming**  15:8
  18:11 20:8
  27:6 28:24

  43:13 51:24
**command**  17:1
**commercial**
  31:17,24 33:10
  33:17 36:13,15
  38:23,25 39:23
  40:1 45:12,24
  46:20,24 47:12
  47:13 48:3,3
  48:24 50:12
  52:17 53:3,16
  55:10,22 56:4
  56:17
**committed**  31:6
**commodity**
  14:7 20:10
**companies**  5:19
  5:23 57:12,17
**company**  1:23
  20:3,6
**compete**  37:8
  38:11 42:2,5,6
  57:5
**competes**  57:6
**competition**
  3:18 17:2,3,6
  17:7 56:11,12
  56:12,13 58:14
**competitive**
  18:9 42:24
  59:25 60:16
**competitor**
  19:21 42:17
**competitors**
  3:20 32:25

  43:5 56:6
**complaint**  36:7
  47:24
**completely**
  40:19
**components**
  5:1 12:22
**computers**  5:18
  5:20 57:11,12
  57:13,18,20,20
**concentration**
  60:8
**concept**  15:25
**concepts**  39:24
  40:20
**conceptualize**
  43:2
**concerned**
  54:16
**concluded**  16:4
  62:13
**conclusion**
  61:13
**conclusions**
  55:4
**conclusory**
  29:3
**condemns**
  16:22
**confirm**  45:23
**connection**
  19:10
**consider**  39:19
  47:17 52:17

**consideration**
  9:25
**considered**
  8:18 10:25
  14:18
**consigned**
  22:25
**consistency**
  21:17
**consistent**
  31:17 39:25
  45:12
**consisting**
  58:23
**constrained**
  6:11
**consultation**
  50:10
**consume**  3:23
**consumer**  14:9
  14:10
**consumers**  13:9
**consuming**
  13:4
**context**  26:17
  34:25 35:18
  52:22
**continue**  23:12
  35:20
**continued**  57:3
**contracts**  8:19
**contradicted**
  21:10
**contrary**  39:20
  55:6

| | | | |
|---|---|---|---|
| **control** 17:21 | 32:24 36:20 | 29:2,2,4,7,19 | **courts** 50:5 |
| **controlling** | 41:22 50:16 | 31:5,11,18 | **cover** 32:13,14 |
| 8:25 | 59:5 | 32:8 33:2,12 | **credible** 32:9 |
| **controls** 8:15 | **county** 21:21 | 33:21,24 34:6 | 53:21 55:3,12 |
| 37:9 | **couple** 19:5 | 34:11,18,21,23 | 58:5,22 |
| **convenience** | **course** 34:15 | 35:5,7,10,14 | **credit** 54:25 |
| 50:25 | **court** 1:1,23 | 36:1,21,25 | **critical** 55:25 |
| **coordinated** | 3:2,3,8,10,12 | 37:4,4,7,25,25 | 56:3,22 57:10 |
| 19:19,22 58:12 | 3:16 4:2,6,7,11 | 38:13,20 40:3 | 57:13 |
| 60:15 | 4:14,14,15,16 | 40:14 41:9 | **criticism** 43:20 |
| **coordination** | 4:20 5:2,7,8,13 | 42:8,11,22 | 43:21 44:14,20 |
| 20:1 | 6:1,4,13 7:13 | 43:16,18 44:1 | 50:14 52:4,8 |
| **corporation** | 8:5,11,13,17,18 | 44:2,5,13,16 | **cross** 28:15 |
| 1:6 3:5 | 8:21,23 9:1,3,6 | 45:4,7 46:14 | 29:13 41:8 |
| **correct** 4:4,5,8 | 9:13,17,19 | 46:23 47:3,8 | **current** 10:8 |
| 10:6 13:6,13 | 10:4,11,12,16 | 47:10,12,18,21 | 11:4 |
| 18:20,24 19:1 | 10:16,18,21,24 | 48:12 49:6,15 | **customer** 6:25 |
| 23:2,23 30:14 | 11:3,5,10,21 | 49:19,22 50:4 | 7:10 17:8,10 |
| 39:14 45:17 | 12:3,7,16 13:1 | 50:8 51:13,23 | 21:3,16 29:20 |
| 46:17 60:5 | 13:7,7,10,13,20 | 51:25 52:6,8 | 30:11 |
| 63:4 | 13:22 14:1,6 | 52:24 53:5 | **customer's** |
| **correctly** 23:4 | 14:13,16,23,24 | 54:9,15,16,22 | 30:12 |
| **cost** 62:9 | 14:24 15:8,25 | 55:8,15,17,18 | **customers** 3:25 |
| **costs** 32:22 | 17:6,17,23 | 55:20,25 56:1 | 6:2,5 7:19 |
| 36:17,18 39:18 | 18:1,23 19:2,9 | 57:24 58:3,6 | 15:22,24 17:8 |
| 50:25 | 19:9,11,24 | 58:10,16 59:6 | 17:16 18:4 |
| **counsel** 26:3 | 20:2,5,8 21:1,4 | 59:10,12,18,20 | 20:20 23:9 |
| 49:23,25 50:2 | 21:8,20,24,25 | 60:1,3,6,9 61:6 | 34:3 35:19,22 |
| 51:4 60:21 | 22:2,8,12,23,24 | 61:16 62:3,5,6 | 39:11 43:12 |
| 62:7 | 23:3,10,10,17 | **court's** 4:24 | 56:19 60:24 |
| **counsel's** 57:8 | 23:21,25 24:3 | 5:15,16 11:13 | 61:4,10,11,20 |
| **counting** 16:14 | 24:9,17,20,22 | 21:7 44:7 | |
| 16:21 31:1 | 24:23 25:5,7 | 56:23 58:21 | **d** |
| **country** 3:23 | 25:21,24 26:1 | 59:1 | **d** 2:1 3:1 |
| 6:15 20:15 | 26:25 27:16,19 | | **d.c.** 1:14,17 |
| | | | 25:5 |

**dated** 63:8
**day** 3:23
**days** 27:23
**de** 12:6,25
**deal** 22:2 24:21
　53:12
**dealing** 33:4
**decide** 4:20
**decision** 5:17
　10:13 11:13
　22:14 44:8
　59:1
**deeper** 53:12
**defeat** 8:3
　15:19 16:3,9
　32:20 35:18
　61:11,14
**defend** 27:9
　43:8
**defendant** 4:13
　48:1
**defendants**
　3:17 8:19
　16:23 25:16
　26:2 59:14
**defense** 51:5
**define** 39:14
　51:3
**defined** 16:8,10
　19:12 21:4,23
　25:18 26:19
　30:1 37:16
　48:9,25 59:3
**definition** 17:2
　34:12 52:13

56:9
**delineating**
　11:21 34:8
**demand** 7:3
　29:13 41:9,23
**demonstrate**
　22:6
**demonstrates**
　14:22 56:20
**demonstration**
　22:20
**department**
　1:12
**depending**
　46:24
**depends** 47:2
　48:6
**describes** 46:6
**designed** 46:13
**desired** 44:17
**despite** 52:4
**determine**
　12:18 25:4,13
　40:23
**determining**
　25:15
**develop** 52:24
**developed** 53:1
　53:25
**difference**
　29:16 50:17
**different** 19:4,4
　26:21 30:8
　34:21 45:13
　47:16

**differentials**
　50:16
**differently**
　55:10
**direct** 56:11
**directly** 22:4
　30:21
**disagree** 49:14
　58:7
**disagreed**
　36:22,24 54:9
**disagreement**
　19:13
**disagrees** 58:10
**disconnect** 26:6
**discovery**
　27:14 28:6
**discredited**
　34:24 48:16
**discussed** 21:19
　41:12 55:24
**discussion** 57:8
**dispute** 37:3
**dissent** 52:9
**distinct** 31:15
　39:24 40:20
　44:22
**distinction**
　57:10
**distinguished**
　57:10
**distributor**
　6:24 7:6 8:6,7
　15:11 16:16
　17:12 29:16

38:6 43:11
　60:13
**distributor's**
　11:1
**distributors**
　5:21 6:1,4,19
　6:20,23 7:9,17
　7:25 8:9 10:8
　11:17 12:12
　13:8,11,18,24
　14:2,9,18,25
　15:14,18,23
　16:13,18,20,20
　16:25 17:4,7
　17:15,19,22
　18:5,11 19:3
　23:9 26:12,21
　26:24 29:9,11
　30:17 31:3
　32:24 37:7,8
　41:12,20 42:4
　42:16 43:4,5
　56:18,25 57:3
　57:22 58:15
　60:14,18,22,25
　61:5,7,10,23
**district** 8:11,18
　8:23 9:2,13
　10:12,16 11:13
　14:1,15,23
　20:5,25 21:6
　23:10 25:5
　29:2 31:5 32:8
　33:21,24 34:21
　34:23 35:5,14

36:21 37:25
38:12 41:9
42:22 43:16
55:8 56:1,23
58:3,21 61:16
**diversity** 41:16
**division** 1:13
**doctrinal** 53:12
53:24
**doctrine** 31:14
**doesn't** 20:14
46:3
**doing** 9:16
34:16 38:21,24
40:11 57:17
**double** 16:14
16:21 31:1
**dr** 28:15 32:7
33:14,15 36:8
39:6,15,16
45:25 49:1
50:16 53:19
55:1,2
**drew** 57:9

**e**

**e** 2:1 3:1,1
**easily** 27:4
30:17 32:23
36:19
**easy** 35:18
**economic** 36:24
52:23
**economically**
9:15

**economics** 48:8
50:10 52:22
53:2
**effect** 7:7 19:20
24:11 35:3
56:10,23,24
**effective** 57:16
**effectively** 8:20
**effects** 18:9
19:15,19,20,22
58:13,13 59:25
60:15,16
**either** 46:4
49:18 53:7
**elasticity** 29:13
41:9
**electronic** 63:5
**eleventh** 54:2
**eliminate** 29:8
**eliminates** 3:18
**eliminating**
19:20
**elzinga** 34:24
**emphasize**
11:16 36:2,3
61:16
**endorsed** 9:18
**engage** 21:1
**engaged** 42:23
**englehart** 54:3
**enter** 43:9
**entire** 4:25 5:5
8:15 9:12
23:19 26:11
27:13 32:12

58:24 59:4
**entities** 13:18
15:4
**entitled** 63:6
**entity** 20:24
**equal** 28:17
**equalized**
50:18
**equation** 7:8
**erroneous**
10:14,20,24,24
11:7,12 13:14
13:16 15:1
**error** 4:24 5:16
5:25 8:17
11:16 12:10,11
12:13 14:4,21
15:3 21:6 31:6
34:16 35:6
40:4 57:24
58:17,25
**errors** 5:15
10:16 11:14
12:8 35:3 58:3
**esq** 1:12,15
**essentially**
21:25 26:8
**establish** 9:18
58:17
**establishing**
9:24
**et** 1:6 3:5
**event** 34:4
59:16

**evidence** 19:18
21:9,18 28:6
28:11,12 29:1
32:5 37:1
39:20 51:17
54:8 58:12,13
**exact** 26:4
29:18
**exactly** 4:24
5:24 8:16,17
8:23 12:10
20:17,25 21:8
27:18 33:23
39:2
**examination**
28:15
**example** 7:10
39:7,8 41:17
41:24 48:15
50:23 52:9
**examples** 38:9
**except** 32:12
**exclude** 57:7
**excluded** 51:21
**exclusion** 31:20
**exclusively**
53:19
**exercise** 8:23
39:13
**exist** 32:4
**exists** 17:3
56:12
**expedited** 4:4
33:3

expense  36:17
expensive
  32:23
expert  32:7,8
  33:14 35:12,12
  48:22 50:10,11
  53:20 55:12
  58:22
expertise  51:10
experts  11:25
explain  18:18
explained
  33:16
explaining  49:2
explanation
  28:23
explicit  33:25
expressed
  19:13
extensive  55:5
extent  45:14
extra  57:6

**f**

face  53:4
facie  19:16
  58:11,18 59:15
  59:20,23,24
facilities  3:20
fact  12:2 14:5
  17:3,15 18:3
  21:12,15 22:19
  29:4 34:13,23
  35:7 36:15
  40:11 43:16,16
  48:24 56:17

factor  36:12
factors  4:15
  9:21,23 10:2,7
  11:1 36:3,4,10
  37:24 44:20,23
  46:16 48:4
  50:25
facts  4:3 10:18
  11:6 17:14
  26:20 36:25
  41:14 43:15
  47:22 54:10,11
  55:14
factual  10:11
  10:19,23 11:6
  11:22,25 12:5
  12:18,22 14:1
  14:24 31:7
  34:8,10 35:5
  37:2 38:22
  42:5 55:5
factually  13:14
  13:16
failed  8:25 9:13
  10:25 21:1
  54:5 59:18
failing  11:17
  12:14 14:4
  23:4 25:20
fails  15:3 24:3
failure  12:12
  13:17 21:15
  23:8 54:6
  56:23

fair  14:14
  51:16 55:8
fall  27:10
false  32:21
familiar  4:2
fare  42:16
fashion  53:1
features  7:16
feel  52:19
felt  33:5
fight  51:15
fights  51:19
figure  28:16,19
  47:24 48:23
  49:5
figures  28:17
finally  27:25
find  24:11 58:4
finding  14:1,15
  14:25 18:3
  34:1 41:10
  43:16 55:13
  61:17,24
finding's  43:17
findings  10:12
  10:17,19 11:6
  11:12 12:5
  20:6 31:7
  33:22 35:6
  37:2 38:19
  42:6 55:6
  61:18
fine  3:16 24:22
  47:6

firms  19:22
  37:6
first  9:9 18:19
  19:1 23:12
  28:7 43:12
  44:1 51:6
fits  49:11
five  29:6
fix  43:11
fixing  43:10
flawed  33:16
flow  32:23 39:4
flowing  36:19
focus  18:1
  29:11 30:1
  36:14 38:5
  50:22
focused  18:19
  27:15 30:11
  31:12 33:24
  37:7 38:1
  54:21
follow  45:9
  56:24
food  3:22
footnote  61:21
force  44:22,25
forego  23:14
foregoing  63:4
foreign  7:15,18
  7:19 15:13,15
  16:7 60:23,23
  61:6
foresee  51:23

| | | | |
|---|---|---|---|
| **forgot** 41:18 | 20:18,18,23 | **going** 7:2 15:10 | **h** |
| **form** 23:6 | 21:13 23:5,13 | 17:9,14 27:21 | |
| **forward** 9:17 | 23:22 24:7 | 27:23 30:21 | **hackensack** |
| 9:23 22:18 | 25:3,13,19 | 31:25 32:19,19 | 21:5,19 22:6,9 |
| 45:21,22 59:8 | 26:17,18 34:5 | 36:1 38:24 | 25:14 31:19 |
| 59:13 61:25 | 34:14 35:16 | 39:5,11,11,13 | 47:8 |
| **found** 32:9 | 37:15 38:4 | 40:16,16,18 | **half** 5:4 9:11 |
| 53:20 55:6,11 | 40:18,22 41:3 | 48:6 52:14,19 | 23:17 35:1 |
| **freeman** 1:9 | 54:24 58:1,8 | 52:19 | **hand** 40:17 |
| **friend** 34:7 | 58:11,20,24 | **good** 14:12,13 | **hang** 13:1 |
| 42:8 | 59:2,7,9,22 | 17:10 25:25 | **happen** 39:11 |
| **ftc** 25:5 | 60:4,24 61:4 | 48:15 | **happened** |
| **function** 56:18 | 61:11,18,19,22 | **governing** | 12:10 |
| **functioning** | 61:25 | 43:25 | **happy** 6:25 |
| 5:21 | **geographical** | **government** | **health** 48:14 |
| **further** 25:21 | 35:23 | 4:9 9:16 11:19 | **healthcare** |
| 55:15 62:1 | **geography** 40:5 | 18:15 22:17,18 | 48:12,13,17 |
| **future** 45:9 | **georgia** 20:11 | 27:2 33:5,20 | 49:6 51:1,10 |
| 51:24 | 27:21 | 36:5,25 37:16 | **heard** 60:21 |
| | **getting** 44:17 | 38:18 43:12 | **heinz** 6:24 7:4 |
| **g** | **given** 9:23 | 45:5,18 46:8 | 7:10 20:9,10 |
| | **global** 37:9,12 | 47:23 51:5 | 20:13,22 29:12 |
| **g** 3:1 63:3 | **globally** 37:7 | 53:15 54:5 | **held** 5:19 13:10 |
| **game** 60:11 | 38:1 | **government's** | **helps** 42:14 |
| **garbage** 38:20 | **go** 7:5 22:16 | 38:14 39:16,17 | **hershey** 5:5 |
| 38:21 39:21,21 | 24:11 27:3,12 | **great** 45:3 | 8:18 9:4 10:10 |
| 45:24,25 | 31:14 35:19,24 | **group** 25:2,12 | 12:4,6 22:5,8 |
| **generally** 37:22 | 39:11 40:16 | 40:21 | 25:14 31:19 |
| 53:23 | 47:24 48:4 | **guess** 8:13 9:1 | 34:12,20,21 |
| **geographic** | 49:3,9 51:11 | 29:7,21 50:4 | 47:4 |
| 4:19 5:1,3,10 | **god** 7:4 | **guidelines** | **high** 7:3 |
| 6:22 7:20 8:1 | **goes** 11:14 | 24:10,15 25:15 | **higher** 19:8 |
| 10:5 11:22 | 19:20,22 39:10 | 26:5,15 40:10 | **hill** 33:14 50:16 |
| 12:4,21 15:14 | 49:23 60:9 | **guiding** 44:25 | **hill's** 28:15 |
| 15:23,24 16:3 | | | 49:1 |
| 16:6 18:17,19 | | | |
| 18:25 19:14 | | | |

**hit** 54:13
**hm** 40:9
**hmt** 5:9 9:3
22:2,9,11
23:14,16 31:12
36:2 38:14,21
38:23,25 39:3
40:4,11 46:17
47:14 48:2
53:7,17,19
**hogarty** 34:24
**holding** 16:12
57:19
**holistic** 49:3
**honestly** 53:12
**honorables** 1:9
**honors** 25:25
55:23
**hopefully** 50:7
50:9
**horizontal** 26:5
40:9 43:13
56:5
**hospital** 49:10
**hospitals** 21:22
**household** 3:25
**households**
3:23
**hypothesis**
31:23
**hypothesize**
8:22
**hypothetical**
4:7,10,17,21
5:15 7:25 8:10

8:14 10:22
11:15 12:13
14:22 16:9
21:10 22:19
23:3 25:2,11
26:6,14 31:9
31:21,22 32:3
32:6,10,25
33:4,15 34:22
35:8,15 36:11
36:23 37:5,6,9
37:12,21 38:22
40:21 41:1,1
43:23 45:22
46:1,7,10,21
48:10 50:21
54:18,21,23
55:9 56:16
59:17

**i**

**idea** 28:13
29:12 31:8
38:5 39:4
44:10,21 46:9
55:4
**identified** 8:17
30:10 46:9
**identify** 51:6
**identifying**
57:24
**ignore** 17:4
54:18
**ignored** 55:8
**ignores** 17:1

**imagine** 26:9
26:10 43:9
52:14,18
**immediate**
56:11
**imperial** 19:20
20:2,6 43:9
**import** 13:17
14:5
**importance** 5:3
23:17
**important** 4:17
4:18 13:24
47:7
**imports** 7:22
26:23,24 27:7
30:15,16,18,21
30:23 38:1,5,8
60:21,23 61:3
**imposed** 8:2
32:16
**imposition** 8:20
**incentives**
19:25 30:8
**include** 19:3
21:13 42:20
60:22
**included** 7:8
20:19 30:4
42:25 51:20
**including** 15:22
21:21 60:18,25
61:4,10
**inconsistent**
33:17 55:13

**incorporated**
3:22
**increase** 3:24
5:24 6:3 8:2,4
8:21 13:19
15:5,17,20
34:5 57:16
61:12
**increased**
15:10 19:23
37:23
**independent**
19:21 23:7
33:14 46:2
57:2
**independently**
33:7
**indiana** 30:22
43:10
**indicated** 4:16
**indicates** 7:24
**indicative**
44:21
**indicia** 5:12
**indiscernible**
39:6
**industry** 42:23
56:18
**informs** 45:15
**input** 39:3
46:19 51:18
**inputs** 46:20
49:4,5
**inquiry** 49:3

inside  15:14,24
insofar  54:15
instances  45:2
interchangea...
  41:8
interchangea...
  29:15
interesting
  53:24
intermediate
  14:11
involved  12:4
irrelevant  10:2
  11:1
issue  4:21
  10:23 22:15
  31:2 32:19
  51:14,25 58:16
  58:20 61:15
issues  16:12
  53:24 54:1,13
  55:22
item  51:2
i'm  49:15

**j**

ja52  41:10
ja545  32:13
january  1:5
  63:8
job  49:2
joined  51:13
joint  28:14
  32:11 46:5
judge  6:14 7:7
  8:6 13:23 15:9

17:9 18:2 52:9
  52:9
judges  1:10 3:2
judicial  43:20
  52:8
justice  1:13
justification
  9:16

**k**

kavanaugh
  52:9,10
keep  6:25 15:8
  17:9 27:20
  39:13
keeps  42:8
kind  12:10 21:4
  21:4 27:22
  36:12 38:20
  39:13 51:4
  53:1,6
know  6:16
  19:24 22:1
  27:8 28:19
  29:4,6 30:5
  31:8,14,15
  32:6,14,16
  33:20,21 34:11
  34:16,20 38:4
  38:9,17 39:9
  39:19,24 41:1
  41:13 42:3,15
  43:1,25 44:1,2
  44:6,20,25
  45:3,14,16,20
  47:2,4 48:8,22

50:11,13,14,14
50:18,20,24
51:2,10,12,20
52:3,12,18,25
53:2,11,20,22
54:9

**l**

lack  30:5 53:3
large  5:18
  41:20
larger  20:12
  27:21
largest  3:19
late  28:10,25
latham  1:15
law  7:1 12:1
  24:11 34:15
  36:23 40:8
  41:19 44:1
  52:23 53:23,24
  54:10,15
layer  53:17
  57:6
layperson's
  6:17
leading  27:14
leased  5:19
  57:15
leases  5:22
  57:11,12
leasing  5:19,23
  57:11,16
leave  46:15
  47:9

left  26:3 31:3
legal  8:24
  10:16 11:14
  12:5,9,19,23
  14:4 15:3
  17:14 21:18
  31:6 34:9,16
  35:3,6 40:4
  53:24 54:1,13
  57:24 58:25
legally  9:15
  10:23 11:12
  22:22
lend  48:19
level  6:12,14,18
  52:24 56:7,14
  56:19
liability  43:14
lies  4:25
likely  52:3
line  17:17
  38:25
lines  29:6 50:20
  51:19
literally  28:16
literature
  52:23
litigated  51:14
  54:8
little  18:13
  44:12,24 49:13
  50:2 51:21
  53:17 57:9
located  7:19
  15:14,23 20:20

20:20,22 21:14
60:24 61:20
**location** 21:3
21:16
**locations** 35:23
**logically** 28:2
**long** 17:16 57:2
**longer** 52:1
**look** 14:15 18:7
23:13 26:16,20
28:9,12,16
29:19,21 30:12
31:9 32:10
34:2,3 36:7,7,8
36:17 39:6,19
40:24 41:2,4,5
42:15 46:5
49:1 50:2,11
50:13,15,19
51:5 52:7
57:24 61:17
**looked** 15:21
25:14 46:8
61:9
**looking** 6:16
10:2,6 18:14
24:17 25:7
35:12 43:18
**looks** 53:5
**lot** 41:14 42:14
43:20 51:1,12
51:17,18 53:23
**lots** 26:21

**m**

**m** 1:12
**machines** 5:24
**made** 9:4 10:12
10:16 14:16,24
18:2 20:5 25:6
27:8 35:5 41:9
43:16 47:4
55:12 57:11
58:4,10
**magic** 38:24
**mainframe**
5:18
**make** 14:1
22:14 33:22
48:24 49:24,25
61:16
**makes** 5:6
16:14 50:22
**making** 20:25
22:5
**manufacturers**
5:21 57:21
**market** 1:6,24
4:19,23,25 5:1
5:3,5,9,10,18
5:23 6:22 7:21
7:22 9:3,11,12
9:14,18,24
10:5,5,13
11:22,24 12:4
12:18,21 13:2
13:3 14:18,20
15:1,16 16:6
16:13,15,19,25

17:2,5,16 18:4
18:7,17,19
19:1,6,7,7,10
19:15,18 20:24
21:20,22,23
23:12,13,18,19
25:4,13,18
26:9,16,17,18
27:1,4,17,22
29:13 30:1,11
31:4,24 34:2,3
34:7,8,12,14,14
35:9,16,19
36:18 37:17,24
38:5,7,14
39:12,14,25
40:6,17,18,23
40:25 41:5,7
41:12 42:2,16
42:21,24,25
43:6 46:3 48:6
48:17,18,25
50:11,22,23
51:1,3,6,18
52:12 53:18
54:20,22,24
56:9,15,15,21
57:4,15 58:2,7
58:8,10,11,14
58:18,20,23,24
59:4,4,7,14,19
59:22 60:2,3,8
60:8,16,17,25
61:2,10,18,22

**markets** 7:20
8:1 13:12
15:15,23,24
16:4,8,10 19:8
19:12 20:18,18
20:19,21,23
21:3,3,13,17
22:17,21 23:5
23:22 24:7,14
26:21,23 27:9
27:14 30:16,22
30:23 31:16
32:5 34:5
35:23 37:15
38:11 39:16
41:3 42:7 46:8
46:9 48:9,20
48:21 59:2,3,5
59:9 60:25
61:4,11,14,19
61:25
**match** 24:13
**matter** 30:13
34:9,10 43:15
54:10 62:12
63:6
**matters** 12:1,2
**mean** 6:13,16
11:25 17:9
18:14 20:13
22:9 27:5,13
29:10,11 31:16
31:21 32:25
33:22 34:11
35:5 36:5 39:3

39:15 40:8,9
43:4,8,12 46:1
46:3,19 47:18
48:11,14 52:21
53:11,15 54:19
59:20
**meaning** 51:8
**means** 9:24,25
11:18 22:7,21
56:8
**measure** 50:21
**meet** 54:5
**melissa** 1:15
26:1
**members** 30:4
30:6 41:25
**mentioned** 4:19
7:16 11:9
27:11 38:6
**merger** 3:17,24
26:5 34:25
40:9 56:5,6
57:1,3 58:14
**merger's** 56:10
**mergers** 48:16
**merging** 8:19
**mess** 48:7
**methodology**
28:22 32:14
**mid** 1:23
**middleman**
14:11
**milk** 39:8,9,10
**minute** 9:19,20

**minutes** 3:14
**misapplication**
4:24 9:10
10:10 12:24
23:6,7,20
25:19 59:17
**misapplying**
12:11
**misunderstan...**
21:16
**mix** 24:13
**monopolist** 4:7
4:12,17,21
5:16 7:25 8:2
8:11,14,22,25
10:9,22,25
11:15 12:14
14:22 16:9
17:20 22:19
23:3 25:2,11
26:7,10,14
31:9,21,22
32:3,6,10 33:1
33:4,15 34:22
35:8,15 36:11
36:23 37:5,6,9
37:13,22 40:21
41:2 43:23
45:23 46:1,7
46:10,21 48:10
50:21 54:18,21
54:23 55:9
56:16 59:18
**monopoly** 57:1

**morning** 3:4
25:25
**move** 41:22
**multiple** 59:2
**mushy** 44:14
44:24 50:15
**muster** 57:2
**myland** 5:17,17
11:18 12:11
14:21 15:4
16:14,21 23:8
42:9,13,17
56:24 57:9,9
57:19

**n**

**n** 2:1 3:1
**n.w.** 1:13,16
**narrow** 59:19
**narrowest**
18:16
**national** 1:23
18:4,7 19:7
27:1,3,4 50:23
56:9 59:10,12
59:14
**nationally**
20:13
**nature** 48:17
**near** 51:24
**necessarily**
6:15 39:25
**necessary**
23:16 52:13
**need** 8:22 17:20
26:8 42:20

58:16
**needed** 20:3
33:6
**needs** 24:24
45:12 57:24
**neither** 35:11
**never** 40:7,8
43:5 54:20
**new** 5:19,24 6:9
53:2 57:11,20
**nice** 49:2
**noreika** 7:7
18:2
**notated** 3:2
**note** 16:11
**novo** 12:6,25
**nuanced** 42:18
48:7
**number** 32:4
45:21 51:17
55:2,3
**numbers** 28:20

**o**

**o** 3:1
**obligation**
41:24
**obviously** 6:17
**official** 63:4
**okay** 11:6
12:16 18:16
19:2 23:14
27:20,25 40:16
55:15 60:6
**ones** 26:19

**open** 47:9
**opening** 18:6
**operate** 3:20
    21:17 56:6
    57:3
**operates** 5:5
    23:19 24:6
    25:16,18
**opinion** 21:7
    61:21,24
**opportunities**
    6:8 34:2 35:17
    51:22 55:5
**opposed** 49:9
    52:17
**opted** 23:11
**option** 9:6 23:1
**options** 26:22
**oral** 62:9
**order** 34:3
**orms** 63:3
**outside** 6:16,21
    15:10,23 20:15
    21:2,22 26:22
    27:3 30:23
    34:2,3 35:19
    35:23 61:19
**overlapping**
    59:9
**own** 10:1 26:15
**owns** 37:6

**p**

**p** 3:1
**pa** 1:6,24

**pabst** 59:1
**page** 2:2 25:17
    28:14 46:6
**pages** 28:8,13
    28:15 32:13
**paragraph**
    14:1 33:25
**part** 8:22 17:5
    25:1,9 40:11
    44:8 48:16
**participants**
    14:20,25
**particular** 42:7
    58:2
**parties** 8:20
    47:5 51:13
**pass** 32:6 38:14
    57:1
**passed** 22:19
**pause** 3:7,9,11
**paying** 17:22
**pen** 53:6
**pennsylvania**
    1:13
**people** 22:12,13
    49:8
**people's** 52:22
**percent** 7:22
    18:3,7,10,11,12
    19:6,8 26:23
    27:6,10 28:13
    28:17,22 30:16
    30:21 35:21
    38:6,7 61:2

**percentage**
    27:17
**performance**
    55:1
**perishable** 51:2
**permissible**
    11:19 15:6
**perspective**
    30:12
**persuasive** 32:9
    53:21 55:2
**pertinent** 57:19
**peter** 1:12 3:13
**philadelphia**
    1:6,24 56:9
**phrase** 53:3
**pick** 35:24
**picture** 19:3
    20:9
**place** 26:4
    46:15
**plain** 54:6
    58:25
**plaintiff** 45:18
    47:2
**plausible** 58:11
    60:17
**play** 14:2 37:24
**played** 4:18
**please** 3:12
    26:1 62:10
**plenary** 34:19
**plus** 20:12
    27:21

**point** 6:13,14
    22:5 25:6,16
    26:4 28:11,12
    33:18 42:3
    43:15 44:1
    47:4,13,14,16
    56:4,14,22
    57:13 58:2
    60:13
**points** 11:15
    19:5
**porter** 1:9
    17:10
**porter's** 6:14
    8:6 15:9
**posit** 8:25
    10:25 17:20
**position** 15:2
    40:9
**possibility**
    46:15
**possible** 10:9
    52:2
**possibly** 31:5
    37:8 43:7
**post** 18:21,23
    28:5,7 36:9
**potentially**
    7:17 17:24
**practical** 5:11
    6:17 16:12
    18:2 37:21
    55:22 56:22
**practically**
    7:13

precisely 21:5 21:22
predicate 52:13
prefer 48:2,4
premise 36:15
prepared 62:8
preparing 33:2 47:19
present 22:2
presented 4:6,9 53:13 54:8,20 55:11 62:7
presents 54:1
presumption 18:8 29:5
pretend 51:9
pretty 4:2
prevail 60:10 60:12,14
prevented 8:20
previously 13:14
price 8:2,3,21 14:12,13 15:17 15:19 17:11 34:4 37:23 39:10 43:10 50:15,18 61:12
prices 3:24 17:22 43:11 44:22
pricing 8:8,10
prima 19:16 58:11,17 59:15 59:20,22,24

primarily 33:5
principle 15:4
principles 12:5 12:9,23,24 21:19
probably 7:1 9:7,8 20:13 48:5,19 50:1,5 51:4,16
problem 28:4 28:10,24 29:24 31:1 32:2 39:21 45:20,25
proceedings 62:13 63:5
process 33:3
producer 7:7 17:12
producers 6:19 6:20,21,23 7:9 13:3,8 14:9 17:7 18:11 20:19
product 4:11 4:23 5:1,9 6:3 6:9 8:7 9:3,14 10:5,13 11:24 12:18 13:2,2,3 14:6,8,18,20,25 15:6 17:5 19:10 20:9 23:5,11,22 24:7 25:18 26:9,16 29:13 29:16,18 34:7

34:8,13 35:9 40:5,17,25 41:5,6 46:3 53:18 54:20,22 56:15,21 58:7 58:10,18 59:21 60:4,10
production 13:3 29:25 30:2,3,7,9 37:10
products 3:22 25:3,12 40:22
prohibitive 36:19
prohibitively 32:23
proof 54:5,6
properly 19:12 33:19
proposed 16:23 19:8 37:15 38:14 60:17
proposition 24:12
prove 59:21,21 59:22,24
proved 41:14 59:15
proven 32:21
provided 21:21
providing 9:15
proving 22:21
purchase 6:12 14:3 30:17,18

34:4 35:20 57:22
purchased 5:20 20:23 57:21
purport 40:4
purpose 31:22
purposes 29:12
push 37:11
pushed 53:16
put 7:1,2 9:16 9:23 22:18 43:22,25 45:6 45:22 47:3 59:8,13 61:25
putting 5:14 19:17 44:3,7,7

**q**

qualify 59:3
qualitative 49:4
quantification 32:16 44:11
quantify 45:3 45:15
quantitative 49:5
quantities 41:20
question 8:6,24 10:19 14:19,19 15:9 17:14 21:17,18 24:23 29:12 34:7,13 37:20 39:3 45:4 49:19

51:9 52:15
60:10
**questions** 13:23
17:9 24:5
25:21 26:20
31:14 53:8,13
55:16,23 58:2
62:1
**quickly** 60:21
**quite** 34:20
**quoted** 26:13
54:3

**r**

**r** 3:1
**rag** 25:5
**raised** 55:23
**rather** 36:25
**raw** 3:21
**reach** 23:25
24:4 58:16
**reaction** 52:24
**read** 32:13,15
40:10,11
**ready** 3:10
**real** 32:25
**realities** 31:17
31:24 33:11,18
36:15 38:23,25
39:24 40:1
45:13,24 46:20
46:25 47:13,14
48:3,24 50:12
52:18 53:3,16
55:10,23

**reality** 36:14
56:4,17
**realize** 49:15
**really** 6:25 8:5
8:8 17:11
20:11 29:5
30:2,13 31:4
32:14,18 34:11
37:20 43:4
51:7 53:23
54:6
**reason** 22:22
30:1 42:1
52:25 54:25
**reasonable**
14:16 41:7
**reasonably**
29:14
**reasons** 41:11
51:1,2
**rebut** 33:6
47:25
**rebuttal** 3:15
24:21 25:22
**receiving** 15:16
**recognition**
24:6
**recognize**
11:17 12:12,14
14:4 21:15
23:4,8 25:16
44:10 59:18
**recognized**
29:2 38:17
52:12 55:10

59:2
**recognizing** 5:4
9:12 23:18
**reconfigured**
57:14
**record** 28:11
28:20,21 39:20
46:11
**recording** 63:5
**reference** 4:22
5:2 9:14
**referenced** 19:6
**referring** 42:8
**refined** 3:21
13:4 14:3,8,17
20:10,11 26:24
27:6 29:15,17
29:17 34:4
38:7
**refiner** 7:19
21:13,14 26:11
26:13 29:17
37:14
**refineries** 3:20
**refiners** 3:19
6:2,5,6 16:18
16:19,24,25
17:4,16 21:2
23:9 42:7 56:5
57:1,23 60:24
61:19
**refining** 6:12
6:14 37:14
56:14,19

**reflect** 7:22
15:3 17:2
**reflecting**
17:20
**reflects** 59:17
**regarding** 23:8
**regardless**
19:14,21 20:23
58:18
**region** 1:23
25:3,13 40:22
**regional** 26:19
26:21,22 27:9
27:13 30:22,23
35:23 36:18
37:15 38:4,11
41:3 46:9
50:22 51:3
**regular** 49:10
**rejection** 10:1
**relate** 61:18
**relationships**
17:18,19
**relevant** 5:22
6:3 7:20 8:1
9:18 10:7 11:1
13:12 15:6,14
17:14 22:16
25:4,13 40:23
58:23 59:3,5
60:2,3 61:14
**reliance** 32:2
**rely** 15:19
**relying** 50:8

remand 62:5
reply 18:6
  33:23
reporting 1:23
representing
  48:1
request 62:4
required 38:17
requirement
  56:24
requirements
  7:5
resale 17:25
resales 16:20
resell 14:3
  57:23
resellers 6:2
  11:18 12:13
  13:18 15:5
  41:13,15 42:4
  56:18
reserve 3:14
residents 21:21
resolution
  58:19
respect 5:15
  13:15 17:8
  30:7 35:1,8
  36:13 39:18
  40:5 41:10,18
  44:24 48:16
  53:18 54:19
  57:17
respond 19:22

responding
  17:15
response 25:17
  38:18
responses 9:9
restraint 42:17
  42:24 43:14
result 39:5
  44:16,18
reversable
  12:25
reverse 62:5
reversible
  58:17
review 12:6
  34:19
reviewable
  12:25
riding 33:1
right 5:10 6:5
  8:8 12:2,7 13:2
  13:5 18:12
  20:16 24:20
  25:21 29:12,13
  29:21,24 30:15
  31:23,25 34:21
  37:21 38:21,25
  39:2 40:11,12
  43:5,7 44:11
  44:15 47:5,20
  48:15 49:21
  50:2,10 51:7
  51:11 52:12,22
  59:7 62:3

role 4:17,18
  11:17 13:18
  14:2
rothman 32:7
  33:15 39:15,16
  45:25 53:20
  55:2
rothman's 36:8
  39:6 55:1
rule 12:17,21
  52:25

## s

s 3:1
sake 5:8 7:4
sale 13:4
sales 7:23 10:8
  11:4 15:13,22
  16:5,16,18,24
  17:4,8 18:3
  20:25 30:3,6
  30:11,24 60:23
  60:23 61:3,6,9
  61:18,23
samsung 57:5
satisfied 37:18
save 28:25
saving 41:18
saying 9:20
  17:10 27:2,12
  28:2,5 34:12
  35:10 38:13
  43:13 57:4
says 22:1 24:12
  25:1 31:18
  32:18 33:20

40:15 46:7
  61:21
scale 5:18
se 43:14 52:25
second 3:3
section 24:16
  25:1,10,10
  40:12 57:2
see 31:25 32:15
  37:23 42:15
  50:11,13,17
  51:7
seem 4:20 27:8
  52:3 53:7
seems 18:15
sell 6:19 30:24
  41:24
selling 6:24
  7:10
sense 6:8 48:23
  50:22 55:7
sentence 25:1
sentences 28:8
separate 14:19
  33:14 40:19
  46:18
services 21:20
setting 3:8 45:8
seven 3:14
share 61:2
shares 7:21,22
  15:16 16:13,15
  16:19 17:1
  19:6,7,18
  20:24 60:8

61:1
**sheila** 63:3
**sherry** 1:15 2:4
  3:6 25:24,25
  26:1 27:5,18
  28:1,4 29:10
  29:23 31:13
  33:8,13 34:10
  34:19 35:11
  36:4 37:11
  38:3,15 39:2
  40:7,15 42:10
  42:13 43:24
  44:3,6,15,19
  45:5,11 46:18
  47:1,9,11,15,20
  48:5,14 49:12
  49:17,21 50:1
  50:6,9 52:2,7
  52:11 53:10
  54:17 55:19
**shoe** 4:15 9:5
  9:21,23 21:25
  22:3 23:1,11
  31:18 36:3,4
  36:10 43:19,21
  45:9,22 46:16
  47:13 48:4
  52:1 53:6,9
  54:16 56:8
**shoe's** 17:1
**show** 42:6
**showed** 60:16
**showing** 59:25

**shows** 26:5
  28:21 42:14
  58:13
**side** 5:3 44:4,7
  44:8 51:5,5
**sides** 4:6 12:15
**signature** 63:12
**simple** 54:6
**simply** 6:2 58:4
  58:22
**single** 26:12
  37:6,14 59:3
**situation** 41:2
  43:9 49:11
**six** 58:23
**smallest** 27:17
**sold** 7:19 17:21
  20:20 21:2
  29:17,17 35:22
  57:21
**solely** 6:5
**somebody**
  51:24
**soon** 52:20
**sorry** 22:13
  24:9 59:11
**sort** 7:1 16:21
  33:18 35:2
  44:17 49:2
  52:15 54:19
**sound** 63:5
**sounds** 6:22
  13:23
**source** 7:17
  15:19 16:3

**sources** 21:6
**southeast** 20:13
  30:24 35:22
**southeast's**
  3:19
**southeastern**
  27:21
**specialty** 49:7
**speculative** 7:2
  41:19
**split** 62:9
**ssnip** 32:16,20
  35:18
**staged** 48:18
**standing** 5:9
**stands** 37:2
**staple** 3:25
**start** 10:18
  26:3 33:7,9,10
  43:25 52:14
**starting** 56:4
  56:14
**starts** 32:13
**state** 59:4,4
**statement** 29:3
  58:21
**states** 1:1,3,6
  1:12 3:4,4,13
  4:1 6:7 15:10
  58:23,24
**status** 12:12
**step** 43:3
**stick** 11:3,5
**stiftung** 25:6

**stopped** 23:12
**storage** 7:2
  41:18,19
**store** 41:21,21
**strange** 36:6
**street** 1:6,16,24
**strictly** 50:20
**struggling** 20:3
  20:6
**stuck** 26:12
  27:22
**stuff** 44:22
**subject** 8:1
  15:18 34:16
**substantial** 8:2
  8:21 61:12
**substitutability**
  16:1
**substitutes**
  14:17 29:14
**subtracted**
  16:25
**sufficient** 9:18
  9:24 16:5 22:6
  22:21,24 32:20
  55:4
**sugar** 1:6 3:4
  3:19,21,22 6:6
  6:20 7:17,18
  7:20 13:4 14:3
  14:8,12,17
  16:24 17:21
  20:10,11 21:2
  26:24 27:6
  29:15,17,17

32:23 34:4
35:20,21,24
36:19 37:9,14
38:7 39:4
41:22,25 43:10
57:1,22
**sugars** 30:22
**suggest** 54:19
**suggested** 13:2
  13:7 37:17
**suggesting**
  46:14 47:23
**suggestion**
  26:25
**suite** 1:16,24
**suited** 48:23
**supplier** 29:22
**suppliers** 11:20
  13:11 15:7
  17:18 26:22
  38:9 56:25
  58:15 60:19
**supply** 5:24 6:3
  6:11 7:4,15,18
  13:19 15:5,9
  15:15,16,18
  16:7 20:19
  21:13 29:24
  41:17 56:7
  57:6,16,22
**support** 10:12
  28:12 29:1
  36:12
**supposed** 29:4
  39:7

**supreme** 17:17
  44:1 51:25
  52:24 59:1
**sure** 24:19,25
  48:7,25
**suspect** 52:15
**switch** 42:15
**systems** 48:12
  48:13

**t**

**take** 3:8,21
  43:2 51:25
  53:1 62:11
**takes** 18:12
**talk** 20:12 22:9
  29:23 35:14
  38:1 40:10,16
  40:18 55:21
**talked** 13:13
  41:16 54:22
**talking** 10:4
  14:7,10 26:9
  41:5
**telling** 47:22
**tend** 51:19
**tends** 52:24
**tenor** 13:22
**terms** 7:5 8:8
  8:10 10:1,9
  17:21,24 37:22
  46:23 59:7
**terribly** 52:20
**test** 4:23,25,25
  5:4,14,16 7:25
  8:11 9:10,12

9:14,17 10:3
10:22 11:22
12:14,18,22
14:22 16:9
21:24 22:6,20
22:20,25 23:3
23:4,19 24:5
25:2,11,15,17
26:7,14 31:9
31:21,22,23,25
32:4,6,11,15
33:1,4,15,16
34:22,23,24
35:1,2,8,15
36:12,23 37:5
37:13,18,22
39:17,22 40:1
40:21,25 41:6
43:23 45:9,13
45:15,23 46:1
46:7,13,21,22
46:23 47:5,6
47:14 48:10,15
48:23 49:11
50:21 51:7,15
54:16,18,21,23
54:25 55:1,9
55:11 56:16
59:18,19
**test's** 5:2 10:7
  12:14 23:17
**tested** 56:15
**testify** 12:1
  58:22

**testifying** 12:1
  12:2
**testimony** 29:6
  36:8 49:1
**testing** 23:19
  24:7 25:18
  46:15,16
**tests** 9:12 46:24
  47:16 48:20
**thank** 25:23
  55:18,19,21
  62:6,6,11
**themes** 36:2
**theory** 4:7,12
  4:21 22:2 26:6
  28:25 36:24
  45:21 53:16
  54:7,8,9 59:6
**thing** 30:14
  36:6 38:12,21
  47:8 52:5
**things** 49:24
  50:19,24 51:4
  51:19
**think** 9:10
  11:14,23 12:10
  14:4,14 17:13
  17:19 18:5,13
  18:19 19:11
  22:5 27:12
  31:24 32:12,18
  32:24 33:8,10
  35:6,21 38:15
  38:16 39:5,23
  41:4 42:13

43:1,3,8,24
44:21 46:19,21
47:1,2,3,7,10
47:15,16 48:5
48:8,18,22
49:2,11,12
50:1,6 51:3,12
51:16 52:2,3
52:21 53:11,13
53:22,25 54:2
54:12,14 55:7
57:23 58:9,15
58:25 59:14
**thinking** 5:10
49:23
**third** 1:1 8:19
17:17 36:12
**thoracic** 49:7
**thought** 21:1,9
33:3,6,9 44:24
**threatens** 3:24
**three** 28:8,13
28:15 30:4
59:4
**time** 3:8 28:7
52:19
**today** 53:4
**together** 3:18
23:5 24:8 25:3
25:12 35:13
40:22
**took** 6:1 39:16
39:17
**top** 53:17

**totally** 31:15
**transcriber**
63:12
**transcript** 29:6
32:11,12 62:8
63:4
**transform** 3:21
**transportation**
32:22 36:17,18
39:18 50:25
**treat** 11:19
15:6 56:25
60:18
**treated** 13:11
17:18 55:9
58:15
**treatment**
57:20 60:13,21
60:22
**trial** 4:3,4
18:18,21,23
28:5,6,7 31:11
32:22 33:3
36:2,9 37:1
54:9 55:14
59:7
**tried** 27:13
35:6
**true** 8:13 13:25
19:17 34:13
40:2 48:19
51:16 53:10
**try** 28:25 29:8
49:5

**trying** 6:23
18:5,8,16
27:16 29:21
37:23 49:22
51:6
**two** 3:19,20 9:9
28:8,17 30:22
31:15 33:18
35:12 39:24
40:19 46:8,24
47:16 48:18
55:3 59:8
**type** 20:3 21:23
48:6 49:10

## u

**ultimately** 7:9
27:2 43:22
**umbrella** 25:1
25:9
**under** 5:16
7:24 8:10 10:3
10:9,10 11:18
12:13 17:21
31:9 46:16,17
48:2 56:8,9
57:2 59:1
62:12
**underlying**
45:21
**undermine**
16:5 61:24
**understand** 4:3
**unfulfilled** 7:5
**unilateral**
19:19,19 58:12

60:15
**unique** 48:17
**united** 1:1,3,6
1:12 3:4,4,13
6:6 15:10 30:3
30:5,5,7 41:23
41:24 58:24
**use** 9:5 22:25
23:21,22 31:25
36:11 48:2
54:16
**used** 32:14 52:1
57:12,13,18
**using** 9:17
56:15
**usually** 50:6

## v

**v** 25:5
**vague** 44:12
**valid** 5:11 9:15
22:22
**veritext** 1:23
**versus** 3:4
**vertical** 17:19
**view** 19:14
31:15 43:21
49:13,17
**viewpoint**
29:20,22
**views** 10:17,21
52:22 53:2
**vs** 1:5

| w | | |
|---|---|---|
| **wait** 9:19,19 | **win** 27:3 28:1 | **year** 41:25 |
| **want** 6:25 | **wondering** 9:1 | **z** |
|   11:16 14:12 | **word** 30:6 | **zoom** 37:16 |
|   26:3 27:7 |   37:12 |   51:21 |
|   29:23 44:11 | **words** 42:11 | |
|   51:9 55:21 | **work** 35:16 | |
|   57:8 58:1,21 |   37:13 38:24 | |
|   60:20 61:15 |   39:7 44:17 | |
| **wants** 9:8 |   46:13 53:7,8 | |
|   17:10 | **working** 18:17 | |
| **washington** | **works** 26:14 | |
|   1:14,17 | **world** 6:7 8:15 | |
| **watkins** 1:15 |   26:11 49:9 | |
| **way** 5:4 11:23 | **worldwide** | |
|   12:17 14:14 |   26:10 37:17 | |
|   15:13 16:8,8 |   41:1 46:10 | |
|   16:16 23:18 | **worry** 30:18 | |
|   25:20 31:22 | **writing** 12:17 | |
|   40:1 41:4 43:1 |   45:8 | |
|   44:17 45:17 | **wrong** 7:11,14 | |
|   46:21 48:4,11 |   8:12,24,24 | |
|   49:2 51:11,14 |   28:2 34:15 | |
|   51:15 61:13 |   39:5 52:20 | |
| **ways** 45:3,13 | **wyoming** 61:7 | |
|   45:14 50:21 | x | |
| **we've** 11:21,23 | **x** 2:1 27:25 | |
|   19:13 30:15 |   28:1 | |
|   41:11 59:14 | y | |
| **welfare** 14:10 | **y** 27:25 | |
| **went** 4:15 8:11 | **yeah** 11:10 | |
|   8:24 14:23 |   24:22 34:18 | |
|   45:21 56:2 |   40:7,14 47:11 | |
| **whatsoever** |   48:14 50:9 | |
|   28:23 |   54:17 | |

# CERTIFICATE OF ACCURACY

I am liaison counsel in this matter and hereby certify that, with the corrections submitted by all counsel made, the transcript of oral argument is accurate.

Dated:  February 1, 2023              Respectfully submitted,

*/s/ Charles S. Dameron*
Charles S. Dameron
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200
charles.dameron@lw.com

*Counsel for United States Sugar Corporation*